## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SOFT SURROUNDINGS HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 23-90769 (CML) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION TO OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDERS, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. Relief is requested not later than 1:30 p.m. (prevailing Central Time) on September 12, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on September 12, 2023, at 1:30 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge López's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge López's homepage. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information**

---

[1]   The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Soft Surroundings Holdings, LLC (2218); Soft Surroundings Intermediate Holdings, LLC (6696); Triad Catalog Co., L.L.C. (3313); and Triad Retail, L.L.C. (2728).  The Debtors' service address is 1100 N. Lindbergh Blvd., St. Louis, MO 63132.

> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge López's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully submit this motion (this "Motion")[2] seeking approval of postpetition debtor-in-possession financing and authority to use cash collateral.  In support of this Motion, the Debtors submit: (a) the *Declaration of Curt Kroll in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Kroll Declaration"), filed contemporaneously herewith; (b) the *Declaration of Matthew Arden in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed R. Bankr. P. 2002, 4001 and 9014  (I) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to Prepetition Secured Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing,*

---

[2]    A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Curt Kroll, Chief Restructuring Officer of Soft Surroundings Holdings, LLC in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on September 10, 2023 (the "Petition Date"), which is incorporated herein by reference.

*and (VII) Granting Related Relief* (the "Arden Declaration"), filed contemporaneously herewith; and (c) the First Day Declaration.  In further support of this Motion, the Debtors respectfully state the following:[3]

**Preliminary Statement**

1.      The Debtors commenced these chapter 11 cases with a restructuring support agreement (the "Restructuring Support Agreement") supported by 100% of the pre-petition secured lenders as well as 100% of the holders of the Debtors' outstanding equity interests.  The Restructuring Support Agreement contemplates the transfer of the Debtors' direct to consumer business to a strategic acquirer and the subsequent wind-down of the Debtors' brick and mortar locations through a plan of reorganization.

2.      In July 2023, it became clear that the Debtors required immediate access to bridge financing to secure additional runway to facilitate an organized chapter 11 filing and to support the continuation of their marketing process.  The only lender that was willing to provide critical bridge financing was 1903 Partners, LLC ("Lender"), which provided emergency bridge financing in the form of a $17 million facility, of which $14.7 million was drawn by the Debtors before the Petition Date (the "1903P Loan").  In connection with the Restructuring Support Agreement, the Debtors secured the Lender's commitment to provide the proposed $18 million superpriority senior secured debtor-in-possession financing facility documented by the DIP Financing Documents (the "DIP Facility").

3.      The Debtors, with the assistance of their proposed investment banker, SSG Capital Advisors, LLC ("SSG"), solicited interest from the market for other financing proposals, but there

---

[3]      Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration, the DIP Financing Documents, or the Interim Order (each as defined herein), as applicable.

were no viable alternatives.  Accordingly, the Debtors seek approval of the DIP Facility to fund the administration of these chapter 11 cases, to stabilize and maintain their operations, and to pursue consummation of the value-maximizing transaction that will preserve the Soft Surroundings brand, as set forth in the Restructuring Support Agreement.

4.      As described in the Kroll Declaration, the Debtors have an immediate need for liquidity, having commenced these chapter 11 cases with less than $750,000 of cash on hand. Absent the DIP Facility and the immediate access to liquidity that it provides, as well as the use of Cash Collateral, the Debtors would have no ability to continue operations and the value of their assets and business would be severely diminished to the detriment of all stakeholders.  If approved, the Debtors will use the proceeds of the DIP Facility to, among other things, repay certain pre-petition obligations, fund general working capital, and fund operational expenses and restructuring expenses of the Debtors, all in accordance with the initial 13-week budget, a copy of which is attached to the Interim Order as Exhibit 2 (the "Budget").

5.      The proposed DIP Facility will provide the Debtors with $18 million of available financing for use during the chapter 11 cases in accordance with the Budget.  Additionally, the DIP Facility provides for the consensual use of the cash collateral (the "Cash Collateral") of the Agent, Lender, and Second Lien Lender (collectively, the "Prepetition Secured Parties") in accordance with the Budget.  The proposed DIP Facility contains a "roll-up" of the 1903P Loan issued to the Debtors shortly before the filing of the chapter 11 cases.  Specifically, the roll-up provides for a "creeping roll-up" of the 1903P Loan through the entry of the Final Order, at which time all remaining outstanding 1903P Loan obligations (other than the Specified Pre-Petition Obligations) will convert to DIP Obligations.  The 1903P Loan provided critical, emergency financing that allowed the Debtors to avoid an immediate "free fall" chapter 11 filing and instead enter these chapter 11 cases in a smooth and organized manner with the support represented by the Restructuring Support Agreement.  The DIP

Facility is the culmination of extensive prepetition negotiations between the Debtors and the Lender, and is the only actionable proposal that the Debtors received.

6.      Thus, for the reasons set forth herein, in the First Day Declaration, the Kroll Declaration, and the Arden Declaration, the Debtors believe that approval of the DIP Facility will maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders and is a sound exercise of the Debtors' business judgment.  The DIP Facility is central to the Debtors' success in these chapter 11 cases and the efforts to conduct a value-maximizing restructuring.  Accordingly, the Debtors respectfully request that the Court approve the relief requested herein and enter an interim order substantially in the form attached hereto (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders").

## Jurisdiction and Venue

7.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* (the "Complex Case Procedures").

**Relief Requested**

10.     The Debtors seek entry of the Interim Order and the Final Order:[4]

(a)     authorizing Triad Catalog Co., L.L.C. ("Catalog"); and Triad Retail, L.L.C. d/b/a Soft Surroundings ("OpCo"), each as debtor and debtor-in-possession, individually a "Borrower" and collectively, "Borrowers") to obtain, and for Soft Surroundings Holdings, LLC ("HoldCo") and Soft Surroundings Intermediate Holdings, LLC ("Intermediate HoldCo"), each as debtor and debtor-in-possession, individually a "Guarantor" and collectively, "Guarantors") to guarantee, unconditionally, on a joint and several basis, post-petition financing on the terms and conditions set forth in the Pre-Petition Credit Agreement, as ratified and amended and restated by that certain Ratification and Amendment Agreement dated as of the DIP Facility Closing Date (the "Ratification Agreement"), a copy of which is attached as Exhibit 1 to the Interim Order, consisting of:

      (i)     $17 million upon the Court's entry of an Interim Order approving the DIP Facility and satisfaction of other conditions in the DIP Financing Documents;

      (ii)     $18 million upon the Court's entry of the Final Order upon satisfaction of the conditions set forth in the DIP Financing Documents; and

      (iii)     "roll-up" term loans up to $14.7 million, whereby Prepetition First Lien Obligations (other than the Specified Pre-Petition Obligations) shall be converted into Revolving DIP Loans on a dollar for dollar basis;

(b)     approving the terms of, and authorizing the Debtors party thereto to execute and deliver, the DIP Credit Agreement and any other agreements, instruments and documents related thereto (collectively, the "DIP Financing Documents"), and to perform such other acts as may be necessary or desirable in connection with the DIP Financing Documents;

(c)     authorizing the Debtors to execute and deliver the DIP Financing Documents, to incur all obligations owing thereunder (collectively, the "DIP Obligations"), grant the Agent, for the benefit of itself and Lender, an allowed superpriority administrative claim, subject to the Carve-Out (as defined in the Interim Order) and otherwise perform all of their respective obligations under the DIP Financing Documents;

(d)     granting to the Agent, for the benefit of itself and Lender valid and perfected first-priority security interests and liens, superior to all other liens, claims or security

---

[4]     To the extent there is any conflict between the descriptions and definitions in this Motion and the DIP Orders or DIP Financing Documents, then the DIP Orders or DIP Financing Documents, as applicable, will control.

interests that any creditor of any of the Debtors' estates may have (but subject to the Carve-Out and the Permitted Liens), in and upon all of the DIP Collateral;

(e)     authorization for the Debtors to use the proceeds of the DIP Facility in accordance with the Budget, subject to permitted variances as set forth in the DIP Credit Agreement, and as otherwise provided herein and in the other DIP Financing Documents;

(f)     authorization for the Debtors to use Cash Collateral in accordance with the terms of the Interim Order, the Budget, and the DIP Financing Documents;

(g)     granting to Agent, for the benefit of itself and Lender, and the Second Lien Lender, the adequate protection as provided in the Interim Order to protect against any diminution in value of such parties' interests in the Pre-Petition First Lien Collateral and the Pre-Petition Second Lien Collateral, respectively;

(h)     modifying the automatic stay of section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent set forth in the Interim Order solely to the extent necessary to permit Agent and Lender to perform any act authorized or permitted under or by virtue of the Interim Order or the DIP Financing Documents, as applicable;

(i)     authorizing payment of certain fees and expenses;

(j)     waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order and providing for the immediate effectiveness of the Interim Order;

(k)     scheduling a final hearing (the "Final Hearing") to consider the relief requested herein on a final basis and approving the form of notice with respect to the Final Hearing; and

(l)     granting related relief.

### Concise Statement of the Material Terms of the Interim Order Pursuant to Bankruptcy Rule 4001 and the Procedures for Complex Cases in the United States Bankruptcy Court for the Southern District of Texas

11.     The following chart contains a summary of the material terms of the proposed

Interim Order, together with references to the applicable sections of the Interim Order and other

relevant source documents, including the DIP Credit Agreement, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures.[5]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Triad Catalog Co., L.L.C.<br>Triad Retail, L.L.C.<br>*See* DIP Credit Agreement, Preamble. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Soft Surroundings Holdings, LLC<br>Soft Surroundings Intermediate Holdings, LLC<br>*See* DIP Credit Agreement, Preamble. |
| **Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | 1903P Loan Agent, LLC, as agent for Lender<br>*See* DIP Credit Agreement, Preamble. |
| **Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | 1903 Partners, LLC, as Lender<br>*See* DIP Credit Agreement, Preamble. |

---

[5]   This summary is intended only to assist the Court by reference to the DIP Financing Documents and the Interim Order, and is qualified in its entirety by the terms of the DIP Financing Documents, each as may be modified by the Interim Order.  Capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Financing Documents or the Interim Order, as applicable.

| | |
|---|---|
| **Maturity Date**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | Borrowings shall be repaid in full and in cash, and the commitments shall terminate, on the earliest to occur of the following:<br><br>(a)  December 1, 2023 (the "Stated Maturity Date"),<br><br>(b)  thirty (30) days after the entry of the Interim Financing Order if the Final Financing Order has not been entered prior to the expiration of such thirty (30) day period,<br><br>(c)  the date of the entry of an order by the Bankruptcy Court confirming a Chapter 11 Plan,<br><br>(d)  the date of the sale of all or a substantial part of the business of any Loan Party or all or substantially all of the assets of any Loan Party,<br><br>(e)  without Agent's prior written consent, the date of filing or express written support by the Loan Parties of bidding procedures, 363 sale processes or transactions (or such similar sale processes or transactions), plans of liquidation or reorganization or related disclosure statements or supplemental materials that are not in accordance with the RSA, if applicable, and that are not otherwise satisfactory to Agent,<br><br>(f)  the date of any breach by Loan Parties or any other party thereto of any of the terms of the RSA, or the termination of the RSA after the effectiveness thereof,<br><br>(g)  the date the Loan Parties' file a motion seeking to convert any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code,<br><br>(h)  the date of conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code,<br><br>(i)  the appointment or election of a trustee under Chapter 11 of the Bankruptcy Code, or an examiner or responsible officer with enlarged powers relating to the operation of the Loan Parties' business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106 of the Bankruptcy Code,<br><br>(j)  the date any Loan Party files a motion seeking a termination or dismissal of any Chapter 11 Case,<br><br>(k)  the date Agent sends a Carve Out Trigger Notice, or<br><br>(l)  the date of dismissal of any Chapter 11 Case.<br><br>*See* DIP Credit Agreement § 1.1. |
| **DIP Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility consists of a senior secured, super-priority, debtor-in-possession revolving credit facility with a maximum principal amount of $18 million (the "Maximum Credit"), to be funded as follows:<br><br>(a)  $17 million upon the Court's entry of an Interim Order approving the DIP Facility and satisfaction of other conditions in the DIP Financing Documents;<br><br>(b)  $18 million upon the Court's entry of the Final Order upon satisfaction of the conditions set forth in the DIP Financing Documents; and<br><br>(c)  "roll-up" term loans up to $14.7 million, whereby Prepetition First Lien Obligations (other than Specified Pre-Petition Obligations) shall be converted into Revolving DIP Loans on a dollar for dollar basis.<br><br>*See* DIP Credit Agreement; Interim Order ¶¶ 1.2, 1.4, and 1.5. |

| | |
|---|---|
| **Conditions of Borrowing**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The DIP Orders and DIP Financing Documents include standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of the Lenders to provide the DIP Facility.<br><br>*See* DIP Credit Agreement, § 4. |
| **Interest Rates**<br>Bankruptcy Rule<br>4001(c)(1)(B) | All amounts outstanding under the DIP Facility will bear interest at the rate of Term SOFR (subject to a 3.00% floor) + 12.00% for SOFR Loans and the Base Rate + 11.00% for Base Rate Loans.<br><br>Upon the occurrence and during the continuance of an Event of Default, upon the election of the Agent, the Loans shall bear interest at an additional 2.00% per annum, and any overdue amounts shall bear interest at the applicable non-default interest rate otherwise applicable to Base Rate Loans plus an additional 2.00% per annum.  Default interest shall be payable on demand.<br><br>*See* DIP Credit Agreement, § 3.1. |
| **Use of DIP Facility and Cash Collateral**<br>Bankruptcy Rule<br>4001(b)(l)(B)(ii) | The proceeds of the DIP Facility will be used in accordance with the terms of the Budget, including:<br><br>(a)   to repay obligations of Borrowers under the Pre-Petition Credit Facility in accordance with the Financing Orders and to repay or discharge other debt as set forth in the Financing Orders,<br><br>(b)   to pay costs, expenses and fees in connection with the DIP Facility and the Pre-Petition Credit Facility incurred during the Chapter 11 Cases in accordance with the terms of the Financing Orders and in the amounts set forth in the Budget,<br><br>(c)   to make adequate protection payments to the Pre-Petition Agent and Pre-Petition Lender, in each case in accordance with the Financing Orders and the Budget, and<br><br>(d)   for working capital, capital expenditures and other general corporate purposes of Borrowers (including allowed administrative expenses incurred during the Chapter 11 Cases), in each case only in accordance with the applicable Budget.<br><br>Loan Parties shall not be permitted to use the proceeds of the DIP Facility in contravention of the terms of the DIP Credit Agreement, the applicable Financing Order or the Bankruptcy Code, including any restrictions or limitations on the use of proceeds contained therein.  In addition, Borrowers may not use the proceeds of the DIP Facility to pay any obligations that are not included in the then applicable Budget without the written consent of Agent.<br><br>In addition, proceeds of Loans shall not be used by the Loan Parties to affirmatively commence or support, or to pay any professional fees incurred in connection with, any adversary proceeding, motion or other action that seeks to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of the Liens of Agent or Pre-Petition Agent, or claims and rights under the Pre-Petition Credit Facility; provided, that, in the Chapter 11 Cases, the Carve-Out and such collateral proceeds and Loan proceeds may be used for allowed fees and expenses in an amount not to exceed the amount set forth in any Financing Order<br><br>*See* DIP Credit Agreement, § 8.13. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule<br>4001(b)(l)(B)(i) | Agent and Lender.<br><br>*See* Interim Order, ¶ F(iii). |

| | |
|---|---|
| **Carve-Out**<br>Bankruptcy Rule 4001(c)(1)(B) | The Interim Order provides a "Carve-Out" of certain statutory fees and allowed professional fees of the Debtors and any Committee appointed in the Cases pursuant to sections 328 or 1103 of the Bankruptcy Code, and a Post-Carve-Out Trigger Notice Cap of $200,000.00, all as detailed in the Interim Order.<br><br>*See* Interim Order, ¶ 2.3(a). |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility includes the following fees:<br><br>(a)  Monitoring Fee.   Borrowers shall pay to Agent, for its own account, an annual monitoring fee in an amount equal to $60,000, which fee shall be payable in cash in monthly installments of $5,000 on the first day of each calendar month during the term of the DIP Facility, with the last payment in the amount of the remaining balance payable on the Maturity Date, except, that, notwithstanding the foregoing, if earlier, the full then remaining amount of such fee shall be due and payable on the Termination Date.<br><br>(b)  Closing Fee.  Borrowers shall pay to Agent for the account of Lender a closing fee in an amount equal to one percent (1.00%) of the Maximum Credit, which fee shall be fully earned by Lender on the DIP Facility Closing Date and payable in full in cash on such date.<br><br>(c)  Agency Fee.  Borrowers shall pay to Agent for the account of Agent an agency fee in an amount equal to one percent (1.00%) of the Maximum Credit, which fee shall be fully earned by Agent on the DIP Facility Closing Date and payable in full in cash on such date.<br><br>(d)  Alternate Sale Transaction Fee.  In the event that any Loan Party or Sponsor or any Affiliate of any Loan Party or Sponsor at any time consummates any transaction that results in, directly or indirectly, the sale  or other disposition of the business and operations of some or all of the assets or equity interests in any Loan Party, whether pursuant to a Chapter 11 Plan, a sale under Section 363 of the Bankruptcy Code or otherwise to any Person or Persons other than Lender or parties approved by Agent on terms satisfactory to Agent (in each case any such transaction being referred to herein as the "Alternate Sale Transaction"),  immediately upon the consummation of such Alternate Sale Transaction, Borrowers shall pay to Lender a fee in the amount equal to three percent (3.00%) of the total consideration payable to Loan Parties or any Affiliate in connection with any such Alternate Sale Transaction (the "Alternate Sale Transaction Fee").<br><br>(e)  Alternate Debt Transaction Fee.  In the event that any Loan Party obtains financing in connection with the Chapter 11 Cases without 1903P Loan Agent, LLC or its designee acting as agent and 1903 Partners LLC or its designee as lender (any such transaction, an "Alternate Debt Transaction"), then immediately upon the consummation of such Alternate Debt Transaction, Borrowers shall pay to Lender a fee in the amount equal to the sum of the Closing Fee and the Agency Fee (or two percent (2.00%) of the Maximum Credit) that would have otherwise been payable (the "Alternate Debt Transaction Fee").<br><br>*See* DIP Credit Agreement, § 3.3 and definition of "Fee Letter", § 1.1. |

| | |
|---|---|
| **Budget and Reporting**<br>Bankruptcy Rule<br>4001(c)(1)(B)<br><br>**Variance Covenant**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The proceeds from the DIP Facility are subject to the Budget, a summary of which is attached as Exhibit 2 to the Interim Order.  The initial Budget sets forth projected receipts, disbursements, net cash flow, net sales, Eligible Credit Card Receivables, Eligible Inventory, payable float, Loan balances and availability for the immediately following consecutive 13 weeks, set forth on a weekly basis for Borrowers, including the anticipated uses of the DIP Facility for such period.  The Budget shall be updated in accordance with the terms of the DIP Credit Agreement and the Interim Order, but in any event shall be updated by Borrowers not less than weekly.<br><br>Three (3) Business Days after the end of each calendar week following the week of the DIP Facility Closing Date, Borrowers shall deliver to Agent commencing on the Wednesday of the second full calendar week following the Petition Date a Budget Compliance Certificate attaching a Budget Variance Report for the prior week and for the period from the commencement of the initial Budget to the end of the prior week.<br><br>Commencing on the fourth calendar week following the Petition Date (and including the week in which the Petition Date occurs as the first week for such purpose), Borrowers shall not permit:<br><br>(a)   the total aggregate disbursements (excluding disbursements for professional fees and expenses paid or paid into escrow) during any DIP Measurement Period to exceed the aggregate amount for such disbursements for such DIP Measurement Period in the applicable Budget by more than ten percent (10.0%),<br><br>(b)   the total aggregate disbursements for professional fees and expenses paid or paid into escrow during any DIP Measurement Period to exceed the aggregate amount for such disbursements for such DIP Measurement Period in the applicable Budget by more than ten percent (10.0%),<br><br>(c)   the total aggregate inventory receipts during any DIP Measurement Period to be less than eighty-five percent (85%) of the aggregate amount thereof for such DIP Measurement Period in the applicable Budget,<br><br>(d)   the total aggregate sales receipts during any DIP Measurement Period to be more than ten percent (10%) less than the aggregate amount thereof for such DIP Measurement Period in the applicable Budget,<br><br>(e)   as of the Saturday of every third calendar week following the Petition Date (and including the week in which the Petition Date occurs as the first week of such three-week period), the Excess Availability to be more than ten percent (10.0%) less than the amount thereof as of such time in the Budget, or<br><br>(f)   the Loan balance under the DIP Facility (together with any then outstanding loans under the Pre-Petition Credit Facility) as of the Saturday of any week to exceed the amount thereof as of such time in the Budget by more than ten percent (10.0%) of such amount in the Budget.<br><br>*See* Interim Order ¶ B.(iv); DIP Credit Agreement, §§ 6.28, 7.19. |

| | |
|---|---|
| **Chapter 11 Milestones**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Financing Documents contain the following chapter 11 milestones:<br><br>(a)  On or before September 12, 2023, the Bankruptcy Court shall have entered an order in form and substance satisfactory to Agent approving (i) the assumption of the Consulting Agreement by and between certain Debtors and Gordon Brothers Retail Partners, LLC; and (ii) the conduct of closings or similarly themed sales and the procedures; (iii) and the procedures and actions necessary or desirable to conduct such sales at the closing stores (the "Store Closing Motion");<br><br>(b)  On or before September 12, 2023, Loan Parties shall have filed with the Bankruptcy Court a motion in form and substance satisfactory to Agent seeking conditional approval of (i) a Disclosure Statement with respect to an Acceptable Plan of Reorganization in form and substance acceptable to Agent; and (ii) the solicitation materials in form and substance acceptable to Agent related to an Acceptable Plan of Reorganization (such materials, collectively, the "Solicitation Materials");<br><br>(c)  On or before September 25, 2023, the Bankruptcy Court shall have entered an order in form and substance satisfactory to Agent conditionally approving (i) the Disclosure Statement with respect to an Acceptable Plan of Reorganization; and (ii) the Solicitation Materials;<br><br>(d)  On or before October 2, 2023, the Bankruptcy Court shall have entered (i) the Final Financing Order and (ii) the Final Store Closing Order, in form and substance satisfactory to Agent;<br><br>(e)  On or before November 3, 2023, the Bankruptcy Court shall have entered a final order in form and substance satisfactory to Agent (i) confirming an Acceptable Plan of Reorganization, and (ii) approving the Sale Transaction and Agency Agreement (as defined in the RSA);<br><br>(f)  On or before November 3, 2023, the Debtors shall have entered into the Agency Agreement (as defined in the RSA); and<br><br>(g)  On or before November 6, the Sale Transaction shall have closed, Lender shall have received repayment in full of the Obligations (including any Pre-Petition Obligations then outstanding, except as Agent may otherwise agree with respect to the Specified Pre-Petition Obligations) and the DIP Credit Facility shall terminate.<br><br>*See* DIP Credit Agreement, § 7.16 and Schedule 7.16. |
| **Limitations on Challenges**<br>Bankruptcy Rule 4001(c)(l)(B) | Any action, claim, defense, complaint, motion or other written opposition (an "Objection") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind: (a) the existence, validity or amount of the Pre-Petition First Lien Obligations and the Pre-Petition Second Lien Obligations as of the<br><br>Petition Date, or (b) the extent, legality, validity, perfection or enforceability of (i) Agent's and Lender's pre-petition liens and security interests in the Pre-Petition First Lien Collateral and (ii) the Second Lien Lender's pre-petition liens and security interests in the Pre-Petition Second Lien Collateral shall be properly filed with the Court on or before the earlier of (x) sixty (60) calendar days from the date of appointment of the Committee by the U.S. Trustee, (y) seventy-five (75) calendar days from the Petition Date, or (z) the first date on which a hearing for confirmation of a Plan of Reorganization is held.<br><br>*See* Interim Order ¶ 4.1. |

| | |
|---|---|
| **Liens and Priorities**<br>Bankruptcy Rule<br>4001(c)(l)(B)(i) | The liens and security interests of Agent and Lender granted under the DIP Financing Documents and the Interim Order in the DIP Collateral securing all DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with §§ 363, 364 or any other section of the Bankruptcy Code or other applicable law; provided, however, that Agent's and Lender's liens on and security interests in the DIP Collateral shall be subject only to (a) Permitted Liens, and (b) the Carve-Out. |
| | For all DIP Obligations now existing or hereafter arising pursuant to the Interim Order, the DIP Financing Documents or otherwise, Agent, for the benefit of itself and Lender, is granted an allowed superpriority administrative claim pursuant to § 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtors (other than the Carve-Out), whether now in existence or hereafter incurred by Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113 or 1114 of the Bankruptcy Code (other than the Carve-Out), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof. |
| | Prior to entry of the Final Order, DIP Collateral shall not include proceeds of Avoidance Actions. |
| | *See* Interim Order ¶¶ 2.1 and 2.2. |
| **Adequate Protection**<br>Bankruptcy Rules<br>4001(b)(l)(B)(iv),<br>4001(c)(1)(B)(ii) | The adequate protection provided to the Agent and the Lenders shall be in accordance with the Interim Order.<br>*See* Interim Order ¶ 2.6(b). |
| **Events of Default**<br>Bankruptcy Rule<br>4001(c)(l)(B) | The DIP Credit Agreement contains events of default that are usual and customary for debtor-in-possession financings, including without limitation, failure to comply with the Budget (subject to the permitted variances) and failure to satisfy any of the Milestones.<br>*See* DIP Credit Agreement § 10.1. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule<br>4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order.<br>*See* Interim Order ¶ 3.4. |

| Indemnification<br>Bankruptcy Rule<br>4001(c)(1)(B)(ix) | Each of the Loan Parties shall be obligated to indemnify and hold harmless the Agent and the Lender, and their respective officers, directors, agents, employees, advisors and counsel and their respective Affiliates (each such person being an "Indemnitee"), harmless from and against any and all losses, claims, damages, penalties, liabilities, costs or expenses (including the fees, charges and disbursements of any counsel for any Indemnitee in connection with the execution or delivery of the DIP Credit Agreement, any other Loan Document, any Pre-Petition Loan Document, any Financing Order, Chapter 11 Plan or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the transactions contemplated thereby, or the monitoring of compliance by any Loan Party and its Subsidiaries with the terms of the Loan Documents, and any refinancing of the DIP Facility or any "exit financing" requested by or on behalf of the Loan Parties in connection with the Chapter 11 Cases, Successor Cases or the Chapter 11 Plan (whether or not the transactions contemplated hereby or thereby shall be consummated).<br><br>*See* DIP Credit Agreement § 12.5. |

## **Statement Regarding Significant Provisions**

12.     The DIP Orders contain certain of the provisions (the "Significant Provisions")[6]

identified in paragraph 8 of the Complex Case Procedures as set forth below:

   (a)     ***Sale or Plan Confirmation Milestones***.   The DIP Credit Agreement imposes certain milestones to obtain entry of the Interim Order, entry of the Final Order, conditional approval of a Disclosure Statement, confirmation of a chapter 11 plan, and consummation of the sale transactions contemplated by the Restructuring Support Agreement.

   (b)     ***No Cross-Collateralization***.  The DIP Orders do not authorize and the DIP Facility does not provide for, any cross-collateralization of the Debtors' funded debt.

   (c)     ***Roll-Up***. The Interim Order provides for proceeds of the DIP Collateral received by Agent or Lender, and any other amounts or payments received by Agent or Lender in respect of the DIP Obligations, to be applied or deemed to be applied by Agent, in its discretion, to the indefeasible repayment in full of the Pre-Petition First Lien Obligations  (other than the Specified Pre-Petition Obligations).  Upon entry of the Final Order, all then

---

[6]     Significant Provisions refer to those provisions that contain: (a) sale or plan confirmation milestones; (b) cross collateralization; (c) roll ups; (d) liens on avoidance actions or proceeds of avoidance actions; (e) default provisions and remedies that are self-executing or preclude court oversight, including: (i) provisions terminating the automatic stay without further order, (ii) provisions waiving rights to challenge lenders' ability to exercise post-default remedies; and (iii) provisions limiting required proof or altering the burden of proof at post-default hearings; (f) releases of claims; (g) limitations on the use of cash collateral or DIP proceeds (other than general "Carve Outs") to pay approved fees and expenses of advisors to official committees or future trustees; (h) nonconsensual priming liens; or (i) any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

outstanding Pre-Petition First Lien Obligations other than the Specified Pre-Petition Obligations (as defined in the DIP Credit Agreement) shall, to the extent not having already been rolled up and converted into Revolving DIP Obligations in accordance with this Interim Order, shall be automatically rolled up and converted into DIP Obligations. These provisions are an integral component of the Lender's willingness to enter into the DIP Facility, which is the only financing available to the Debtors as of the Petition Date. *See* Interim Order ¶ 1.5.

(d)  ***Liens on Avoidance Actions or Proceeds of Avoidance Actions***. The Final Order, but not the Interim Order, grants the Lender liens on proceeds of actions maintained or taken pursuant to Chapter 5 of the Bankruptcy Code. *See* Interim Order ¶ 2.1(a).

(e)  ***Default Provisions and Remedies***. The DIP Credit Agreement contains events of default that are usual and customary for debtor-in-possession financings, including without limitation, failure to comply with the Budget (subject to the permitted variances) and failure to satisfy any of the Milestones. *See* DIP Credit Agreement § 10.1.

(f)  ***Releases***. Upon the entry of the Final Order, and subject to Section 4.1 of the Interim Order, each Debtor, on behalf of itself and its successors and assigns, (collectively, the "Releasors"), shall, forever release, discharge and acquit Agent, Lender, BA-Molagers SPV (each solely in its capacity as an agent or lender under the applicable loan documents) and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives in their respective capacities as such and in connection with Agent, Lender, or BA-Molagers SPV as applicable in its capacity as an agent or lender under the applicable loan documents (collectively, the "Pre-Petition Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that any of the Releasors had, have or hereafter can or may have against Pre-Petition Releasees (or any of them) as of the Petition Date, in respect of events that occurred on or prior to the Petition Date with respect to the Debtors, the Pre-Petition First Lien Obligations, the Pre-Petition First Lien Loan Documents, the Pre-Petition Second Lien Obligations, the Pre-Petition Second Lien Loan Documents, the DIP Obligations, the DIP Financing Documents and any Loans or other financial accommodations made by Agent, Lender, and/or BA-Molagers SPV to Debtors pursuant to the Pre-Petition First Lien Loan Documents, the Pre-Petition Second Lien Loan Documents, or the DIP Financing Documents. *See* Interim Order ¶ 4.5.

(g)   ***Limitations on the Use of DIP Proceeds and Cash Collateral Other than General "Carve-Outs" To Pay Approved Fees and Expenses of Advisors to Official Committees or Future Trustees***. The DIP Credit Agreement and the Interim Order set forth the allowed uses for the DIP Facility and Cash Collateral. The Debtors shall be entitled to use the proceeds of the DIP Facility and other credit and financial accommodations provided by Agent and Lender under the DIP Credit Agreement and the other DIP Financing Documents solely for payment of expenses set forth in the Budget and amounts owing to Agent and Lender, the Second Lien Lender, and Professional Persons in accordance with the terms and conditions of the DIP Financing Documents and the Interim Order. *See* Interim Order ¶ 1.2.

(h)   ***Non-Consensual Priming Liens***. The DIP Orders grant Agent, for the benefit of itself and Lender, valid and perfected first-priority security interests and liens, superior to all other liens, claims or security interests that any creditor of any of the Debtors' estates may have (but subject to the Carve-Out and the Permitted Liens), in and upon all of the DIP Collateral. *See* Interim Order ¶ 2.1.

(i)   ***No Limitations on the Ability of Estate Fiduciaries to Fulfill Their Duties***. The DIP Orders do not limit the ability of the estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

13.    The inclusion of each of the applicable Significant Provisions in the DIP Facility is appropriate and necessary to permit the Debtors' access to the DIP Facility. The terms and conditions of each of the Significant Provisions included in the DIP Orders are the result of arm's-length and hard-fought negotiations between the Debtors and the Lender, and the Lender is unwilling to provide the DIP Facility absent the inclusion of these provisions. Further, no third party has presented an alternative DIP financing proposal. As set forth herein and in the First Day Declaration, the Kroll Declaration, and the Arden Declaration, granting the relief requested pursuant to the Interim Order is critical to the continued operation of the Debtors' businesses and will permit the Debtors to smoothly transition into these chapter 11 cases, preserving the value of the Debtors' estates for all parties in interest. In light of the foregoing, the Debtors submit that the Significant Provisions in the Interim Order are appropriate and necessary under the facts and circumstances of these chapter 11 cases and should be approved.

## The Debtors' Prepetition Capital Structure

14.     As of the Petition Date, the Debtors have approximately $68.9 million in total funded debt, the holders of which all support the Restructuring and are parties to the Restructuring Support Agreement.  The funded debt consists of the following:

| Funded Debt | Stated Maturity | Outstanding Principal Amount as of the Petition Date |
|---|---|---|
| Prepetition Senior Term Loan | July 24, 2024 | $14.7 million |
| Prepetition Second Lien Secured Loans | June 30, 2026 | $54.2 million |
| | Total Funded Debt | $68.9 million |

### *(i)     Prepetition Senior Term Loan*

15.     Three of the Debtors are party to that certain Credit Agreement, dated as of July 20, 2023, by and among Catalog and OpCo, as borrowers, Intermediate HoldCo, as guarantor, 1903P Loan Agent, LLC, as agent, and 1903 Partners, LLC, as lender, which provided for the 1903P Loan.  The 1903P Loan comprises two term loan tranches: (i) a closing date term loan of $10,000,000, which was immediately payable upon closing; and (ii) a delayed draw term loan of up to $7,000,000, which would become available if certain metrics were met, including the Company's borrowing base.  As of the Petition Date, the 1903P Loan has an outstanding principal balance of $14.7 million.

16.     The obligations under the 1903P Loan are secured by substantially all the assets of Intermediate HoldCo, Catalog, and OpCo, including, among other things, all accounts, goods, equipment, inventory, fixtures, and intangible assets including intellectual property.

### *(ii)    Prepetition Second Lien Secured Loans*

17.     Three of the Debtors are party to that certain Secured Promissory Note, dated as of July 8, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time the "Second Lien Secured Loans"), by and among Catalog, OpCo, and HoldCo,

as borrowers, and the Second Lien Lender, as lender.  The Second Lien Lender is a joint venture among Brentwood and the Missouri Local Government Employees Retirement System.  The Second Lien Secured Loans, which were amended and restated five times prior to the Petition Date, currently have an aggregate outstanding principal balance of $54.2 million as of the Petition Date.[7]

18.     The obligations under the Second Lien Secured Loans are secured on a second lien basis by substantially all the assets of HoldCo, Catalog, and OpCo, including, among other things, all accounts, goods, equipment, inventory, fixtures, and intangible assets including intellectual property.

###### *(iii)     Subordination Agreement*

19.     On July 20, 2023, in connection with the execution of the 1903P Loan, Intermediate HoldCo, Catalog, and OpCo entered into that certain subordination agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time the "Subordination Agreement") with 1903P Loan Agent, LLC and the Second Lien Lender.  By the Subordination Agreement, the Second Lien Lender agreed that the Agent's and Lender's security interests in and liens on the secured collateral are senior to and have priority over the Second Lien Lender's security interests and liens.  The Second Lien Lender further agreed that the 1903P Loan is senior to and prior in right of payment to the Subordinated Note.[8]

20.     Additionally, 1903P Loan Agent, LLC, 1903P, Brentwood and the Second Lien Lender are parties to an Intercreditor Support Agreement pursuant to which they have made certain agreements related to their support of the Restructuring.

---

[7]     The aggregate outstanding principal amount does not include accrued amounts of the 2.0% deferred exit fee.

[8]     Such subordination is consistent historically with the Second Lien Secured Loans, which were previously subordinate to the Company's previous first lien facility.

### The DIP Facility

**I.    The Debtors' Need for Immediate Access to the DIP Facility and Cash Collateral**

21.    As described in the First Day Declaration, the Kroll Declaration, and the Arden Declaration, the Debtors require immediate incremental liquidity on an urgent basis to operate their business through consummation of the consensual comprehensive restructuring.  The Debtors filed these chapter 11 cases with less than $750,000 of cash on hand, which is insufficient to maintain operations and to fund these chapter 11 cases.  Kroll Decl. at ¶ 5.

22.    Prior to the Petition Date, the Debtors prepared the Budget in consultation with their proposed restructuring advisor, SierraConstellation Partners, LLC.  *See id.* at ¶ 9.  The Debtors believe that the Budget and the projections therein provide a good faith estimate of their funding requirements over the identified period and are reasonable and appropriate under the circumstances.  Further, the Debtors believe that the Budget establishes that the Debtors will have adequate liquidity during the identified period to maintain operations and administer these cases. *Id*.

23.    Based on these analyses, the Debtors determined that they will require immediate access to the DIP Facility to meet their cash flow needs to fund these chapter 11 cases.  Immediate access to the DIP Facility and Cash Collateral is essential not only to meet working capital and business operating needs, but also to fund the administration of these chapter 11 cases, enabling the Debtors to achieve the primary objectives of the restructuring, including the transfer of the Debtors' direct to consumer business and the subsequent wind-down of the Debtors' brick and mortar locations through a plan of reorganization.  *Id*. at ¶ 7.

24.    Therefore, the Debtors believe the DIP Facility is essential to preserve and maximize the value of their estates and responsibly administer these chapter 11 cases.

## II.        The Debtors' Efforts to Obtain Financing

25.        Prior to the Petition Date, the Debtors, with the assistance of their proposed investment banker, SSG, considered potential alternative sources of financing for the Debtors.  In addition to contacting over 300 strategic and financial investors, SSG, on behalf of the Debtors, conducted outreach to 18 sophisticated financing sources to determine the availability and viability of third-party financing.  *See* Arden Decl. at ¶ 6.  Despite this outreach by SSG, none of the parties contacted (other than the Agent and Lender) were willing to provide financing to the Debtors in an amount sufficient to fund the go-forward enterprise.  *Id*.

26.        Accordingly, the Debtors determined that the 1903P Loan constituted the best possible financing available.  In late July 2023, the Debtors closed on the 1903P Loan which provided much-needed bridge financing and allowed the Debtors to continue their marketing process.  *Id*. at ¶ 7.  Following the closing of the 1903P Loan, the Debtors continued to engage in arm's-length negotiations and successfully garnered support for the value maximizing transaction set forth in the Restructuring Support Agreement.   A critical component of this consensual comprehensive restructuring is the DIP Facility, pursuant to which the Agent and Lender committed to provide the Debtors with up to $18 million of new money postpetition financing.  *Id*. at ¶ 8.

## III.        The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates

27.        Absent the DIP Facility and the immediate access to liquidity that it provides, as well as the use of Cash Collateral, the Debtors would suffer immediate and irreparable harm, and the value of their assets and businesses would be severely diminished to the detriment of all stakeholders.  *See* Kroll Decl. at ¶ 6.  In short, the Debtors would be unable to fund their operations as a going concern in the near term or for the duration these chapter 11 cases. Accordingly, the DIP Facility is necessary to preserve the value of the Debtors' estates.

## Basis for Relief

**I.     Entering into the DIP Financing Documents Is an Exercise of the Debtors' Sound Business Judgment.**

28.     The Court should authorize the Debtors, in an exercise of their sound business judgment, to enter into the DIP Financing Documents and obtain access to the DIP Facility.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").  Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. Apr. 3, 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah Oct. 8, 1981) (noting that courts should not second guess a debtor's business decision that involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

29.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. Apr. 17, 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. Apr. 30, 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

30.     The Debtors' decision to move forward with the DIP Facility is a sound exercise of their business judgment.  Specifically, the Debtors and their advisors determined that the Debtors

would require significant postpetition financing to support the administration of their chapter 11 cases and their ongoing operations.  The Debtors negotiated the terms of the DIP Financing Documents with the Lender in good faith, at arm's length, and with the assistance of their advisors. The DIP Facility will provide immediate access to capital on terms that, collectively, are the best and most favorable terms available to the Debtors.  Without access to the DIP Facility, the Debtors would experience a liquidity shortfall and be deprived of the capital necessary to operate their businesses.  The DIP Facility will enhance the Debtors' ability to minimize disruption to their businesses and instill confidence in their various creditor constituencies, including customers, employees, vendors, and service providers.  With the DIP Facility, the Debtors will be in a position to preserve the value of their assets for the benefit of all creditors.  Accordingly, the Court should authorize the Debtors' entry into the DIP Financing Documents as a reasonable exercise of the Debtors' business judgment.

## II.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.

31.    The Debtors propose to obtain financing under the DIP Facility, in part, by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the Agent, for the benefit of itself and Lender, valid and perfected first-priority security interests and liens, superior to all other liens, claims or security interests that any creditor of any of the Debtors' estates may have (but subject to the Carve-Out and the Permitted Liens), in and upon all of the DIP Collateral.

32.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and a hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c); *see also In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (holding that secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon

showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code. Specifically, courts consider whether:

(a)     the debtor is unable to obtain unsecured credit under section 364(b) (*i.e.*, by allowing a lender only an administrative claim);

(b)     the credit transaction is necessary to preserve estate assets; and

(c)     the terms of the transaction are fair, reasonable, and adequate under the circumstances of the debtor-borrower and the proposed lender.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. May 9, 1988).

33.     The Debtors meet each part of this test. As described above, no DIP financing proposals representing a viable alternative to the proposed DIP Facility were available to the Debtors.  *See* Arden Decl. ¶ 9.  Given the Debtors' emergency cash position, the DIP Facility should be approved.

34.     If a debtor in possession cannot obtain postpetition credit on an unsecured basis, a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.  *See id.* § 364(c).  As described above and in the Arden Declaration, the Debtors are unable to obtain junior, let alone unsecured, credit.  Therefore, approving superpriority claims, liens on the unencumbered property of the estate, and junior liens subject to Permitted Liens, in each case in favor of Agent for the benefit of itself and Lender, is reasonable and appropriate.

35.     Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and

a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral is adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

36.     Here, the Prepetition Secured Parties consented or are deemed to have consented to the DIP Facility and actively participated in facilitating the proposed DIP Facility. As set forth more fully herein and in the Interim Order, the Debtors propose to provide a variety of adequate protection to protect the interests of such parties. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**III.     The Debtors Should Be Authorized to Use the Cash Collateral.**

37.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party. Here, the Prepetition Secured Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

38.     As described above and in the First Day Declaration, access to Cash Collateral during these cases is essential to the continued operation of the Debtors' businesses and smooth entry into these chapter 11 cases. Use of Cash Collateral is in the best interests of the Debtors'

estates and all of their stakeholders, including the Prepetition Secured Parties, and should be approved.

**IV.      Adequate Protection Provided to the Prepetition Secured Parties is Appropriate.**

39.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

40.     The Debtors propose to provide the Prepetition Secured Parties with a variety of adequate protection to protect against the postpetition diminution in value of the prepetition collateral (including Cash Collateral) resulting from the use, sale, or lease of such collateral by the Debtors and the imposition of the automatic stay.  The proposed adequate protection includes replacement liens, adequate protection superpriority claims, and adequate protection fees and expenses.  The Debtors submit that the proposed adequate protection to be provided for the benefit of the Prepetition Secured Parties is appropriate. The Debtors' provision of such adequate protection is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the prepetition collateral (including Cash Collateral), subject to the terms and limitations set forth in the Interim Order and the DIP Financing Documents, including pursuant to the Budget, for the benefit of all parties in interest and the Debtors' estates.

## V.    The Roll-Up Is Appropriate.

41.    The proposed DIP Facility contains a "roll-up" of the 1903P Loan issued to the Debtors shortly before the filing of the chapter 11 cases.  Specifically, the roll-up provides for a "creeping roll-up" of the 1903P Loan pursuant to the Interim Order, which permits the proceeds of the DIP Collateral or other payments in respect of the DIP Obligations received by Agent or Lender to be applied to the repayment of the 1903P Loan obligations.  Further, upon entry of the Final Order, all remaining outstanding 1903P Loan obligations will convert to DIP Obligations. The proposed roll-up was a requirement of the Agent and Lender agreeing to provide the DIP Facility.  *See* Kroll Decl. at ¶ 10.  Moreover, the 1903P Loan provided critical, emergency financing that allowed the Debtors to avoid an immediate "free fall" chapter 11 filing and instead enter these chapter 11 cases in a smooth and organized manner with the support represented by the Restructuring Support Agreement.  Accordingly, the inclusion of the roll-up in the DIP Facility is a sound exercise of the Debtors' business judgment.

42.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. Payment of existing obligations is appropriate where necessary to protect and preserve the estate, including an operating business's going concern value. *See, e.g., In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).  Repayment of prepetition debt via a "roll-up" has been approved in similar situations as the one presented here.

*See e.g., In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. April 3, 2019) (approving roll-up).

43.     Here, the DIP Facility is critical to the reorganization and would not be available to the Debtors absent the roll-up.  Accordingly, the roll-up is a reasonable and appropriate component of the DIP Facility and should be approved.

**VI.     The Scope of the Carve-Out Is Appropriate.**

44.     The DIP Obligations are in all cases subject to the Carve-Out.  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these cases would be restricted.  *See Ames*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of the Clerk of the Court, U.S. Trustee fees, and professional fees of the Debtors' and any official committee appointed under section 1102 of the Bankruptcy Code.

**VII.    The Debtors Should Be Authorized to Pay the Fees Required by the Lender Under the DIP Financing Documents.**

45.     As set forth above, in connection with negotiating the DIP Facility, the Debtors agreed, subject to Court approval, to pay certain fees, expenses, and other payments arising under the DIP Financing Documents or the DIP Orders (the "DIP Payments").  Such fees are often permitted where the associated financing is, in the Debtors' business judgment, beneficial to the Debtors' estates.  *See In re Aleris Int'l Inc.*, No. 09-10478 (Bankr. D. Del. Mar. 18, 2009).

46.     The DIP Payments are reasonable in the context of the credit provided to the Debtors under the circumstances.  The amounts the Debtors have agreed to pay, and the other obligations under the DIP Financing Documents, represent the most favorable terms to the Debtors on which the Agent and Lender would agree to make the DIP Facility available.  *See* Kroll Decl. at ¶ 11. The Debtors considered the DIP Payments when determining in their sound business judgment that the DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and administer these chapter 11 cases. The Debtors do not believe that a loan with terms similar to those in the DIP Facility is available to the Debtors for lower fees.  Making the DIP Payments to obtain the DIP Facility is in the best interests of the Debtors' estates, creditors, and other parties in interest.

## VIII.   The Lender Should Be Afforded Good-Faith Protection Under Section 364(e) of the Bankruptcy Code.

47.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

48.     The DIP Facility is the result of (a) the Debtors' reasonable and informed determination that the Agent and Lender offered the most favorable terms on which postpetition financing was available for these Chapter 11 Cases, and (b) arm's-length, good faith negotiations

between the Debtors and the Agent and Lender. The Debtors submit that the terms and conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Financing Documents other than as described herein. Accordingly, the Court should find that the Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded thereby.

## IX.     The Automatic Stay Should Be Modified on a Limited Basis.

49.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to grant the security interests and liens described above to the Agent and Lender, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens. Paragraph 3.4 of the Interim Order further provides that the automatic stay shall be modified to the extent necessary to permit the Agent and the Lender to exercise all rights and remedies provided for in the DIP Financing Documents and the Interim Order. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases. Accordingly, the Debtors request that the Court grant the requested relief from the automatic stay as provided in the DIP Orders.

### Request for a Final Hearing

50.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and no later than 30 days after Petition Date to consider entry of the Final Order and the permanent approval of the relief requested in this Motion. The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to entry of the Final Order,

by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

## **Emergency Consideration**

51.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations, and any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  The failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

52.     The Debtors request that the Court enter an order providing that notice of the relief requested satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h), which is necessary to implement the relief requested in this Motion.

## **Reservation of Rights**

53.     Nothing contained herein is intended or should be construed as: (a) an admission as to the validity or priority of any claim or lien against the Debtor; (b) a waiver of the Debtors' rights to subsequently dispute such claim or lien on any grounds; (c) a promise or requirement to

pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or the proposed DIP Orders; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## **Notice**

54.     The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Pre-Petition First Lien Lender and proposed DIP Lender; (d) counsel to Brentwood and the Pre-Petition Second Lien Note Holder; (e) the Office of the United States Attorney for the Southern District of Texas; (f) the state attorneys general for states in which the Debtors conduct business; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) the Environmental Protection Agency; (j) other governmental agencies having a regulatory or statutory interest in these cases; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
September 10, 2023

*/s/ Elizabeth C. Freeman*

**LAW OFFICE OF LIZ FREEMAN**
Elizabeth C. Freeman (TX Bar No. 2400922)
PO Box 61209
Houston, TX 77208-1209
Telephone: (832) 779-3580
Email: liz@lizfreemanlaw.com

*Proposed Co-Counsel and Conflicts Counsel*
*for the Debtors and Debtors in Possession*

**KATTEN MUCHIN ROSENMAN LLP**
Cindi M. Giglio
Michael E. Comerford
Marc B. Roitman
Grace A. Thompson
50 Rockefeller Plaza
New York, NY 10020-1605
Telephone: (212) 940-8800
Email: cgiglio@katten.com
        michael.comerford@katten.com
        marc.roitman@katten.com
        grace.thompson@katten.com

- and -

William B. Freeman (*pro hac vice* pending)
515 South Flower Street, Suite 4150
Los Angeles, CA 90071-2212
Telephone: (213) 443-9003
Email: bill.freeman@katten.com

*Proposed Co-Counsel for the Debtors and*
*Debtors in Possession*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Elizabeth C. Freeman*
Elizabeth C. Freeman

## **Certificate of Service**

I certify that, on September 10, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Elizabeth C. Freeman*
Elizabeth C. Freeman