**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| SOFT SURROUNDINGS HOLDINGS, LLC, *et al.*,[1] | Case No. 23-90769 (CML) |
| Debtors. | (Joint Administration Requested) |
| | **Re: Docket Nos.** |

**INTERIM ORDER
PURSUANT TO 11 U.S.C.
§§ 105, 361, 362, 363, 364, AND 507 AND
FED. R. BANKR. P. 2002, 4001 AND 9014
(I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION
TO OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING,
(II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO
THE PREPETITION SECURED LENDERS, (V) MODIFYING THE AUTOMATIC
STAY, (VI) SCHEDULING A FINAL HEARING, AND
(VII) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") pursuant to §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2) and 364(c)(3), and 364(d) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and the Procedures for Complex Cases in the Southern District of Texas (the "Complex Case Procedures") made applicable by Rule 1075-1 of the Local Bankruptcy

---

[1]   The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Soft Surroundings Holdings, LLC (2218); Soft Surroundings Intermediate Holdings, LLC (6696); Triad Catalog Co., L.L.C. (3313); and Triad Retail, L.L.C. (2728).  The Debtors' service address is 1100 N. Lindbergh Blvd., St. Louis, MO 63132.

Rules for the United States Bankruptcy Court for the Southern District of Texas (the "<u>Local Rules</u>"), *inter alia* seeking, among other things:

(1)     authorization for Triad Catalog Co., L.L.C. ("<u>Catalog</u>"); and Triad Retail, L.L.C. d/b/a Soft Surroundings ("<u>OpCo</u>"), each as debtor and debtor-in-possession, individually a "<u>Borrower</u>" and collectively, "<u>Borrowers</u>") to obtain, and for Soft Surroundings Holdings, LLC ("<u>HoldCo</u>") and Soft Surroundings Intermediate Holdings, LLC ("<u>Intermediate HoldCo</u>"), each as debtor and debtor-in-possession, individually a "<u>Guarantor</u>" and collectively, "<u>Guarantors</u>") to guarantee, unconditionally, on a joint and several basis, post-petition financing on the terms and conditions set forth in the Pre-Petition Credit Agreement (as defined below), to be ratified and amended and restated by that certain Ratification and Amendment Agreement to be dated as of the DIP Facility Closing Date (the "<u>Ratification Agreement</u>") a copy of which is attached hereto as **Exhibit 1** (the Pre-Petition Credit Agreement as amended and restated by the Ratification Agreement and as amended, supplemented or otherwise modified from time to time in accordance with the terms and conditions set forth herein shall be referred to herein as the "<u>DIP Credit Agreement</u>"),[2] by and among the Borrowers, the Guarantors, 1903P Loan Agent, LLC, as agent ("<u>Agent</u>"), and 1903 Partners, LLC, as lender ("<u>Lender</u>"), and the other Loan Documents (as defined in the DIP Credit Agreement and referred to herein as the "<u>DIP Financing Documents</u>"), and in accordance with this order ("<u>Interim Order</u>"), secured by perfected senior priority security interests in and liens on the DIP Collateral (as defined below) pursuant to

---

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the DIP Credit Agreement, as applicable.

§§ 364(c)(2) and 364(c)(3), and 364(d) of the Bankruptcy Code (subject to the Carve-Out and the Permitted Liens (each as defined below));

(2)     authorization for Borrowers and Guarantors to remit all collections, asset proceeds and payments to Agent and Lender for application, or deemed application, first to all Pre-Petition First Lien Obligations (as defined below) until such obligations are fully repaid (other than the Specified Pre-Petition Obligations, as defined in the DIP Credit Agreement), and then to the repayment of all DIP Obligations (as defined below) in accordance with the DIP Credit Agreement and the other DIP Financing Documents;

(3)     authorization for the Debtors to grant superpriority administrative claim status, pursuant to § 364(c)(1) of the Bankruptcy Code, to Agent, for the benefit of itself and Lender, in respect of all DIP Obligations (subject to the Carve-Out (as defined below));

(4)     as set forth below, subject to Section 4.1 of this Interim Order, approval of certain stipulations by the Debtors as set forth in this Interim Order in connection with the Pre-Petition Credit Agreement and the Pre-Petition Second Lien Note (each as defined below);

(5)     authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Financing Documents as such become due, including, without limitation, continuing commitment fees, closing fees, audit fees, appraisal fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable and documented fees and disbursements of Agent's and Lender's respective attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the applicable DIP Financing Documents;

(6)     as set forth below, authorization to use Cash Collateral and all other Pre-Petition First Lien Collateral and to provide adequate protection to Agent and Lender (each in their

respective capacities under the Pre-Petition First Lien Loan Documents (as defined below)), to the extent set forth herein;

(7)      as set forth below, authorization to use Pre-Petition Second Lien Collateral and to provide adequate protection to BA-Molagers SPV (as defined below) in its capacity as lender under the Pre-Petition Second Lien Note (as defined below), to the extent set forth herein;

(8)      effective only upon entry of a Final Order (as defined below), the waiver of the Debtors' right to assert claims to surcharge against the DIP Collateral (as defined below) pursuant to § 506(c) of the Bankruptcy Code, to the extent set forth below;

(9)      the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order to the extent hereinafter set forth;

(10)     the setting of a final hearing on the Motion ("Final Hearing") to consider entry of a final order (the "Final Order") authorizing, among other things, the borrowing under the DIP Financing Documents on a final basis, as set forth in the Motion and the DIP Credit Agreement filed with the Court, including the granting to Agent and Lender the senior security interests and liens described above and super-priority administrative expense claims (subject to the Carve-Out); and

(11)     related relief.

The initial hearing on the Motion having been held by this Court on September 12, 2023 (the "Interim Hearing"), and upon the record made by the Debtors at the Interim Hearing, including the Motion, the *Declaration of Curt Kroll in Support of the First Day Motions* (the "First Day Declaration"), the *Declaration of Curt Kroll in Support of the Motion* (the "Kroll Declaration"), the *Declaration of Matthew Arden in Support of the Motion* (the "Arden

Declaration"), and the filings and pleadings in the above-captioned chapter 11 cases (the "Cases"), the Court having found that the relief requested in the Motion is in the best interests of Debtors, their estates, their creditors and other parties in interest, and represents a sound exercise of the Debtors' business judgment and is essential for the continued operation of the Debtors' businesses; it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing; and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "Notice") was appropriate under the circumstances; and the Notice having been served by the Debtors in accordance with Bankruptcy Rule 4001 and 9014 and the Local Rules on (i) counsel to Agent; (ii) counsel to BA-Molagers SPV; (iii) the office of the U.S. Trustee; (iv) the holders of the thirty (30) largest unsecured claims, on a consolidated basis, against the Debtors' estates (the "30 Largest Unsecured Creditors"); (v) the Internal Revenue Service and applicable state taxing authorities; (vi) any party that has asserted or may assert a lien in the Debtors' assets; (vii) the office of attorneys general for the states in which the Debtors operate; (viii) the United States Attorney's Office for the Southern District of Texas; (ix) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002; and (x) the United States Securities and Exchange Commission (collectively, the "Noticed Parties") and the opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and after due deliberation sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW[3]:

A.     <u>Petition</u>.  On September 10, 2023 (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition (each, a "<u>Petition</u>") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

B.     <u>Disposition</u>.  The Motion is hereby granted in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of the Interim Order that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled.

C.     <u>Jurisdiction and Venue</u>.  The Court has jurisdiction of this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion is a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M).  Venue of the Cases and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     <u>Committee Formation</u>. As of the date hereof, the United States Trustee for the Southern District of Texas (the "<u>U.S. Trustee</u>") has not yet appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "<u>Committee</u>").  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 9013 and 9014 and the applicable provisions of the Local Rules.

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.    <u>Notice</u>.  Proper, timely, adequate, and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

F.    <u>Debtors' Acknowledgments and Agreements</u>.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of any Committee appointed in these Cases or other parties-in-interest as and to the extent set forth in Section 4.1 of this Interim Order, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge and agree that:

(a)    <u>First Lien Stipulations</u>

(i)    <u>Pre-Petition First Lien Loan Documents</u>.  Prior to the commencement of the Cases, Agent and Lender made loans, advances and provided other financial accommodations to Borrowers, as guaranteed by Intermediate HoldCo, pursuant to the terms and conditions set forth in (1) that certain Credit Agreement dated July 20, 2023 as amended by Amendment No. 1 to Credit Agreement, dated as of September 6, 2023 (without giving effect to the Ratification Agreement) (the "<u>Pre-Petition Credit Agreement</u>"); (2) that certain Security Agreement dated July 20, 2023 by and among Borrowers and Intermediate HoldCo, as Grantors, and Agent, as Secured Party (the "<u>Pre-Petition First Lien Security Agreement</u>"); and (3) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of Agent or Lender in connection with the Pre-Petition Credit Agreement or the Pre-Petition First Lien Security Agreement, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto

(all of the foregoing, together with the Pre-Petition Credit Agreement and the Pre-Petition First Lien Security Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Pre-Petition First Lien Loan Documents").

       (ii)       Pre-Petition First Lien Obligations. As of the Petition Date, the Borrowers and Intermediate HoldCo were indebted to Agent and Lender under the Pre-Petition First Lien Loan Documents in respect of outstanding Loans (as defined in the Pre-Petition Credit Agreement) in an aggregate amount of not less than $14.7 million, plus all other Obligations (as defined in the Pre-Petition Credit Agreement), plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "Pre-Petition First Lien Obligations"). The Pre-Petition First Lien Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Borrowers and Intermediate HoldCo, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description, in any such case, arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Interim Order, which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition First Lien Obligations or liens and security interest securing the same described in clause (F)(a)(iii) below, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non- bankruptcy law. The Debtors and their

estates (a) have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against Agent or Lender or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Pre-Petition First Lien Loan Documents or Pre-Petition First Lien Obligations; and (b) have waived, discharged, and released any right to challenge any of the Pre-Petition First Lien Obligations, including the priority of the Pre-Petition First Lien Obligations, and the validity, extent, and priority of the liens securing the Pre-Petition First Lien Obligations.

       (iii)       <u>Pre-Petition First Lien Collateral</u>.  As of the Petition Date, the Pre-Petition First Lien Obligations were fully secured pursuant to the Pre-Petition First Lien Loan Documents by valid, perfected, enforceable and non-avoidable first-priority security interests and liens (the "<u>Pre-Petition First Liens</u>") granted by Borrowers and Intermediate HoldCo for fair consideration and reasonably equivalent value to Agent, for the benefit of itself and Lender under the Pre-Petition First Lien Loan Documents, in and upon all of the Collateral (as defined in the Pre-Petition First Lien Security Agreement, and hereinafter referred to as the "<u>Pre-Petition First Lien Collateral</u>"), subject only to the liens described in Section 6.17 of the Pre-Petition Credit Agreement to the extent that such security interests, liens or encumbrances are (A) valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date securing valid, binding and unavoidable debt permitted under the Pre-Petition First Lien Loan Documents (or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code), and (B) senior to, have not been, and are not subject to being subordinated to the Pre-Petition First Liens or otherwise avoided, and, in each instance, only for so long as and to

the extent that such encumbrances are and remain senior and outstanding (hereinafter referred to as the "Permitted Pre-Petition First Liens").  The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description, whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 (including, without limitation, sections 510, 544, 547, 548, 549 or 550) of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, that would in any way affect the validity, enforceability and non-avoidability of any of Agent's and Lender's liens, claims or security interests in the Pre-Petition First Lien Collateral.

(iv)      Default by the Debtors. The Debtors acknowledge and stipulate that an Event of Default (as defined in the Pre-Petition Credit Agreement) has occurred and is continuing as of the date hereof.

(v)      Proof of Claim.  The acknowledgment by Debtors of the Pre-Petition First Lien Obligations and the liens, rights, priorities and protections granted to or in favor of Agent and Lender in respect of the Pre-Petition First Lien Collateral as set forth herein and in the Pre-Petition First Lien Loan Documents shall be deemed a timely filed proof of claim on behalf of Agent and Lender in these Cases.

(b)      Second Lien Stipulations

(i)      Pre-Petition Second Lien Loan Documents.  Prior to the commencement of the Cases, BA-Molagers SPV II, LLC, a Delaware limited liability company ("BA-Molagers SPV") made loans, advances and provided other financial accommodations to Borrowers and HoldCo pursuant to the terms and conditions set forth in (1) that certain Fifth Amended and Restated Secured Promissory Note dated March 10, 2023 by and among Borrowers and HoldCo,

as Makers, and BA-Molagers SPV, as Payee (the "Pre-Petition Second Lien Note"); and (2) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of BA-Molagers SPV in connection with the Pre-Petition Second Lien Note, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Pre-Petition Second Lien Note, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Pre-Petition Second Lien Loan Documents").

(ii)      Pre-Petition Second Lien Obligations.   As of the Petition Date, the Borrowers and HoldCo were indebted to BA-Molagers SPV under the Pre-Petition Second Lien Loan Documents in respect of certain advances in an aggregate amount of not less than $47 million, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "Pre-Petition Second Lien Obligations" and, together with the Pre-Petition First Lien Obligations, the "Pre-Petition Secured Obligations").   The Pre-Petition Second Lien Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Borrowers and HoldCo, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description, in any such case, arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Interim Order, which would in any

way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Second Lien Obligations or liens and security interest securing the same described in clause (F)(b)(iii) below, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors and their estates (a) have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against BA-Molagers SPV or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Pre-Petition Second Lien Loan Documents or Pre-Petition Second Lien Obligations; and (b) have waived, discharged, and released any right to challenge any of the Pre-Petition Second Lien Obligations, including the priority of the Pre-Petition First Lien Obligations, and the validity, extent, and priority of the liens securing the Pre-Petition Second Lien Obligations. Notwithstanding the foregoing, Pre-Petition Second Lien Obligations are subordinate in right of payment to the Pre-Petition First Lien Obligations, pursuant to the terms of the Subordination Agreement (as defined below).

(iii)     <u>Pre-Petition Second Lien Collateral</u>.  As of the Petition Date, the Pre-Petition Second Lien Obligations were fully secured pursuant to the Pre-Petition Second Lien Loan Documents by valid, perfected, enforceable and non-avoidable second-priority security interests and liens (the "<u>Pre-Petition Second Liens</u>") granted by Borrowers and HoldCo for fair consideration and reasonably equivalent value to BA-Molagers SPV, in and upon all of the Collateral (as defined in the Pre-Petition Second Lien Note, and hereinafter referred to as the "<u>Pre-Petition Second Lien Collateral</u>"), subject to subordination of such security interests and

liens to the Pre-Petition First Liens pursuant to the terms of the Subordination Agreement and subject to the Permitted Pre-Petition First Liens and any other security interests, liens or encumbrances to the extent that such security interests, liens or encumbrances are (A) valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date securing valid, binding and unavoidable debt (or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code), and (B) senior to, have not been, and are not subject to being subordinated to the Pre-Petition Second Liens or otherwise avoided, and, in each instance, only for so long as and to the extent that such encumbrances are and remain senior and outstanding (the "Permitted Pre-Petition Second Liens," and together with the Permitted Pre-Petition First Liens, the "Permitted Liens").  The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description, whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 (including, without limitation sections 510, 544, 547, 548, 549, or 550) of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, that would in any way affect the validity, enforceability and non-avoidability of any of BA-Molagers SPV's liens, claims or security interests in the Pre-Petition Second Lien Collateral.

(iv)     Default by the Debtors. The Debtors acknowledge and stipulate that an Event of Default (as defined in the Pre-Petition Second Lien Note) has occurred and is continuing as of the date hereof.

(v)     Proof of Claim.  The acknowledgment by Debtors of the Pre-Petition Second Lien Obligations and the liens, rights, priorities and protections granted to or in favor of BA-Molagers SPV in respect of the Pre-Petition Second Lien Collateral as set forth herein and in

the Pre-Petition Second Lien Loan Documents shall be deemed a timely filed proof of claim on behalf of BA-Molagers SPV in these Cases.

(c)      Intercreditor Agreement Stipulations

(i)      Subordination Agreement. Agent and BA-Molagers SPV are parties to that certain Subordination Agreement dated as of July 20, 2023 (as further amended, supplemented or otherwise modified from time to time, the "Subordination Agreement"), which (x) confirms the senior priority of the Pre-Petition First Liens over the Pre-Petition Second Liens in respect of any Pre-Petition First Lien Collateral; (y) acknowledges and confirms that BA-Molagers SPV shall not accept any payment from any Obligor (as defined in the Subordination Agreement) of any amounts owing under the Pre-Petition Second Lien Note until Discharge (as defined in the Subordination Agreement) of the Pre-Petition First Lien Obligations, except for such permitted payments made pursuant to section 3(a) of the Subordination Agreement, and (z) provides certain other rights, obligations and agreements between Agent and BA-Molagers SPV relating to the Pre-Petition First Lien Collateral and the DIP Collateral, including BA-Molagers SPV's consent to the Debtors' use of Cash Collateral.

B.      Findings Regarding the Post-Petition Financing.

(i)      Post-Petition Financing.  The Debtors have requested from each of Agent and Lender, and Agent and Lender are willing, to extend certain loans, advances and other financial accommodations on the terms and conditions set forth in this Interim Order, the DIP Credit Agreement and the other DIP Financing Documents, respectively.

(ii)      Need for Post-Petition Financing.  The Debtors do not have sufficient available sources of working capital, including cash collateral, to operate their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability

to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of the Estates (as defined below).  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with Agent and Lender as set forth in this Interim Order, the DIP Credit Agreement, and other DIP Financing Documents, as applicable, is vital to the preservation and maintenance of the going concern value of each Debtor.  Accordingly, the Debtors have an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates (as defined under § 541 of the Bankruptcy Code, the "Estates") in order to maximize the value of the Estates.

(iii)     No Credit Available on More Favorable Terms.  The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under §§ 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, junior liens on encumbered property of the Estates, or liens on property of the Estates not subject to a lien pursuant to § 364(c)(1), 364(c)(2) or 364(c)(3) of the Bankruptcy Code.  The Debtors have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by each of Agent and Lender pursuant to the DIP Financing Documents.

(iv)     Budget.  The Debtors have prepared and delivered to Agent and Lender an initial 13-week budget (the "Budget") a summary of which is attached hereto as **Exhibit 2**.  Such Budget has been prepared by the Debtors, with the assistance of their professional advisors and

management, including the Chief Restructuring Officer of the Debtors, and sets forth, among other things, the projected cash receipts and disbursements of the Debtors for the periods covered thereby.  The Debtors represent to the Agent that the Budget is achievable in accordance with the terms of the DIP Financing Documents and this Interim Order. Agent and Lender are relying upon the Debtors' compliance with the Budget in accordance with this Interim Order in determining to enter into the post-petition financing arrangements provided for herein. For the avoidance of doubt, all references to the Budget shall be subject in all respects to any permitted variances.

(v)     <u>Business Judgment and Good Faith Pursuant to § 364(e)</u>.  The terms of the DIP Financing Documents and this Interim Order are fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms and conditions of the DIP Financing Documents and this Interim Order have been negotiated in good faith and at arms' length by and among the Debtors and Agent, with all parties being represented by counsel.  Any credit extended under the terms of this Interim Order shall be deemed to have been extended in good faith by Agent and Lender, as that term is used in § 364(e) of the Bankruptcy Code.

(vi)     <u>Good Cause</u>.  The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and ongoing operations, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors'

creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

(vii)     _Immediate Entry_.   Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).   No party appearing in the Cases has filed or made an objection to the relief sought in the Motion or the entry of this Interim Order, or any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

IT IS HEREBY ORDERED THAT:

Section 1.     _Authorization and Conditions to Financing._

1.1     _Motion Granted_.   The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order.   Except as otherwise expressly provided in this Interim Order, any objection to the entry of this Interim Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

1.2     _Authorization to Borrow, Guaranty, and Use Loan Proceeds_.   Borrowers are hereby authorized and empowered to immediately borrow and obtain Loans and to incur indebtedness and other Obligations (as defined in the DIP Credit Agreement) (collectively referred to as the "_DIP Obligations_"), and the Guarantors are hereby authorized to guaranty such DIP Obligations, all pursuant to the terms and conditions of this Interim Order, the DIP Credit Agreement, and the other DIP Financing Documents, during the period commencing on the date of this Interim Order through and including the end of the week in which the Final Hearing is held as set forth in Section 6 of this Interim Order (the "_Interim Financing Period_"), up to an aggregate amount equal to the sum of (i) $17 million, which amount equals 110% of all

disbursements for the Interim Financing Period in the "Total Disbursements" line item of the Budget, plus (ii) all interest, costs, and fees, accrued or accruing under the DIP Credit Agreement and other DIP Financing Documents.  Subject to the terms and conditions contained in this Interim Order and the DIP Financing Documents, Borrowers shall use the proceeds of the Loans and other credit and financial accommodations provided by Agent and Lender under the DIP Credit Agreement and the other DIP Financing Documents solely for payment of expenses set forth in the Budget and amounts owing to Agent and Lender, BA-Molagers SPV and Professional Persons in accordance with the terms and conditions of the DIP Financing Documents and this Interim Order.

1.3    <u>Financing Documents</u>

(a)    <u>Authorization</u>.  Debtors are hereby authorized to enter into, execute, deliver, perform, and comply with all of the terms, conditions and covenants of the DIP Credit Agreement and the other DIP Financing Documents.  Upon execution and delivery of the DIP Credit Agreement and the other DIP Financing Documents, such agreements and documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of such agreements, documents and this Interim Order.  No obligation, payment, transfer or grant of security arising under the DIP Credit Agreement, the other DIP Financing Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under § 502(d) of the Bankruptcy Code), or be subject to any defense, reduction, setoff, recoupment or counterclaim.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, expenses and other amounts described in the DIP Financing Documents as such become due and without need to

obtain further Court approval, including, without limitation, monitoring fees, agency fees, alternate transaction fees, closing fees, unused facility fees, continuing commitment fees, backstop fees, exit fees, servicing fees, yield maintenance premiums, audit fees, appraisal fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable and documented fees and disbursements of Agent's attorneys, advisors, accountants, and other consultants, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order or the DIP Financing Documents. Upon execution and delivery, the DIP Credit Agreement and other DIP Financing Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

(b)     <u>Approval; Evidence of Borrowing Arrangements</u>.   All terms, conditions and covenants set forth in the DIP Financing Documents (including, without limitation, the DIP Credit Agreement) are approved to the extent necessary to implement the terms and provisions of this Interim Order.  All such terms, conditions and covenants shall be sufficient and conclusive evidence of (a) the borrowing arrangements by and among Debtors, Agent and Lender, and (b) each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the DIP Credit Agreement and the other DIP Financing Documents for all purposes, including, without limitation, to the extent applicable, the payment of all Obligations arising thereunder, including, without limitation, all principal, interest, fees and other expenses, including, without limitation, all of Agent's and Lender's consultant fees, professional fees, attorney fees and legal expenses, as more fully set forth in the DIP Financing Documents.

(c)  Amendment.  Subject to the terms and conditions of the DIP Credit Agreement and the other DIP Financing Documents, Debtors and Agent may amend, modify, supplement or waive any provision of the DIP Financing Documents (a "DIP Amendment") without further approval or order of the Court, so long as  (a) such DIP Amendment is not material (for purposes hereof, a "material" DIP Amendment shall mean any DIP Amendment that operates to increase the interest rate other than as currently provided in the DIP Financing Documents, increase the Maximum Credit (as defined in the DIP Credit Agreement), increase or add an additional early termination fee or prepayment or repayment premium, add specific new events of default or enlarge the nature and extent of default remedies available to Agent and Lender following an event of default) and is undertaken in good faith by Agent, Lender and Debtors; (b) the Debtors provide prior written notice of the DIP Amendment (the "DIP Amendment Notice") to  the U.S. Trustee,  counsel to BA-Molagers SPV, and  counsel to any Committee, or in the event no such Committee is appointed at the time of such DIP Amendment, the 30 Largest Unsecured Creditors (collectively, the "Notice Parties"), and (c) the Debtors file the DIP Amendment Notice with the Court; provided, however, that neither consent of the Notice Parties nor approval of the Court will be necessary to effectuate any such amendment, modification or supplement.  Any material DIP Amendment to the DIP Financing Documents must be approved by the Court to be effective.

1.4  Payment of Pre-Petition Debt.  The Debtors are authorized to repay all Pre-Petition First Lien Obligations in accordance with the DIP Credit Agreement, the other DIP Financing Documents and this Interim Order, including, without limitation, Sections 1.5 and 1.6 of this Interim Order.  For the avoidance of any doubt, the rights of the Committee with respect to the validity, extent, and priority of the Pre-Petition First Lien Obligations and the liens

securing the Pre-Petition First Lien Obligations are fully reserved and preserved to the extent provided in section 4.1 of this Interim Order.

1.5     Payments and Application of Payments & DIP Collateral Proceeds; Roll-Up.  The Debtors are authorized and directed to make all payments and transfers of Estate property to Agent as provided for, permitted and/or required under the DIP Credit Agreement and the other DIP Financing Documents, which payments and transfers shall not be avoidable or recoverable from Agent or Lender under §§ 547, 548, 550, 553 or any other section of the Bankruptcy Code, or by reason of any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law or otherwise.   All proceeds of the DIP Collateral (as defined herein) received by Agent or Lender, and any other amounts or payments received by Agent or Lender in respect of the DIP Obligations, may be applied or deemed to be applied by Agent, in its discretion, first, to the indefeasible repayment in full of the Pre-Petition First Lien Obligations, and then in repayment of the DIP Obligations, all in accordance with the DIP Credit Agreement, the other DIP Financing Documents and this Interim Order.   Without limiting the generality of the foregoing, the Debtors are authorized without further order of this Court to pay or reimburse Agent and Lender for future costs and expenses, including, without limitation, all professional fees, consultant fees and legal fees and expenses paid or incurred by Agent or Lender in connection with the financing transactions as provided in this Interim Order and the DIP Financing Documents, all of which shall be and are included as part of the principal amount of the DIP Obligations and secured by the DIP Collateral (as defined herein).   Upon entry of the Final Order, all then outstanding Pre-Petition First Lien Obligations other than the Specified Pre-Petition Obligations (as defined in the DIP Credit Agreement) shall, to the extent

not having already been rolled up and converted into Revolving DIP Obligations in accordance with this Interim Order, shall be automatically rolled up and converted into DIP Obligations.

      1.6    <u>Continuation of Pre-Petition Procedures</u>.  Except to the extent expressly set forth in the DIP Financing Documents, all pre-petition practices and procedures for the payment and collection of proceeds of the DIP Collateral (as defined herein), the turnover of cash, the delivery of property to Agent and Lender, and any blocked depository bank account arrangements, are hereby approved and shall continue without interruption after the commencement of the Cases.

Section 2.    <u>Post-Petition Lien; Superpriority Administrative Claim Status.</u>

      2.1    <u>Post-Petition Lien</u>.

      (a)    <u>Post-Petition Lien Granting</u>.  To secure the prompt payment and performance of any and all DIP Obligations of Debtors to Agent and Lender of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, Agent, for the benefit of itself and Lender, shall have and is hereby granted, effective as of the Petition Date, valid and perfected first-priority security interests and liens, superior to all other liens, claims or security interests that any creditor of any of the Debtors' Estates may have (but subject to the Carve-Out (as defined below) and the Permitted Liens), in and upon all of the Collateral (as defined in the DIP Credit Agreement and referred to herein as the "<u>DIP Collateral</u>").  For the avoidance of doubt, solely for purposes of this Interim Order, "DIP Collateral" does not include (i) any of the Debtors' unexpired real property leases to the extent that such unexpired leases prohibit the non-consensual grant of security interests or liens in such unexpired leases (in which case, the DIP Collateral shall include the proceeds of such unexpired leases) and (ii) prior to the

entry of the Final Order, any proceeds of actions maintained or taken pursuant to Chapter 5 of the Bankruptcy Code (the "Avoidance Actions").

(b)     Lien Priority in DIP Collateral.  The liens and security interests of Agent and Lender granted under the DIP Financing Documents and this Interim Order in the DIP Collateral securing all DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with §§ 363, 364 or any other section of the Bankruptcy Code or other applicable law; provided, however, that Agent's and Lender's liens on and security interests in the DIP Collateral shall be subject only to (a) Permitted Liens, and (b) the Carve-Out (as defined below).

(c)     Right of Repayment.  The right of Agent and Lender to repayment in accordance with the DIP Financing Documents and this Interim Order from the sale or other disposition of the DIP Collateral, or any proceeds thereof, shall be first and senior in priority to all other rights of repayment of every kind, nature, and description (other than the Carve-Out).

(d)     Post-Petition Lien Perfection.  This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including without limitation control agreements with any deposit bank or with any other financial institution(s) holding a depository account or other account consisting of or containing Collateral (a "Perfection Act").  Notwithstanding the

foregoing, if Agent, shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, then Agent is authorized to perform such act, and the Debtors are authorized to perform such act to the extent necessary or required by Agent, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law.  Agent may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law. Should Agent so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

(e)    Nullifying Pre-Petition Restrictions to Post-Petition Financing. Notwithstanding anything to the contrary contained in any pre-petition agreement, contract, lease, document, note or instrument to which any Debtor is a party or under which any Debtor is obligated, except as otherwise permitted under the DIP Financing Documents, any provision that restricts, limits or impairs in any way any Debtor from granting Agent security interests in or liens upon any of the Debtors' assets or properties (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) under the DIP Financing Documents or this Interim Order, as applicable, or otherwise entering into and complying with all of the terms, conditions and provisions hereof or

of the DIP Financing Documents, shall not (a) be effective and/or enforceable against any such Debtors, Agent or Lender, as applicable, or (b) adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to Agent and Lender pursuant to this Interim Order or the DIP Financing Documents, in each case, to the maximum extent permitted under the Bankruptcy Code and other applicable law.

2.2     <u>Superpriority Administrative Expenses</u>.   For all DIP Obligations now existing or hereafter arising pursuant to this Interim Order or the DIP Financing Documents, Agent, for the benefit of itself and Lender, is granted an allowed superpriority administrative claim pursuant to § 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtors (other than the Carve-Out), whether now in existence or hereafter incurred by Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113 or 1114 of the Bankruptcy Code (other than the Carve-Out), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (the "<u>Post-Petition DIP Superpriority Claim</u>").

2.3     <u>Carve-Out</u>.

(a)     <u>Carve-Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate ("<u>Clerk and US Trustee Fees</u>"); (ii) all reasonable fees and expenses up to $50,000 incurred

by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve-Out"); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, and to the extent set forth in the Budget, all accrued and unpaid fees, disbursements, costs, and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtors' Professionals") and by any Creditors' Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtors' Professionals, "Professional Persons") at any time before or on the first business day following delivery by Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000 incurred after the first business day following delivery by Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by Agent to the Notice Parties, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Credit Agreement, respectively, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     Pre-Carve-Out Trigger Notice Funding.  On or before the Thursday of each week, Debtors shall fund from borrowing hereunder or cash on hand as of such date and any available cash thereafter held by any Debtor to fund into a segregated escrow account ("Funded Reserve Account") held by Katten Muchin Rosenman LLP in trust for the benefit of Professional Persons (or for the benefit of others as applicable to the extent funded with Clerk and US Trustee

Fees and/or the Chapter 7 Trustee Carve-Out) in an amount equal to the amount of Allowed Professional Fees set forth in the "Professional Fees (Escrow Account Funding)" line item of the Budget for the prior week.  The Debtors shall pay Allowed Professional Fees from the Funded Reserve Account prior to any and all other claims, and all payments of Allowed Professional Fees incurred prior to the Carve-Out Termination Date shall be paid first from such Funded Reserve Account.

(c) _Post-Carve Out Trigger Notice Funding_.  On the day on which a Carve-Out Trigger Notice is given by the Agent to counsel for the Debtors and the Committee (the "Carve-Out Termination Date"), the Carve-Out Trigger Notice shall be deemed a draw request and notice of borrowing hereunder and also a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund (A) the Funded Reserve Account in an amount equal to the sum of (x) the amounts set forth in paragraphs (a)(i) and (a)(ii), above, _plus_ (y) the total amount of unpaid Allowed Professional Fees set forth in the "Professional Fees (Escrow Account Funding)" line item of the Budget for any time before or on the first business day following delivery by Agent of a Carve Out Trigger Notice, to the extent not already funded in accordance with section 2.3(b), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (B) a segregated escrow account held by Katten Muchin Rosenman LLP in trust for the benefit of Professional Persons in an amount equal to the Post-Carve-Out Trigger Notice Cap (the "Post-Carve-Out Trigger Notice Reserve Account" and, together with the Funded Reserve Account, the "Carve-Out Reserve Accounts").

(d) _No Direct Obligation To Pay Allowed Professional Fees_.  Agent and Lender and BA-Molagers SPV shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any

Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order shall be construed to obligate Agent or Lender or BA-Molagers SPV, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     <u>Payment of Allowed Professional Fees Prior to the Carve-Out Termination Date</u>. Any payment or reimbursement made prior to the occurrence of the Carve-Out Termination Date in respect of any Allowed Professional Fees shall not reduce the Carve Out; *provided* that, upon the funding of the Carve-Out Reserve Accounts, the Debtors' authorization to use Cash Collateral to fund the Carve-Out Reserve Accounts shall cease, and the liens and claims of the Agent and Lender shall cease being subordinated to the Carve-Out, each with respect to and to the extent of the amounts so funded.

(f)     <u>Payment of Carve Out On or After the Carve-Out Termination Date</u>. Any payment or reimbursement made on or after the occurrence of the Carve-Out Termination Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Financing Documents, the Bankruptcy Code, and applicable law.

2.4     <u>Payment of Carve-Out</u>.

Payment from the Carve-Out, whether by or on behalf of Agent or Lender, shall not and shall not be deemed to reduce the DIP Obligations, and shall not and shall not be deemed to subordinate any of any of Agent's or Lender's liens and security interests in the Pre-Petition First Lien Collateral, any other DIP Collateral, the Pre-Petition First Lien Adequate

Protection Superpriority Claim (as defined below), or the Post-Petition DIP Superpriority Claim to any junior pre- or post-petition lien, interest or claim in favor of any other party.

2.5     Excluded Professional Fees.

(a)     Notwithstanding anything to the contrary in this Interim Order, neither the proceeds of DIP Collateral nor any Loans or any other credit or financial accommodations provided under or in connection with the DIP Financing Documents shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following:

(i)     an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (A) challenging the legality, validity, priority, perfection, or enforceability of (I) the Pre-Petition First Lien Obligations or Agent's and Lender's liens on and security interests in the Pre-Petition First Lien Collateral, (II) the Pre-Petition Second Lien Obligations or BA-Molagers SPV's liens on and security interests in the Pre-Petition Second Lien Collateral, or (III) the DIP Obligations or Agent's or Lender's liens on and security interests in the DIP Collateral; (B) invalidating, setting aside, avoiding, recharacterizing or subordinating, in whole or in part, (I) the Pre-Petition First Lien Obligations or Agent's and Lender's liens on and security interests in the Pre-Petition First Lien Collateral, (II) the Pre-Petition Second Lien Obligations or BA-Molagers SPV's liens on and security interests in the Pre-Petition Second Lien Collateral, or (III) the DIP Obligations or Agent's or Lender's liens on and security interests in the DIP Collateral; or (C) preventing, hindering or delaying Agent's or Lender's assertion or enforcement of any lien, claim, right or security interest or

realization upon any DIP Collateral in accordance with the terms and conditions of the DIP Credit Agreement, the DIP Financing Documents, and this Interim Order;

(ii)     a request to use Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior written consent of Agent;

(iii)    a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or section 364(d) of the Bankruptcy Code or otherwise incur Indebtedness (as defined in the Pre-Petition Credit Agreement) without the prior written consent of Agent (except to the extent permitted under the DIP Financing Documents);

(iv)     the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against Agent or Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest or disgorge any payments under chapter 5 of the Bankruptcy Code or any applicable state law equivalents;

(v)      the cost of investigation into any claims against Agent or Lender arising under or in connection with the Pre-Petition First Lien Loan Documents in excess of $50,000; or

(vi)     any act which has or could directly, materially and adversely modify or compromise the rights and remedies of Agent or Lender under this Interim Order, or which directly results in the occurrence of an Event of Default under this Interim Order or any DIP Financing Documents.

2.6     Limited Use of Cash Collateral; Adequate Protection.

(a)     Authorization to Use Cash Collateral.   Subject to the terms and conditions of this Interim Order, the DIP Credit Agreement, the DIP Financing Documents, and in accordance with the Budget, Borrowers shall be and are hereby authorized to use the Cash Collateral (as defined in section 363 of the Bankruptcy Code) for the period commencing on the date of this Interim Order and terminating upon the date on which Agent delivers an Enforcement Notice (as defined below) to the Notice Parties, subject to the liens and security interests granted to Agent and Lender; *provided* that during the Default Notice Period (as defined herein) the Debtors may use Cash Collateral solely for the following amounts and expenses: (i) to fund the Carve Out Reserves, as set forth in paragraph 2.3 above; and (ii) to meet payroll obligations and, as agreed by Agent, in its sole discretion, to pay expenses critical to the administration of the Debtors' Estates. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or any Debtor's use of Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Interim Order, the DIP Financing Documents and in accordance with the Budget.

(b)     Replacement Liens.

(i)     As adequate protection for the diminution in value of their interests in the Pre-Petition First Lien Collateral (including Cash Collateral) on account of the Borrowers' use of such Pre-Petition First Lien Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out on a dollar-for-dollar basis (collectively, the "First Lien Diminution in Value"), Agent, for the benefit of itself and Lender, is hereby granted pursuant to §§ 361 and 363 of the Bankruptcy Code,

and solely to the extent of the First Lien Diminution in Value, valid, binding, enforceable and perfected replacement liens upon and security interests in all DIP Collateral (the "Pre-Petition First Lien Replacement Lien").  The Pre-Petition First Lien Replacement Lien shall be junior and subordinate only to (A) the Carve-Out (B) the Permitted Liens, and (C) Agent's and Lender's liens on the DIP Collateral to secure the DIP Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

(ii)     As adequate protection for the diminution in value of their interests in the Pre-Petition Second Lien Collateral on account of the Borrowers' use of such Pre-Petition Second Lien Collateral, the imposition of the automatic stay and the subordination to the Carve-Out on a dollar-for-dollar basis (collectively, the "Second Lien Diminution in Value"), BA-Molagers SPV is hereby granted pursuant to §§ 361 and 363 of the Bankruptcy Code, and solely to the extent of the Second Lien Diminution in Value, valid, binding, enforceable and perfected replacement liens upon and security interests in all Pre-Petition Second Lien Collateral (the "Pre-Petition Second Lien Replacement Lien").  The Pre-Petition Second Lien Replacement Lien shall be junior and subordinate only to (A) the Carve-Out (B) the Permitted Liens, (C) Agent's and Lender's liens on the DIP Collateral to secure the DIP Obligations, (D) the Pre-Petition First Lien Replacement Lien, (E) the Pre-Petition First Lien Adequate Protection Superpriority Claim, and (F) the Post-Petition DIP Superpriority Claim, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Pre-Petition Second Lien Collateral.

(c)      Section 507(b) Priority Claims.

(i)      As adequate protection for the First Lien Diminution in Value, Agent, for the benefit of itself and Lender, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, and solely to the extent of the First Lien Diminution in Value, an allowed superpriority administrative expense claim in each of the Cases and any successor bankruptcy cases (the "Pre-Petition First Lien Adequate Protection Superpriority Claim").  The Pre-Petition First Lien Adequate Protection Superpriority Claim shall be junior only to (A) the Carve-Out, and (B) the Post-Petition DIP Superpriority Claim, and shall otherwise have priority over all administrative expense claims and unsecured claims against Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.

(ii)      As adequate protection for the Second Lien Diminution in Value, BA-Molagers SPV is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, and solely to the extent of the Second Lien Diminution in Value, an allowed superpriority administrative expense claim in each of the Cases and any successor bankruptcy cases (the "Pre-Petition Second Lien Adequate Protection Superpriority Claim").  The Pre-Petition Second Lien Adequate Protection Superpriority Claim shall be junior only to (A) the Carve-Out, (B) the Post-Petition DIP Superpriority Claim, and (C) the Pre-Petition First Lien Adequate Protection Superpriority Claim, and shall otherwise have priority over all administrative expense claims and unsecured claims against Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.

(d)      <u>Adequate Protection Payments and Protections</u>.

(i)      Upon entry of this Interim Order, as further adequate protection (the "<u>First Lien Adequate Protection Payments</u>") for the First Lien Diminution in Value, the Debtors are authorized and directed to provide adequate protection to Agent and Lender in the form of payment in cash (regardless of the Budget, and regardless of any First Lien Diminution in Value) for (i) the reasonable fees, expenses, and disbursements (including without limitation, the reasonable and documented fees, expenses, and disbursements of counsel and third-party consultants and other vendors, including without limitation, financial advisors and auditors) incurred by Agent arising prior to the Petition Date, and (ii) the reasonable fees, expenses, and disbursements (including without limitation, the fees, expenses, and disbursements of counsel and third-party consultants and other vendors, including without limitation, financial advisors and auditors) incurred by Agent arising subsequent to the Petition Date.

(ii)      Upon entry of this Interim Order, as further adequate protection (the "<u>Second Lien Adequate Protection Payments</u>," and together with the First Lien Adequate Protection Payments, the "<u>Adequate Protection Payments</u>") for the Second Lien Diminution in Value, the Debtors are authorized and directed to provide adequate protection to BA-Molagers SPV in the form of payment in cash (regardless of the Budget, and regardless of any Second Lien Diminution in Value) of up to $100,000.00 for (i) the reasonable fees, expenses, and disbursements (including without limitation, the reasonable and documented fees, expenses, and disbursements of counsel and third-party consultants and other vendors, including without limitation, financial advisors and auditors) incurred by BA-Molagers SPV arising prior to the Petition Date, and (ii) the

reasonable fees, expenses, and disbursements (including without limitation, the fees, expenses, and disbursements of counsel and third-party consultants and other vendors, including without limitation, financial advisors and auditors) incurred by BA-Molagers SPV arising subsequent to the Petition Date.

Section 3.        Default; Rights and Remedies; Relief from Stay.

3.1        Events of Default.  The occurrence of any of the following events shall constitute an "Event of Default" under this Interim Order: (a) any Debtor's failure to perform, in any respect, any of their obligations under this Interim Order; or (b) an "Event of Default" under the DIP Credit Agreement or any of the other DIP Financing Documents.

3.2        Rights and Remedies upon Event of Default.  Upon the occurrence of and during the continuance of an Event of Default, (a) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Order, the DIP Credit Agreement and the other DIP Financing Documents, and (b) Agent shall be entitled to take any act or exercise any right or remedy (subject to Section 3.4 below) as provided in this Interim Order or the DIP Credit Agreement or any of the other DIP Financing Documents, as applicable, including, without limitation, declaring all DIP Obligations immediately due and payable, accelerating the DIP Obligations, ceasing to extend Loans, setting off any DIP Obligations with DIP Collateral or proceeds in Agent's or Lender's possession, and enforcing any and all rights with respect to the DIP Collateral.  Agent and Lender shall have no obligation to lend or advance any additional funds to or on behalf of Debtors, or provide any other financial accommodations to Debtors, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

3.3     Expiration of Loan Commitment.   Upon the expiration of Borrowers' authority to borrow or otherwise obtain other credit accommodations from Agent and Lender pursuant to the terms of this Interim Order and the DIP Financing Documents (except if such authority shall be extended with the prior written consent of Agent, which consent shall not be implied or construed from any action, inaction or acquiescence by Agent or Lender), unless an Event of Default set forth in Section 3.1 above occurs sooner and the automatic stay has been lifted or modified pursuant to Section 3.4 of this Interim Order, all of the DIP Obligations shall immediately become due and payable and Agent and Lender shall have no obligation whatsoever to make or extend any loans, advances, provide any financial or credit accommodations to Debtors or permit the use of Cash Collateral.

3.4     Modification of Automatic Stay.   The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application or order of the Court to the extent necessary to permit Agent and Lender to perform any act authorized or permitted under or by virtue of this Interim Order or the DIP Financing Documents, as applicable, including, without limitation, (a) to implement the post-petition financing arrangements authorized by this Interim Order and pursuant to the terms of the DIP Financing Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Pre-Petition First Lien Obligations or the DIP Obligations, as applicable, including, without limitation, all interests, fees, costs and expenses permitted under the DIP Financing Documents (subject to Section 5.12 of this Interim Order) and apply such payments to the Pre-Petition First Lien Obligations or DIP Obligations pursuant to the DIP Financing

Documents and/or this Interim Order, as applicable, and upon an Event of Default, (d) declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral and (e) to take any other action and exercise all other rights and remedies provided to it by this Interim Order, the DIP Financing Documents or applicable law other than those rights and remedies against the DIP Collateral upon the expiration of the Default Notice Period (as defined below). In addition, and without limiting the foregoing, upon the occurrence of an Event of Default and after providing five (5) business days (the "Default Notice Period") prior written notice (the "Enforcement Notice") to the Notice Parties, Agent, acting on behalf of itself and Lender, without further notice, application or order of the Court, shall be entitled to take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Financing Documents or applicable law that Agent may deem appropriate in its sole discretion to proceed against and realize upon the DIP Collateral or any other assets or properties of Debtors' Estates upon which Agent, for the benefit of itself and Lender, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all DIP Obligations. Notwithstanding anything to the contrary, any action that Agent is otherwise permitted to take pursuant to this Interim Order to (i) terminate the Commitments, (ii) accelerate the Loans, (iii) send blocking notices or activation notices pursuant to the terms of any deposit account control agreement, and (iv) repay any amounts owing in respect of the DIP Obligations (including, without limitation, fees, indemnities and expense reimbursements), in each case, shall not require any advance notice to the Debtors.  During the Default Notice Period, the Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing, and Agent and Lender shall consent to such emergency hearing, within the Default Notice Period with the Court.  The Court may fashion any appropriate remedy at the emergency

hearing and may terminate the automatic stay as to Agent and Lender (and, in the event that the DIP Obligations and Pre-Petition First Lien Obligations have been paid in full, BA-Molagers SPV) to permit Agent and Lender (and, if applicable, BA-Molagers SPV) to exercise all remedies set forth herein and in the DIP Loan Documents, the Pre-Petition First Lien Loan Documents, and the Pre-Petition Second Lien Loan Documents, as applicable, and as otherwise available at law or in equity without further order of or application or motion to this Court.

Section 4.      <u>Representations; Covenants; and Waivers.</u>

      4.1      <u>Objections to Pre-Petition First and Second Lien Obligations</u>. Notwithstanding anything to the contrary in this Interim Order, any action, claim, defense, complaint, motion or other written opposition (hereinafter, an "<u>Objection</u>") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind: (a) the existence, validity or amount of the Pre-Petition First Lien Obligations and the Pre-Petition Second Lien Obligations as of the Petition Date, or (b) the extent, legality, validity, perfection or enforceability of (i) Agent's and Lender's pre-petition liens and security interests in the Pre-Petition First Lien Collateral and (ii) BA-Molagers SPV's pre-petition liens and security interests in the Pre-Petition Second Lien Collateral shall be properly filed with the Court on or before the earlier of (x) sixty (60) calendar days from the date of appointment of the Committee by the U.S. Trustee, (y) seventy-five (75) calendar days from the Petition Date, or (z) the first date on which a hearing for confirmation of a Plan of Reorganization is held; <u>provided</u>, <u>however</u>, that nothing herein shall permit any party to challenge the extent or validity of the DIP Obligations for any disbursements in excess of the Pre-Petition First Lien Obligations and the Pre-Petition Second Lien Obligations.  If any such Objection is timely and properly filed and a final, non-appealable order is entered by a court of

competent jurisdiction sustaining and ordering some or all of the relief requested in such Objection, then nothing in this Interim Order shall prevent the Court from granting appropriate relief with respect to (i) the Pre-Petition First Lien Obligations or Agent's or Lender's pre-petition liens on the Pre-Petition First Lien Collateral and (ii) the Pre-Petition Second Lien Obligations or BA-Molagers SPV's pre-petition liens on the Pre-Petition Second Lien Collateral. If no Objection is timely and properly filed, or if an Objection is timely and properly filed but denied, (i) the Pre-Petition First Lien Obligations and the Pre-Petition Second Lien Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and Agent's and Lender's pre-petition liens on and security interest in the Pre-Petition First Lien Collateral and BA-Molagers SPV's pre-petition liens on and security interests in the Pre-Petition Second Lien Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject to only the Carve-Out and Permitted Liens, and (ii) Agent, Lender, and BA-Molagers SPV, and each of their respective participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns (each in their respective capacities as such) shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Pre-Petition First Lien Loan Documents and Pre-Petition Second Lien Loan Documents, as applicable, and shall not be subject to any further objection or challenge relating thereto or arising therefrom by any party at any time.  Nothing contained in this Section 4.1(a) shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to Agent or Lender in connection with all post-petition Loans, and any other post-petition financial and credit accommodations provided by Agent and Lender to Debtors in reliance on

section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this Interim Order and the DIP Financing Documents.

4.2     Debtors' Waivers.  Prior to DIP Payment in Full, (x) it shall be an Event of Default if the Debtors seek further authority, and (y) upon entry of a Final Order, whether or not an Event of Default has occurred, the Debtors irrevocably waive any right that they may have:  (a) to use Cash Collateral of Agent and Lender under section 363 of the Bankruptcy Code other than as provided in this Interim Order, (b) to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than as provided in this Interim Order or as may be otherwise expressly permitted pursuant to the DIP Financing Documents, (c) to challenge the application of any payments authorized by this Interim Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Pre-Petition First Lien Collateral is less than the Pre-Petition First Lien Obligations, (d) to propose, support or have a plan of reorganization or liquidation that is either inconsistent with the Ratification Agreement or RSA (as defined in the DIP Credit Agreement), or (e) to seek relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of Agent or Lender as provided in this Interim Order and the DIP Financing Documents or Agent's or Lender's exercise of such rights or remedies; provided, however, that Agent may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by Agent or Lender.

4.3     Section 506(c) Claims.  Subject to entry of the Final Order, no costs or expenses of administration which have or may be incurred in the Cases shall be charged against Agent or Lender, their respective claims, or the DIP Collateral pursuant to §§ 105 or 506(c) of

the Bankruptcy Code or otherwise without the prior written consent of Agent, and no such consent shall be implied from any other action, inaction or acquiescence by Agent or Lender.

4.4    DIP Collateral Rights.  Until DIP Payment in Full:

(a)    no other party shall foreclose or otherwise seek to enforce any junior lien or claim in DIP Collateral; and

(b)    upon and after the declaration of the occurrence of an Event of Default, and subject to Agent obtaining relief from the automatic stay as provided for herein to enforce its rights and remedies against the DIP Collateral, in connection with a liquidation of any of the DIP Collateral, Agent (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, at the sole cost and expense of Debtors, to: (i) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by Debtors and (ii) use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their businesses.  Agent and Lender will be responsible for the payment of any applicable fees, rentals, royalties or other amounts due such lessor, licensor or owner of such property for the period of time that Agent actually uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that Agent actually occupies or uses such assets or properties or for any fees, rentals or other amounts that may become due following the end of Agent's occupation or use).

4.5     Releases.

Upon the entry of the Final Order, and subject to Section 4.1 above, in consideration of (i) Agent and Lender permitting Debtors to use the Pre-Petition First Lien Collateral (including Cash Collateral) and providing other credit and financial accommodations to the Debtors and (ii) BA-Molagers SPV permitting the Debtors to use the Pre-Petition Second Lien Collateral pursuant to the provisions of the DIP Financing Documents and this Interim Order, as applicable, each Debtor, on behalf of itself and its successors and assigns, (collectively, the "Releasors"), shall, forever release, discharge and acquit Agent, Lender, BA-Molagers SPV (each solely in its capacity as an agent or lender under the applicable loan documents) and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives in their respective capacities as such and in connection with Agent, Lender, or BA-Molagers SPV as applicable in its capacity as an agent or lender under the applicable loan documents (collectively, the "Pre-Petition Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that any of the Releasors had, have or hereafter can or may have against Pre-Petition Releasees (or any of them) as of the date hereof, in respect of events that occurred on or prior to the date hereof with respect to the Debtors, the Pre-Petition First Lien Obligations, the Pre-Petition First Lien Loan Documents, the Pre-Petition Second Lien Obligations, the Pre-Petition Second Lien Loan Documents, the DIP Obligations, the DIP Financing Documents and any Loans or other financial accommodations made by Agent, Lender, and/or BA-Molagers

SPV to Debtors pursuant to the Pre-Petition First Lien Loan Documents, the Pre-Petition Second Lien Loan Documents, or the DIP Financing Documents.

Section 5.     Other Rights and DIP Obligations.

5.1     No Modification or Stay of This Interim Order.  Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim Order, the DIP Financing Documents or any term hereunder or thereunder, (b) the failure to obtain a Final Order pursuant to Bankruptcy Rule 4001(c)(2), or (c) the dismissal or conversion of one or more of the Cases (each, a "Subject Event"), (x) the acts taken by each of Agent and Lender in accordance with this Interim Order, and (y) the DIP Obligations incurred or arising prior to Agent's actual receipt of written notice from Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Interim Order, and the acts taken by Agent and Lender in accordance with this Interim Order, and the liens granted to Agent and Lender in the DIP Collateral, and all other rights, remedies, privileges, and benefits in favor of Agent and Lender pursuant to this Interim Order and the DIP Financing Documents shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code.  For purposes of this Interim Order, the term "appeal", as used in section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Interim Order by this Court or any other tribunal.

5.2     Power to Waive Rights; Duties to Third Parties.  Agent shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order that are in favor of Agent and Lender (the "Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce,

any Lender Right(s).  Any waiver by Agent of any Lender Rights shall not be or constitute a continuing waiver.  Any delay in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, subject Agent or Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to Agent or Lender.

5.3     <u>Disposition of DIP Collateral</u>.   Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral outside the ordinary course of business, other than pursuant to the terms of the DIP Credit Agreement, this Interim Order, and the Budget, without the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or Lender) and, in each case, an order of this Court.

5.4     <u>Inventory</u>.  Debtors shall not, without the consent of Agent, (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

5.5     <u>Reservation of Rights</u>.   The terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of Agent and Lender to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Financing Documents or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral, as applicable, or priority in favor of any other party, to

object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estates.

5.6    Binding Effect.

(a)    The provisions of this Interim Order and the DIP Financing Documents, the DIP Obligations, the Pre-Petition First Lien Adequate Protection Superpriority Claim, the Post-Petition DIP Superpriority Claim and any and all rights, remedies, privileges and benefits in favor of each of Agent and Lender provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h) and 7062, shall continue in full force and effect, and shall survive entry of any such other order converting one or more of the Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Cases.

(b)    Any order dismissing one or more of the Cases under section 1112 or otherwise shall be deemed to provide (in accordance with §§ 105 and 349 of the Bankruptcy Code) that (a) the Post-Petition DIP Superpriority Claim and Agent's and Lender's liens on and security interests in the DIP Collateral and all other claims, liens, adequate protections and other rights granted pursuant to the terms of this Interim Order shall continue in full force and effect notwithstanding such dismissal until DIP Payment in Full, and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing all such claims, liens, protections and rights.

(c)    In the event this Court modifies any of the provisions of this Interim Order or the DIP Financing Documents following a Final Hearing, such modifications shall not affect the rights or priorities of Agent and Lender pursuant to this Interim Order with

respect to the DIP Collateral or any portion of the DIP Obligations which arises or is incurred or is advanced prior to such modifications, and this Interim Order shall otherwise remain in full force and effect to such extent.

(d)     This Interim Order shall be binding upon Debtors, all parties in interest in the Cases and their respective successors and assigns, including any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor.  This Interim Order shall also inure to the benefit of Debtors, Agent, Lender, and each of their respective successors and assigns.

5.7     <u>Restrictions on Cash Collateral Use, Additional Financing, Plan Treatment</u>.

(a)     All post-petition advances and other financial accommodations under the DIP Credit Agreement and the other DIP Financing Documents are made in reliance on this Interim Order and there shall not at any time be entered in the Cases, or in any subsequently converted case under chapter 7 of the Bankruptcy Code, any order (other than the Final Order) which authorizes the use of cash collateral of Debtors in which Agent or Lender have an interest, or the sale, lease, or other disposition of property of any Debtor's Estate in which Agent or Lender have a lien or security interest, except as expressly permitted hereunder or in the DIP Financing Documents, or authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which Agent or Lender hold a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to Agent and Lender herein; unless, in each instance (x) Agent shall have given its express prior written consent with respect thereto, no such consent being implied from

46

any other action, inaction or acquiescence by Agent or Lender, or (y) such other order requires DIP Payment in Full.  The security interests and liens granted to or for the benefit of Agent and Lender hereunder and the rights of Agent and Lender pursuant to this Interim Order and the DIP Financing Documents with respect to the DIP Obligations and the DIP Collateral are cumulative.

      5.8    No Owner/Operator Liability.  Subject to the entry of the Final Order, neither Agent nor Lender shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).

      5.9    Marshalling.  Subject to entry of the Final Order, in no event shall Agent or Lender be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral or the Pre-Petition First Lien Collateral.  Agent and Lender shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to Agent or Lender with respect to proceeds, products, offspring or profits of any of the DIP Collateral or the Pre-Petition First Lien Collateral, as applicable.

      5.10    Right of Setoff.  To the extent any funds were on deposit with Agent as of the Petition Date, including, without limitation, all funds deposited in, or credited to, an account of any Debtor with Agent or Lender immediately prior to the filing of the Cases (regardless of whether, as of the Petition Date, such funds had been collected or made available for withdrawal by any such Debtor), such funds (the "Deposited Funds") are subject to rights of setoff.  By

virtue of such setoff rights, the Deposited Funds are subject to a lien in favor of Agent and/or Lender, as applicable, pursuant to §§ 506(a) and 553 of the Bankruptcy Code.

       5.11   <u>Right to Credit Bid</u>.

       (a)   Agent, on behalf of itself and Lender, shall have the right to "credit bid" (including through the designation of third-party purchasers as contemplated in the APA) the amount of its and their claims that are DIP Obligations arising under the terms of the DIP Financing Documents and/or the Pre-Petition First Lien Obligations arising under the terms of the Pre-Petition First Lien Loan Documents, during any sale of all or substantially all of the Debtors' assets, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code.

       (b)   BA-Molagers SPV shall have the right, subject to the Subordination Agreement and the Intercreditor Support Agreement, to "credit bid" the amount of its claims that are the Pre-Petition Second Lien Obligations arising under the terms of the Pre-Petition Second Lien Loan Documents, during any sale of all or substantially all of the Debtors' assets, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)–(iii) of the Bankruptcy Code.

       5.12   <u>Payment and Review of Lender Professional Fees and Expenses</u>.   Each Debtor shall pay (i) all reasonable professional fees and other expenses of Agent and Lender to the extent provided in the DIP Financing Documents, whether incurred before or after the Petition Date, and (ii) up to $100,000 of reasonable professional fees and other expenses of BA-Molagers SPV to the extent provided in the DIP Financing Documents, whether incurred

before or after the Petition Date; <u>provided</u>, that Debtors shall pay all such reasonable fees and expenses within seven (7) business days of delivery of a statement or invoice for such fees and expenses (it being understood that such statements or invoices may be in summary form and shall not be required to be maintained in accordance with the U.S. Trustee Guidelines, nor shall any such counsel or other professional be required to file any interim or final fee applications with the Court or otherwise seek the Court's approval of any such payments) to the Debtors and the Committee (if appointed), unless, within such seven (7) business day period, the Debtors or the Committee (if appointed) serve a written objection upon the requesting party, in which case, the Debtors shall immediately pay such amounts that are not the subject of any objection and pay the withheld amount as subsequently agreed by the parties or ordered by the Court to be paid.

5.13   <u>Access to DIP Collateral</u>.  Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of Agent and Lender contained in this Interim Order, the DIP Financing Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Credit Agreement, upon reasonable prior written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing, Agent may, subject to the applicable notice provisions, if any, in this Interim Order and any separate applicable agreement by and between such landlord and Agent, enter upon any leased premises of the Debtors or any other party for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder, provided that Agent shall be obligated only to pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by Agent, calculated on a daily per diem basis. Nothing herein shall require Agent to assume any lease as a condition

to the rights afforded in this paragraph. For the avoidance of doubt, subject to (and without waiver of) the rights of Agent under applicable nonbankruptcy law, Agent can only enter upon a leased premises after an Event of Default in accordance with (i) a separate agreement with the landlord at the applicable leased premises, or (ii) upon entry of an order of this Court obtained by motion of Agent on such notice to the landlord as shall be required by this Court.

5.14    <u>Term; Termination</u>.  Notwithstanding any provision of this Interim Order to the contrary, the term of the financing arrangements among Debtors, Agent and Lender authorized by this Interim Order may be terminated pursuant to the terms of the DIP Credit Agreement.

5.15    <u>Limited Effect</u>.   In the event of a conflict between the terms and provisions of any of the DIP Financing Documents and this Interim Order, the terms and provisions of this Interim Order shall govern, interpreted as most consistent with the terms and provisions of the DIP Financing Documents.

5.16    <u>Objections Overruled</u>.  All objections to the entry of this Interim Order are (to the extent not withdrawn, waived, or settled) hereby overruled.

5.17    <u>Retention of Jurisdiction</u>.  The Court retains jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order, the DIP Credit Agreement, and the other DIP Financing Documents.

Section 6.    <u>Final Hearing and Response Dates.</u>

The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for September __, 2023, at ____ before this Court.  The Debtors shall promptly mail copies of this Interim Order to the Noticed Parties, and to any other party that has filed a request for notices with this Court and to any Committee (if appointed) and such Committee's counsel, if

same shall have filed a request for notice.  Such notice is deemed good and sufficient and that no further notice need be given.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) proposed restructuring counsel to the Debtors, (i) Katten Muchin Rosenman LLP, 50 Rockefeller Plaza, New York, New York 10020-1605, Attn: Cindi M. Giglio, Esq. and Michael E. Comerford, Esq.; (E-Mail: cgiglio@katten.com and michael.comerford@katten.com) and (ii) The Law Office of Liz Freeman, 700 Smith St., Houston, TX 77208-1209, Attn: Liz Freeman, Esq. (E-Mail: liz@lizfreemanlaw.com); (b) counsel for Agent, Otterbourg, P.C., 230 Park Avenue, New York, New York 10169, Attn: Chad B. Simon, Esq. and James V. Drew, Esq. (E-Mail: csimon@otterbourg.com and jdrew@otterbourg.com); (c) counsel for BA-Molagers SPV, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Brian E. Schartz, Esq. (E-Mail: bschartz@kirkland.com); (d) counsel to the Committee (if appointed); and (e) the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn: Ha Nguyen, Esq. and Vianey Garza, Esq. (E-Mail: ha.nguyen@usdoj.gov and vianey.garza@usdoj.gov), and shall be filed with the Clerk of the United States Bankruptcy Court for the Southern District of Texas, in each case, to allow actual receipt of the foregoing no later than ten (10) days prior to the Final Hearing.

Dated: Houston, Texas
      September __, 2023

 

_____
CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

## __EXHIBIT 1__

**Ratification Agreement**

RATIFICATION AND AMENDMENT AGREEMENT

This RATIFICATION AND AMENDMENT AGREEMENT (this "Ratification Agreement" as hereinafter further defined), dated as of September [___],  2023 is entered into by and among Triad Catalog Co., L.L.C., a Missouri limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Triad Catalog") and Triad Retail, L.L.C., a Missouri limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Triad Retail," and together with Triad Catalog and any other entity that may hereafter become party hereto as a Borrower, individually, a "Borrower" and collectively, "Borrowers"), Soft Surroundings Holdings, LLC, a Delaware limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Holdings"), Soft Surroundings Intermediate Holdings, LLC, a Delaware limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Intermediate Holdings," and together with Holdings and any entity that may hereafter become party hereto as a Guarantor, individually, a "Guarantor" and collectively, "Guarantors," and together with Borrowers, individually, a "Loan Party" and collectively, the "Loan Parties"), 1903 Partners, LLC, a Delaware limited liability company ("Lender") and 1903P Loan Agent, LLC, in its capacity as agent for Lender (in such capacity, "Agent" as hereinafter further defined).

W I T N E S S E T H:

WHEREAS, on September 10, 2023 (the "Petition Date"), each Loan Party commenced a voluntary chapter 11 case, as administratively consolidated (individually, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases"), with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") and each Loan Party continues to operate its business and manage its properties as debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, Lender provided financing to Borrowers as set forth in the Credit Agreement, dated as of July 20, 2023, by and among the Agent, Lender, Borrowers and Intermediate Holdings (as amended prior to the date hereof and in effect immediately prior to the DIP Facility Closing Date, the "Pre-Petition Credit Agreement," and as ratified and amended and restated, supplemented and otherwise modified pursuant to this Ratification Agreement, and as the same may hereafter be further amended, modified, supplemented, extended, renewed, restated or replace, the "Credit Agreement");

WHEREAS, on or about the date hereof, Holdings has become a party to the Credit Agreement pursuant to this Ratification Agreement and the other Loan Documents as set forth in the Joinder Agreement, dated of even date herewith, by Holdings with and in favor of Agent and Lender;

WHEREAS, Loan Parties have requested that Lender make post-petition loans to Borrowers secured by substantially all of the assets and properties of Loan Parties as set forth in the Financing Orders and the Loan Documents and make certain amendments to the Pre-Petition Credit Agreement, and Lender is willing to do so, subject to (a) entry by the Bankruptcy Court of an Interim Financing Order and (b) the other terms and conditions contained herein; and

WHEREAS, each Borrower and Intermediate Holdings desires to reaffirm its obligations to Agent and Lender pursuant to the Pre-Petition Loan Documents and acknowledge its continuing liabilities to Agent and Lender thereunder in order to induce Lender to make such post-petition loans to Borrowers;

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrowers mutually covenant, warrant and agree as follows:

1.    Definitions; Interpretation.

1.1    Additional Definitions.  As used herein, the following terms shall have the meaning assigned to them below and the Pre-Petition Loan Documents shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

"Financing Orders" has the meaning assigned to such term in the Credit Agreement after giving effect to the Ratification Agreement.

"Post-Petition Collateral" has the meaning assigned to such term in the Credit Agreement after giving effect to the Ratification Agreement.

"Post-Petition Obligations" has the meaning assigned to such term in the Credit Agreement after giving effect to the Ratification Agreement.

"Ratification Agreement" means the Ratification and Amendment Agreement, dated as of September [____], 2023, by and among Loan Parties, Agent and Lender.

"Pre-Petition Collateral" has the meaning assigned to such term in the Credit Agreement after giving effect to the Ratification Agreement.

"Pre-Petition Loan Documents" has the meaning assigned to such term in the Credit Agreement after giving effect to the Ratification Agreement, provided, that, for purposes of the amendments to definitions set forth in Section 1.2 of the Ratification Agreement, such term shall not include the Pre-Petition Credit Agreement as amended and restated pursuant to the Ratification Agreement.

"Pre-Petition Obligations" has the meaning assigned to such term in the Credit Agreement after giving effect to the Ratification Agreement.

"Ratification Effective Date" means the DIP Facility Closing Date as such term is defined in the Credit Agreement after giving effect to the Ratification Agreement.

1.2    Amendments to Definitions.

(a) The definition of "Collateral" in the Pre-Petition Loan Documents, or any other term referring to the security for the Pre-Petition Obligations, are each hereby amended to add to such reference the following:

(including, collectively, the Pre-Petition Collateral and the Post-Petition Collateral).

(b) The definition of "Credit Agreement" or other references to the Pre-Petition Credit Agreement in the Pre-Petition Loan Documents are each hereby amended to add to such reference the following:

(including as amended by the Ratification Agreement and as ratified, assumed and adopted by each Loan Party as debtor and debtor-in-possession pursuant to the terms thereof and

2

the Financing Orders, and as amended and supplemented thereby or pursuant thereto, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced).

(c) The definition of "Loan Documents" or any other references to the Pre-Petition Loan Documents in the Pre-Petition Loan Documents, are each hereby amended to add to such reference the following:

(and including, in addition and not in limitation, the Ratification Agreement and all of the Pre-Petition Loan Documents, as ratified, assumed and adopted by each Loan Party as debtor and debtor-in-possession pursuant to the terms of the Ratification Agreement, and as amended and supplemented thereby, and the Financing Orders, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced).

(d) The definition of "Obligations" or "Secured Obligations" or any other references to such Obligations in the Pre-Petition Loan Documents are each hereby amended to add to such reference the following:

(and including, the Pre-Petition Obligations and the Post-Petition Obligations).

1.3    Interpretation.

(a) For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Credit Agreement after giving effect to this Ratification Agreement.

(b) Each reference to the terms "Borrower", "Guarantor", "Debtor" or "Loan Party" in any of the Pre-Petition Loan Documents shall be deemed and each such reference is hereby amended to mean and include (as applicable) the applicable Loan Party, each as defined herein, and its successors and assigns (including any trustee or other fiduciary hereafter appointed as any Loan Party's legal representative, as applicable, or with respect to any Loan Party the property of the estate of such Loan Party whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case or cases and its successor upon conclusion of the Chapter 11 Case of such Loan Party, as the case may be).

(c) Each reference to the "Agreement", "Credit Agreement", "thereunder", "thereof", "therein" or words of like import originally applicable to the Pre-Petition Credit Agreement contained in any Pre-Petition Loan Document shall mean and be a reference to the Credit Agreement as set forth in Exhibit A to this Ratification Agreement, as such Credit Agreement may be amended, supplemented, restated or otherwise modified from time to time.

2.    Amendments to Pre-Petition Credit Agreement.

2.1    As of the Ratification Effective Date, the Pre-Petition Credit Agreement (excluding the schedules and exhibits thereto, which shall remain in full force and effect, except as specifically amended and restated pursuant to Section 2.2 of this Ratification Agreement) is hereby amended and restated in its entirety such that on the Ratification Effective Date, the terms and conditions set forth in Exhibit A hereto shall replace and supersede in their entirety the terms and conditions set forth in the Pre-Petition Credit Agreement.

2.2   All schedules and exhibits to the Pre-Petition Credit Agreement, as in effect immediately prior to the Ratification Effective Date, shall constitute schedules and exhibits to the Credit Agreement, except, that, those schedules and exhibits which are attached to the Credit Agreement as set forth in Exhibit A to this Ratification Agreement shall constitute those respective schedules and exhibits after the date of this Ratification Agreement.

3.   Acknowledgment.

3.1   Pre-Petition Obligations.  Each Loan Party hereby acknowledges, confirms and agrees that, as of September 10, 2023, Loan Parties are jointly and severally indebted to Lender in respect of all Pre-Petition Obligations in the aggregate principal amount of not less than $[15,120,846.94], consisting of Loans to Borrowers made pursuant to the Pre-Petition Credit Agreement, together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and legal expenses) accrued and owing by Borrowers pursuant to the terms of the Pre-Petition Credit Agreement, all of which are unconditionally owing by Loan Parties to Lender, without offset, defense or counterclaim of any kind, nature and description whatsoever.

3.2   Acknowledgment of Security Interests.   Each Loan Party hereby acknowledges, confirms and agrees that Agent, (a) has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens (subject as to priority to those Permitted Liens that have priority by operation of law, which shall not include the Carve-Out) upon all Pre-Petition Collateral heretofore granted to Pre-Petition Agent pursuant to the Pre-Petition Loan Documents as in effect immediately prior to the Petition Date to secure all of the Obligations, and (b) shall have valid and enforceable security interests in and liens upon all Post-Petition Collateral granted to Agent under the Financing Orders or hereunder or under any of the other Loan Documents or otherwise granted to or held by Agent having the priorities set forth in the Loan Documents and the Financing Orders, as the case may be, and subject as to priority as to those Permitted Liens that have priority by operation of law and any other Liens expressly permitted by the Financing Orders that under the terms thereof have priority over the security interests and liens in favor of Lender.

3.3   Binding Effect of Documents.   Each Loan Party hereby acknowledges, confirms and agrees that: (a) each of the Pre-Petition Loan Documents to which it is a party was duly executed and delivered to Agent and Lender by such Loan Party and each is in full force and effect as of the date hereof, (b) the agreements and obligations of such Loan Party contained in the Pre-Petition Loan Documents constitute the legal, valid and binding obligations of such Loan Party enforceable against it in accordance with the terms thereof, and such Loan Party has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Agent and Lender are and shall be entitled to all of the rights, remedies and benefits provided for in the Loan Documents and the Financing Orders.

3.4   Adoption and Ratification of Pre-Petition Loan Documents.   Each Loan Party hereby (a) ratifies, restates, assumes, adopts, affirms and confirms all of the terms and conditions of the Pre-Petition Loan Documents, as amended and supplemented pursuant hereto and pursuant to the Financing Orders, and each Loan Party agrees to be fully bound, as Debtor and Debtor-in-Possession, by the terms of the Pre-Petition Loan Documents to which such Loan Party is a party and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Pre-Petition Loan Documents, as amended by this Ratification Agreement, and in accordance with the Financing Orders.   All of the Pre-Petition Loan Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by each Loan Party, each as Debtor and Debtor-in-Possession, and considered as agreements between such Loan Party, on the one hand, and Agent and Lender, as applicable, on the other hand.

4.   <u>Grant of Security Interest for DIP Credit Facility</u>.  As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), each Loan Party, each as debtor and debtor-in-possession, hereby grants, pledges and assigns to Agent (for itself and Lender), and also confirms, reaffirms and restates the prior grant to Agent of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral.

5.   <u>Representations and Warranties</u>.  Each Loan Party represents and warrants with and to Agent and Lender as follows, which representations and warranties shall survive the execution and delivery hereof:

5.1   <u>Authorization; Enforceability</u>.  Subject to the entry of the Interim Financing Order, the execution, delivery and performance by each Loan Party of this Ratification Agreement has been duly authorized by all necessary organizational actions and, if required, actions by equity holders.  This Ratification Agreement has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

5.2   <u>No Conflicts</u>.  The execution, delivery, and performance by each Loan Party of this Ratification Agreement does not and will not (a) violate any material provision of Federal, State, or local law or regulation applicable to such Loan Party, the Organization Documents of such Loan Party, or any order,  judgment, or decree of any court or other Governmental Authority binding on such Loan Party or its property, (b) except as otherwise excused by the Bankruptcy Code, conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material agreement of such Loan Party where any such conflict, breach or default could individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (c) result in the creation or imposition of, or require or give rise to any obligation to grant, any lien, security interest, charge or other encumbrance upon any property of such Loan Party, other than Permitted Liens, or (d) require any approval of any holder of Equity Interests of such Loan Party or any approval or consent of any Person under any material agreement of such Loan Party, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of material agreements, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Effect.

5.3   <u>Governmental Approvals</u>.  Subject to the entry of the Interim Financing Order, the execution, delivery, and performance by each Loan Party of this Ratification Agreement and the consummation of the transactions contemplated hereby do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than registrations, consents, approvals, notices, or other actions that have been obtained and that are still in force and effect and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Agent for filing or recordation, as of the Ratification Effective Date.

5.4   <u>Representations and Warranties</u>.  All of the representations and warranties of each Loan Party set forth herein and in each of the other Loan Documents are true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) on and as of the Ratification Effective Date before and after giving effect to the effectiveness of this Ratification Agreement and the transactions contemplated hereby with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date in which case such representations and warranties shall be true and

correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) as of such earlier date.

6.    Conditions Precedent to Ratification Effective Date.  The amendments contained herein shall only be effective upon satisfaction of each of the following conditions precedent:

6.1    Agent shall have received executed counterparts of this Ratification Agreement, duly authorized, executed and delivered by the Loan Parties and any other Loan Document required by the terms hereof to be delivered in connection herewith by Loan Parties in form and substance satisfactory to Agent, duly authorized, executed and delivered by the parties thereto; and

6.2    each of the conditions precedent set forth in Sections 4.1 and 4.2 of the Credit Agreement (as amended hereby) is satisfied.

7.    Release.

7.1    Release of Pre-Petition Claims.

(a)  Upon the entry of and subject to the Interim Financing Order, in consideration of the agreements of Agent and Lender contained herein and the making of any Loans by Lender, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Loan Party on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges each of Agent and Lender and its successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Agent and Lender and all such other parties being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Pre-Petition Released Claim" and collectively, "Pre-Petition Released Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which any Loan Party, or any of its predecessors, successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Ratification Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Pre-Petition Credit Agreement, as amended and supplemented through the date hereof, and the other Pre-Petition Loan Documents.

(b)  Upon the entry of and subject to the Interim Financing Order, each Loan Party, on behalf of itself and its predecessors, successors, assigns, and other legal representatives, as Debtors, but not on behalf of the bankruptcy estate of any Loan Party, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Loan Party pursuant to this Section 7.1.  If any Loan Party violates the foregoing covenant, the Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

7.2    Release of Post-Petition Claims.  Upon (a) the receipt by Lender of payment in full of all Obligations (other than contingent and indemnification obligations for which no claim has been asserted) in cash or other immediately available funds, plus cash collateral or other collateral security

acceptable to Agent to secure any Obligations that survive or continue beyond the termination of the Loan Documents, and (b) the termination of the Loan Documents (the "Payment Date"), in consideration of the agreements of Agent and Lender contained herein and the making of any Loans by or on behalf of Lender, each Loan Party hereby covenants and agrees to execute and deliver in favor of Agent and Lender a valid and binding termination agreement, in form and substance satisfactory to Agent and Lender, the terms of which as to a release, subject to the entry of the Final Financing Order, shall be substantially consistent with the terms of the release provided for in this Section 7, subject to being supplemented to reflect any requirements of applicable state law.  If any Loan Party violates such covenant, the Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

7.3    Releases Generally.

(a)  Each Loan Party understands, acknowledges and agrees that the releases set forth above in Sections 7.1 and 7.2 hereof may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

(b)  Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 7.1 hereof and, when made, Section 7.2 hereof.

8.    Miscellaneous.

8.1    Amendments and Waivers.    Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing executed in accordance with the requirements of Section 12.3 of the Credit Agreement.

8.2    No Novation.  The terms and conditions of the Pre-Petition Credit Agreement are amended as set forth in, and restated in their entirety and superseded by, Exhibit A to this Ratification Agreement.  Nothing in this Ratification Agreement (including Exhibit A hereto) shall be deemed to be a novation of any of the Obligations as defined in the Pre-Petition Credit Agreement or in any way impair or otherwise affect the rights or obligations of the parties thereunder (including with respect to Loans and representations and warranties made thereunder) except as such rights or obligations are amended or modified hereby.  Notwithstanding any provision of this Ratification Agreement or any other Loan Document or instrument executed in connection herewith, the execution and delivery of this Ratification Agreement and the incurrence of Obligations hereunder shall be in substitution for, but not in payment of, the Obligations owed by the Loan Parties under the Pre-Petition Credit Agreement.  The Pre-Petition Credit Agreement as amended and restated pursuant to the terms set forth in Exhibit A shall be deemed to be a continuing agreement among the parties, and all documents, instruments and agreements delivered pursuant to or in connection with the Pre-Petition Credit Agreement not amended and restated in connection with the entry of the parties into this Ratification Agreement shall remain in full force and effect, each in accordance with its terms, as of the date of delivery or such other date as contemplated by such document, instrument or agreement to the same extent as if the modifications to the Pre-Petition Credit Agreement contained herein were set forth in an amendment to the Pre-Petition Credit Agreement in a customary form, unless such document, instrument or agreement has otherwise been terminated or has expired in accordance with or pursuant to the terms of this Ratification Agreement, the Pre-Petition Credit Agreement or such document, instrument or agreement or as otherwise agreed by the required parties hereto or thereto.  The amendments provided for herein, including in Exhibit A hereto, shall not, in any manner, be construed to impair, limit, cancel or extinguish, or constitute a novation in respect of, the

Indebtedness and other obligations and liabilities of any Loan Party evidenced by or arising under the Credit Agreement or the other Loan Documents.

       8.3   <u>Headings</u>.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

       8.4   <u>Counterparts; Electronic Execution</u>.  This Ratification Agreement, any documents executed in connection herewith and any notices delivered under this Ratification Agreement may be executed by means of (i) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, or any other relevant and applicable electronic signatures law; (ii) an original manual signature; or (iii) a faxed, scanned, or photocopied manual signature.  Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature.  This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute only one instrument.

       8.5   <u>Costs and Expenses</u>.  Subject to the terms of the Financing Orders, Loan Parties shall pay to Agent and Lender on demand all costs and expenses that Agent or Lender pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Ratification Agreement and the other Loan Documents and the Financing Orders as set forth in the Credit Agreement (as amended hereby).

       8.6   <u>Financing Orders</u>.  In the event of any inconsistency between the terms of the Financing Orders and the Loan Documents, the terms of the Financing Orders shall control.

       [REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

LENDER:

1903 PARTNERS, LLC

By: _____
Name: _____
Title: _____

AGENT:

1903P LOAN AGENT, LLC

By: _____
Name: _____
Title: _____

[signatures continue on next page]

[signatures continued from previous page]

<u>BORROWERS</u>:

TRIAD CATALOG CO., L.L.C.,
as Debtor and Debtor-In-Possession

By: _____
Name: _____
Title: _____

TRIAD RETAIL, L.L.C.,
as Debtor and Debtor-In-Possession

By: _____
Name: _____
Title: _____

<u>GUARANTORS</u>:

SOFT SURROUNDINGS INTERMEDIATE HOLDINGS, LLC,
as Debtor and Debtor-In-Possession

By: _____
Name: _____
Title: _____

SOFT SURROUNDINGS HOLDINGS, LLC,
as Debtor and Debtor-In-Possession

By: _____
Name: _____
Title: _____

EXHIBIT A
to
<u>RATIFICATION AND AMENDMENT AGREEMENT</u>

<u>Credit Agreement</u>

See attached.

EXHIBIT A
to
Ratification and Amendment Agreement

---

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
CREDIT AGREEMENT

by and among

TRIAD CATALOG CO., L.L.C.,
as debtor and debtor-in-possession
TRIAD RETAIL, L.L.C.,
as debtor and debtor-in-possession
as Borrowers

SOFT SURROUNDINGS HOLDINGS, LLC,
as debtor and debtor-in-possession
SOFT SURROUNDINGS INTERMEDIATE HOLDINGS, LLC,
as debtor and debtor-in-possession
as Guarantors

1903P LOAN AGENT, LLC,
as Agent

1903 PARTNERS, LLC
as Lender

Dated: September [____], 2023

---

TABLE OF CONTENTS

**Page**

SECTION 1.    DEFINITIONS.................................................................................2

    1.1    Defined Terms ....................................................................2
    1.2    Interpretative Provisions ...................................................36
    1.3    Accounting Terms..............................................................37
    1.4    Rounding............................................................................38
    1.5    [Reserved].........................................................................38
    1.6    Divisions............................................................................38
    1.7    Rates..................................................................................38

SECTION 2.    CREDIT FACILITY ........................................................................38

    2.1    Loans.................................................................................38
    2.2    Requests for Loans............................................................39
    2.3    [Reserved].........................................................................40
    2.4    [Reserved].........................................................................40
    2.5    [Reserved].........................................................................40
    2.6    Protective Advances ..........................................................40
    2.7    Pre-Petition Obligations....................................................40

SECTION 3.    INTEREST AND FEES .....................................................................41

    3.1    Rates and Payment of Interest...........................................41
    3.2    Computation of Interest and Fees. ....................................41
    3.3    Fees ...................................................................................42
    3.4    Inability to Determine Rates. ............................................42
    3.5    Illegality ...........................................................................43
    3.6    Compensation for Losses ..................................................44
    3.7    Maximum Interest .............................................................44

SECTION 4.    CONDITIONS PRECEDENT ............................................................44

    4.1    Conditions Precedent to Initial Term Loans .....................44
    4.2    Conditions Precedent to each Loan...................................47

SECTION 5.    PAYMENTS AND ADMINISTRATION............................................48

    5.1    Payments Generally, Allocation of Proceeds....................48
    5.2    [Reserved.]........................................................................49
    5.3    Indemnity for Returned Payments ....................................49
    5.4    Maturity; Effect of Maturity.............................................49
    5.5    Prepayments of Loans; Additional Cash Collateral..........49
    5.6    Maintenance of Loan Account; Statements. ......................51
    5.7    Taxes.................................................................................51
    5.8    Triad Catalog as Agent for Loan Parties...........................52

SECTION 6.      REPRESENTATIONS AND WARRANTIES ........................................53

    6.1      Organization; Powers.........................................................................53
    6.2      Authorization; Enforceability ..........................................................53
    6.3      No Conflicts ......................................................................................53
    6.4      Governmental Approvals ..................................................................53
    6.5      Financial Statements; No Material Adverse Effect ........................53
    6.6      Properties; No Liens .........................................................................54
    6.7      Litigation ..........................................................................................54
    6.8      Compliance with Laws .....................................................................54
    6.9      Environmental Condition ..................................................................54
    6.10      No Defaults .......................................................................................54
    6.11      Material Contracts.............................................................................54
    6.12      Restrictive Agreements .....................................................................55
    6.13      Taxes .................................................................................................55
    6.14      ERISA ...............................................................................................55
    6.15      Insurance ...........................................................................................55
    6.16      Capitalization and Subsidiaries ........................................................55
    6.17      Security Interest in Collateral ..........................................................55
    6.18      Brokers ..............................................................................................55
    6.19      Intellectual Property .........................................................................56
    6.20      Trade Relations .................................................................................56
    6.21      Labor Relations ................................................................................56
    6.22      [Reserved.] .......................................................................................56
    6.23      Margin Regulations, Investment Company Act, Etc .......................56
    6.24      Complete Disclosure ........................................................................56
    6.25      OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws; Patriot
    Act      .............................................................................................................56
    6.26      BA-Molagers Subordinated Loan Documents .................................57
    6.27      Credit Card Agreements ....................................................................57
    6.28      DIP Budget.......................................................................................57
    6.29      Chapter 11 Cases; Super-Priority Administrative Expense Claim. ...................57
    6.30      DIP Asset Purchase Documents.......................................................58

SECTION 7.      AFFIRMATIVE COVENANTS .....................................................58

    7.1      Financial Statements, Borrowing Base Certificate and Other Information ......58
    7.2      Notices of Material Events...............................................................61
    7.3      Existence ...........................................................................................62
    7.4      Payment of Obligations....................................................................62
    7.5      Maintenance of Properties ................................................................62
    7.6      Compliance with Laws; OFAC; Sanctions, Etc..............................62
    7.7      Insurance ...........................................................................................62
    7.8      Inspection Rights; Field Examinations; Appraisals.........................62
    7.9      Cash Management; Collection of Proceeds of Collateral. ...............63
    7.10      Additional Collateral; Further Assurances.......................................64
    7.11      End of Fiscal Years; Fiscal Quarters ...............................................65
    7.12      Costs and Expenses...........................................................................65
    7.13      [Reserved] .........................................................................................66
    7.14      Investment Bank ...............................................................................66
    7.15      Chief Restructuring Officer ..............................................................66

|       | 7.16 | Milestones ................................................................ | 67 |
|       | 7.17 | Advisors to Agent and Lender ................................................ | 67 |
|       | 7.18 | Inventory Matters ........................................................ | 67 |
|       | 7.19 | DIP Budget ............................................................. | 68 |
|       | 7.20 | Compliance with Financing Orders, Etc .......................................... | 70 |
|       | 7.22 | No Discharge ............................................................ | 70 |
|       | 7.23 | Waiver of Certain Rights ..................................................... | 70 |
|       | 7.24 | Post-Closing Actions ....................................................... | 71 |

SECTION 8.   NEGATIVE COVENANTS ................................................................ 71

|       | 8.1  | Indebtedness ............................................................. | 71 |
|       | 8.2  | Liens .................................................................. | 71 |
|       | 8.3  | Fundamental Changes ....................................................... | 71 |
|       | 8.4  | Asset Dispositions ......................................................... | 71 |
|       | 8.5  | Investments ............................................................. | 72 |
|       | 8.6  | Transactions with Affiliates .................................................. | 72 |
|       | 8.7  | Change in Business ........................................................ | 72 |
|       | 8.8  | Restricted Payments ....................................................... | 72 |
|       | 8.9  | Restrictive Agreements ..................................................... | 73 |
|       | 8.10 | Certain Payments of Indebtedness, Etc .......................................... | 73 |
|       | 8.11 | Amendment of Material Documents ............................................. | 74 |
|       | 8.12 | Accounting Methods ....................................................... | 74 |
|       | 8.13 | Use of Proceeds .......................................................... | 74 |
|       | 8.14 | Reclamation Claims; Pre-Petition Payables ....................................... | 75 |
|       | 8.15 | Insolvency Proceeding Claims ................................................. | 75 |
|       | 8.16 | Bankruptcy Actions ........................................................ | 75 |
|       | 8.17 | Carve-Out .............................................................. | 75 |

SECTION 9.   [Reserved] ................................................................... 76

SECTION 10.  EVENTS OF DEFAULT AND REMEDIES ................................................ 76

|       | 10.1 | Events of Default .......................................................... | 76 |
|       | 10.2 | Remedies ............................................................... | 79 |
|       | 10.3 | Application of Funds ....................................................... | 80 |
|       | 10.4 | Right of Setoff ........................................................... | 80 |
|       | 10.5 | Crediting of Payments and Proceeds ............................................ | 81 |
|       | 10.6 | Agent May File Proofs of Claim ............................................... | 81 |

SECTION 11.  AGENCY ..................................................................... 81

|       | 11.1 | Appointment and Authority ................................................... | 81 |
|       | 11.2 | Exculpatory Provisions ...................................................... | 82 |
|       | 11.3 | Reliance by Agent ......................................................... | 82 |
|       | 11.4 | Delegation of Duties ....................................................... | 82 |
|       | 11.5 | Resignation of Agent ....................................................... | 82 |

SECTION 12.  JURY TRIAL WAIVER; AMENDMENTS AND OTHER WAIVERS
CONSENTS; GOVERNING LAW ........................................................ 83

12.1    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver.......................83
12.2    Waiver of Notices .................................................................................................84
12.3    Amendments and Waivers ......................................................................................84
12.4    Waiver of Counterclaims ........................................................................................84
12.5    Indemnity; Damage Waiver. ...................................................................................85

SECTION 13.    NOTICES; MISCELLANEOUS ...............................................................86

13.1    Notices. ................................................................................................................86
13.2    Disclosure ............................................................................................................87
13.3    Partial Invalidity....................................................................................................87
13.4    Successors and Assigns.........................................................................................87
13.5    Entire Agreement..................................................................................................88
13.6    USA Patriot Act ...................................................................................................88
13.7    Counterparts, Electronic Signature, Etc..................................................................88

INDEX
TO
EXHIBITS AND SCHEDULES

Exhibit A                    Initial DIP Budget

Exhibit B                    Form of Borrowing Base Certificate

Exhibit C-1                  Form of Compliance Certificate

Exhibit C-2                  Form of DIP Budget Compliance Certificate

Exhibit D                    Form of Borrowing Request

Exhibit E                    Reserved

Exhibit F                    Reserved

Exhibit G                    Reserved

Exhibit H                    Form of Credit Card Notification

Schedule 6.7                 Litigation

Schedule 6.9                 Environmental Matters

Schedule 6.11                Material Agreements

Schedule 6.12                Restrictive Agreements

Schedule 6.15                Insurance

Schedule 6.16                Subsidiaries

Schedule 6.19                Intellectual Property

Schedule 6.21                Collective Bargaining Agreements

Schedule 6.27                Credit Card Agreements

Schedule 7.1                 Collateral Reporting

Schedule 7.9                 Bank Accounts

Schedule 7.16                Milestones

Schedule 7.24                Post-Closing Deliveries

Schedule 8.1                 Existing Indebtedness

Schedule 8.2                    Existing Liens

Section 8.6                     Transactions with Affiliates

## SENIOR SECURED, SUPER-PRIORITY
## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement ("Agreement") dated as of September [\_\_\_], 2023 is entered into by and among Triad Catalog Co., L.L.C., a Missouri limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Triad Catalog") and Triad Retail, L.L.C., a Missouri limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Triad Retail," and together with Triad Catalog and any other entity that may hereafter become party hereto as a Borrower, individually, a "Borrower" and collectively, "Borrowers"), Soft Surroundings Holdings, LLC, a Delaware limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Holdings"), Soft Surroundings Intermediate Holdings, LLC, a Delaware limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Intermediate Holdings," and together with Holdings and any entity that may hereafter become party hereto as a Guarantor, individually, a "Guarantor" and collectively, "Guarantors," and together with Borrowers, each a "Loan Party" and collectively, the "Loan Parties"), 1903 Partners, LLC, a Delaware limited liability company ("Lender") and 1903P Loan Agent, LLC, a Delaware limited liability company, in its capacity as agent for Lender (in such capacity, "Agent" as hereinafter further defined).

PRELIMINARY STATEMENTS:

A.  On September [10], 2023 (the "Petition Date"), each Loan Party commenced a voluntary chapter 11 case, as administratively consolidated (individually, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases"), with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

B.  Each Loan Party continues to operate its business and manage its properties as debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

C.  Prior to the Petition Date, Lender provided financing to Borrowers as set forth in the Credit Agreement, dated as of July 20, 2023, by and among the Agent, Lender, Borrowers and Intermediate Holdings.

D.  The Pre-Petition Obligations are secured by a security interest in certain existing and after-acquired assets of the Loan Parties as more fully set forth in the Pre-Petition Loan Documents and such security interest is perfected and has, with certain exceptions as described in the Pre-Petition Loan Documents, priority over other security interests.

E.  Borrowers have requested, and, upon the terms and conditions set forth in this Agreement, Lender has agreed to make available to Borrowers a senior secured, super-priority credit facility of up to $18,000,000 (subject to the then applicable Borrowing Base) (i) for working capital and general corporate purposes of Borrowers in accordance with the DIP Budget, including, to refinance in full on the date of the Final Financing Order the indebtedness of Borrowers outstanding under the Pre-Petition Credit Facility (other than the Specified Pre-Petition Obligations), and (ii) to pay fees, costs and expenses incurred in connection with the Transactions.

F.  Each Loan Party has agreed to secure all of the Obligations under the Loan Documents by granting to Agent, for the benefit of itself and Lender, a security interest in and lien upon substantially all of its existing and after-acquired personal and real property (subject to the limitations and priorities contained in the Loan Documents and the Financing Orders).

1

G.  Each Loan Party's business is a mutual and collective enterprise and the Loan Parties believe that the loans to Borrowers under this Agreement will enhance the borrowing power of Borrowers and facilitate the administration of the Chapter 11 Cases and their loan relationship with Agent and Lender, all to the mutual advantage of the Loan Parties.

H.  Each Loan Party acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans to Borrowers as provided in this Agreement.

I.  The willingness of Agent and Lender to provide financial accommodations to Borrowers, as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Loan Parties and at the Loan Parties' request and in furtherance of the Loan Parties' mutual and collective enterprise.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**SECTION 1.**   DEFINITIONS

1.1   <u>Defined Terms</u>.  For purposes of this Agreement, the following terms shall have the respective meanings given to them below:

"Acceptable Document of Title" means, with respect to any Inventory, a tangible, negotiable bill of lading or other Document (as defined in the UCC) that (a) is issued by a common carrier which is not an Affiliate of the seller of such Inventory or any Loan Party which is in actual possession of such Inventory, (b) is issued to the order of a Loan Party or, if so requested by Agent, to the order of the Agent, (c) names the Agent as a notify party and bears a conspicuous notation on its face of the Agent's security interest therein, (d) is not subject to any Lien (other than in favor of Agent), and (e) is on terms otherwise reasonably acceptable to Agent.

"Acceptable Plan of Reorganization" means a Chapter 11 Plan in form and substance acceptable to Agent and Lender (and as to the Agent with respect to those provisions thereof that affect the rights, obligations, liabilities, duties or treatment of Agent) in all respects, that, among other things, (i) is consistent with the terms and conditions as set forth in the RSA and the exhibits thereto, and (ii) contains a release by Loan Parties in favor of Agent, Lender and their respective Affiliates in their capacities as such to the extent permitted under applicable law.

"Affiliate" means, with respect to a specified Person, any other Person (excluding any Subsidiary) which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person.  For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power either (a) to vote ten percent (10.0%) or more of the securities having ordinary voting power for the election of directors of such Person or (b) to direct or cause the direction of the management and policies, whether through the ownership of Equity Interests, by agreement or otherwise.

"Agent" shall mean 1903P Loan Agent, LLC, in its capacity as agent on behalf of Lender pursuant to the terms hereof and any replacement or successor agent hereunder.

"Agent Advisors" has the meaning set forth in Section 7.17.

2

"Agent Payment Account" means such account of Agent as Agent may from time to time designate in writing to a Borrower as the Agent Payment Account for purposes of this Agreement and the other Loan Documents.

"Anti-Corruption Laws" means the U.S. Foreign Corrupt Practices Act of 1977 and any other anti-bribery or anti-corruption laws, regulations or ordinances in any jurisdiction in which any member of the Loan Party, or its Affiliates or Subsidiaries or any officer, director or agent acting on its behalf, is located or doing business.

"Anti-Money Laundering Laws" means applicable laws or regulations in any jurisdiction in which any Loan Party, or its Affiliates or Subsidiaries or any officer, director or agent acting on its behalf, is located or doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable Law" means all laws, rules, regulations and governmental guidelines applicable to the Person or matter in question, including statutory law, common law and equitable principles, as well as provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of any Governmental Authority.

"Applicable Margin" means, as of any date of determination and with respect to SOFR Loans, twelve percent (12.00%) and with respect to Base Rate Loans, eleven percent (11.00%).

"Asset Sale" means any Disposition of Collateral or series of related Dispositions of Collateral (other than any such Disposition permitted by clauses (a), (b), (c), (d), (e), (f), (g), (i) or (m) of the definition of Permitted Dispositions); provided that any Disposition that results in Net Cash Proceeds to any Loan Party in an amount equal to or less than $100,000 for any such individual Disposition and $200,000 in the aggregate for all such Dispositions in any fiscal year shall not constitute an Asset Sale. For the avoidance of doubt, the issuance of Equity Interests shall not constitute an Asset Sale for purposes of this definition.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (b) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date.

"Avoidance Action" means any and all claims and causes of action of the estate of any Loan Party arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, together with any proceeds therefrom.

"Avoided Payments" has the meaning assigned to such term in Section 2.7(b).

"BA-Molagers" means BA-Molagers SPV II, LLC, a Delaware limited liability company and its successors, assigns and transferees.

"BA-Molagers Subordinated Debt" means the Indebtedness and related obligations and liabilities of Loan Parties to BA-Molagers evidenced by or arising under the Third Amended and Restated Secured Promissory Note, dated as of December 16, 2022, by Borrowers payable to BA-Molagers.

3

"BA-Molagers Subordinated Loan Documents" means, collectively, the Fifth Amended and Restated Secured Promissory Note, dated as of March 10, 2023, by Borrowers and Holdings payable to BA-Molagers and all related agreements, documents and instruments executed and delivered in connection therewith.

"BA-Molagers Subordination Agreement" means the Subordination Agreement, dated as of July 20, 2023, by and among Agent and BA-Molagers, as acknowledged and agreed to by the Loan Parties.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Bankruptcy Court" has the meaning set forth in the Preliminary Statements.

"Base Rate" means, for any day, the greatest of (a) the Floor, (b) Term SOFR for a one month tenor in effect on such day, plus one percent (1.00%), provided, that, this clause (b) shall not be applicable during any period in which Term SOFR is unavailable or unascertainable, and (c) the rate of interest in effect for such day as publicly announced from time to time by Bank of America, N.A. as its "prime rate," whether or not such prime rate is the best rate available at it.  The "prime rate" is a rate set by Bank of America, N.A. based upon various factors and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.  Any change in such rate announced by Bank of America, N.A. shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loans" means any Loans or portion thereof on which interest is payable based on the Base Rate in accordance with the terms hereof.

"Benchmark" means, initially, the Term SOFR Reference Rate, as applicable; provided, that, if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the applicable then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 3.4(b)(i).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by Agent and Lead Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for Dollar-denominated bilateral credit facilities and (b) the related Benchmark Replacement Adjustment; provided, that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement shall be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Available Tenor, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Agent and the Lead Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated bilateral credit facilities.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)   in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)   in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided, that, such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date;

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)   a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided, that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)   a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the FRB, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided, that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)   a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative or in compliance with.

For the avoidance of doubt, if the then-current Benchmark has any Available Tenors, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement

or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Start Date" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the ninetieth (90th) day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than ninety (90) days after such statement or publication, the date of such statement or publication).

"Benchmark Unavailability Period" means the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.4(b) and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.4(b).

"Benefit Plan" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) for which any Loan Party or ERISA Affiliates has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"Borrowing" means a borrowing of Loans pursuant to Section 2.2.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.2.

"Borrowing Base" means, at any time of calculation, an amount equal to:

     (a)   ninety-five percent (95.0%) multiplied by the Eligible Credit Card Receivables; <u>plus</u>

     (b)   one hundred-five percent (105.0%) of the Net Recovery Percentage of Eligible Retail Inventory (other than Eligible In-Transit Inventory) multiplied by the Value of such Inventory; <u>plus</u>

     (c)   ninety-five percent (95.0%) of the Net Recovery Percentage of Eligible DTC Inventory (other than Eligible In-Transit Inventory) multiplied by the Value of such Inventory; <u>plus</u>

     (d)   ninety-five percent (95.0%) of the Net Recovery Percentage of Eligible In-Transit Inventory multiplied by the Value of the Eligible In-Transit Inventory; <u>plus</u>

     (e)   the Supplemental Availability; <u>minus</u>

     (f)   Reserves, provided, that, the only Reserve as of the DIP Facility Closing Date shall be the "Medical Claim Reserve" subject to the right of Agent to establish any Reserves at any time on or after a Default or Event of Default shall have occurred or if Agent otherwise determines that in view of the then current circumstances in its Permitted Discretion it requires such Reserves.

Notwithstanding anything to the contrary herein, in no event will the amount included in the Borrowing Base pursuant to clause (d) above (the "In-Transit Availability") at any time exceed the In-Transit Availability Limit.

The "In-Transit Availability Limit" means (i) for the period on and prior to September 30, 2023, such amount of In-Transit Availability so that the fraction (expressed as a percentage), the numerator of which

6

is the amount of In-Transit Availability and the denominator of which is the sum of the amounts included in the Borrowing Base at such time pursuant to clauses (a), (b), (c) and (e) plus such In-Transit Availability is equal to or less than forty-five percent (45.0%) and (ii) on and after October 1, 2023, such amount of In-Transit Availability so that the fraction (expressed as a percentage), the numerator of which is the amount of In-Transit Availability and the denominator of which is the sum of the amounts included in the Borrowing Base at such time pursuant to clauses (a), (b), (c) and (e) plus such In-Transit Availability is equal to or less than fifteen percent (15.0%), except that for purposes of this clause (ii) such percentage may be thirty-five percent (35.0%), so long as (A) no Default or Event of Default exists or has occurred and is continuing and (B) prior to October 1, 2023, Agent shall have received the Purchase Agreement (as defined in Schedule 7.16) and at all times thereafter such Purchase Agreement is in full force and effect, there is no default thereunder and such agreement has not been terminated or the conditions to the consummation of the Sale Transaction pursuant thereto can no longer be satisfied.

For purposes of the calculation of the Borrowing Base, at any time the amount of Eligible Retail Inventory shall be equal to fifty percent (50.0%) of the total amount of Eligible Inventory other than Eligible In-Transit Inventory at such time and Eligible DTC Inventory shall be equal to fifty percent (50.0%) of the total amount of Eligible Inventory other than Eligible In-Transit Inventory at such time, provided, that, Agent may from time to time in its discretion change such percentages as to either Eligible Retail Inventory or Eligible DTC Inventory (but which percentages as so adjusted shall together in any event equal one hundred percent (100.0%)).

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit B hereto, as such form, subject to the terms hereof, may from time to time be modified by Agent, which is duly completed (including all schedules thereto) and executed by a Responsible Officer of a Borrower and delivered to Agent.

"Brentwood" means Brentwood Private Equity IV, L.P., a Delaware limited partnership.

"Business Day" means any day that is not a Saturday, Sunday or other day on which the Federal Reserve Bank of New York is closed.

"Capital Expenditures" means, with respect to any Person for any period, the amount of all expenditures by such Person during such period that are capital expenditures as determined in accordance with GAAP.

"Capital Lease Obligations" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP and, for purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date on a balance sheet prepared in accordance with GAAP.

"Carve-Out" has the meaning set forth in the Interim Financing Order (or Final Financing Order, when applicable).

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one (1) year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one (1) year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (c) commercial paper maturing no more than two hundred seventy (270) days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from

S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within one (1) year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $1,000,000,000, (e) deposit accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $1,000,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"Cash Management Bank" shall have the meaning set forth in Section 7.9.

"Cash Management Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Agent, which among other matters authorizes the Loan Parties to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Credit Agreement and the Financing Orders) or such other arrangements as shall be acceptable to Agent.

"Casualty Event" shall mean any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation, expropriation or other taking (including by any Governmental Authority) of, any property of any Company.  "Casualty Event" shall include any taking of all or any part of any Real Property of any Person or any part thereof, in or by condemnation, expropriation or other eminent domain proceedings pursuant to any Applicable Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any Person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means: (a) the occurrence of any event (whether in one or more transactions) which results in a transfer of control of any Loan Party to a Person other than Sponsor and its Controlled Investment Affiliates, (b) the occurrence of any event (whether in one or more transactions) which results in Sponsor and its Controlled Investment Affiliates failing to own, directly or indirectly, more than one hundred percent (100.0%) of the voting interests in the Equity Interests (on a fully diluted basis) of Holdings, (c) the occurrence of any event (whether in one or more transactions) which results in Holdings failing to own, directly or indirectly, one hundred (100.0%) percent of the Equity Interests (on a

fully diluted basis) of each other Loan Party, except in connection with a transaction permitted by Section 8.3 hereof, or (d) any merger, consolidation or sale of substantially all of the property or assets of any Loan Party, except in connection with a transaction permitted by Section 8.3 hereof. For purposes of this definition, "control" of any Person shall mean the power, direct or indirect (x) to vote more than fifty percent (50.0%) of the Equity Interests having ordinary voting power for the election of directors (or the individuals performing similar functions) of such Person or (y) to direct or cause the direction of the management and policies of such Person by contract or otherwise.

"Chapter 11 Case" and "Chapter 11 Cases" each have the meaning set forth in the Preliminary Statements.

"Chapter 11 Plan" means a plan of reorganization, compromise or arrangement in any or all of the Chapter 11 Cases.

"Chief Restructuring Officer" has the meaning set forth in Section 7.15 of this Agreement.

"Code" means the Internal Revenue Code of 1986, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Collateral" means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by any Person in or upon which a Lien is granted, or purported to be granted, by such Person in favor of Agent or Lender under any of the Loan Documents or any Financing Order (including collectively, the Pre-Petition Collateral and all such assets notwithstanding that any such property may have been excluded from the "Collateral" as such term is defined in the Pre-Petition Credit Agreement or other Pre-Petition Loan Documents).

"Collateral Access Agreement" means an agreement in writing, in form and substance satisfactory to Agent, from any lessor of premises to a Borrower or any other person to whom any Collateral is consigned or who has custody, control or possession of any such Collateral or is otherwise the owner or operator of any premises on which any of such Collateral is located, in favor of Agent.

"Collection Account" means the deposit account or deposit accounts of a Borrower identified on Schedule 7.9 as a collection account and such other accounts as may be established after the date hereof in accordance with the terms hereof used exclusively to receive payments on accounts, Credit Card Receivables and proceeds of other Collateral.

"Commitment" means the commitment of Lender to make Revolving Loans or otherwise provide any credit or services to a Borrower under this Agreement.

"Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases by the US Trustee, if any.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C-1 to this Agreement delivered in the form provided by Agent to a Borrower, as such form, subject to the terms hereof, may from time to time be modified by Agent, which is duly completed (including all schedules thereto), and delivered by a Responsible Officer of a Borrower to Agent.

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition

of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, and other technical, administrative or operational matters) that the Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Control Agreement" means a control agreement, in form and substance satisfactory to Agent, executed and delivered by a Loan Party, Agent and the applicable securities intermediary (with respect to a securities account) or bank (with respect to a deposit account).

"Controlled Investment Affiliates" means, as to Sponsor, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, Sponsor and (b) is organized by Sponsor (or any Person controlling Sponsor) primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Credit Card Agreements" shall mean all agreements now or hereafter entered into by any Borrower with any Credit Card Issuer or any Credit Card Processor (in each case, in such capacity), or with any other Person for the processing and/or payment of the proceeds of any Credit Card Receivables, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Credit Card Issuer" shall mean any person (other than a Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc.,  and Novus Services, Inc. and other issuers approved by the Agent.

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notification" has the meaning set forth in Section 7.9.

"Credit Card Receivables" means each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by such Credit Card Issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"Debt Issuance" shall mean the Incurrence by any Loan Party of Indebtedness on or after the DIP Facility Closing Date (other than as permitted by Section 8.1).

"Default" means an act, condition or event which with notice or passage of time or both would constitute an Event of Default.

"Default Notice Period" has the meaning assigned to such term in the Interim Financing Order (or Final Financing Order, when applicable).

"Default Rate" means, for any Obligation (including, to the extent permitted by law, interest not paid when due), (a) in the case of any principal of any Loan, two percent (2.00%) plus the rate otherwise applicable to such Loan and (b) in the case of any other Obligation, two percent (2.00%) plus the rate otherwise applicable to Base Rate Loans.

"DIP Asset Purchase Agreement" means the Asset Purchase Agreement, dated on or about September 11, 2023, between 1903P Loan Agent, LLC, in it is individual capacity, as purchaser and Loan Parties, as Sellers, for the sale of all or substantially all of the assets of such Loan Parties, for a purchase price the cash portion of which is sufficient (except as otherwise agreed by Agent), and is used, to repay in full the Obligations (and any Pre-Petition Obligations then outstanding, other than Specified Pre-Petition Obligations) on or before the effectiveness of such sale, in form and substance acceptable to Agent.

"DIP Asset Purchase Documents" means (a) the DIP Asset Purchase Agreement and (b) all material agreements, documents and instruments at any time executed and/or delivered in connection therewith.

"DIP Budget" means the initial budget prepared by or on behalf of Borrowers in the form of Exhibit A, as the same may be updated, modified or supplemented from time to time as provided in Section 7.19, in each case to the extent approved by Agent as set forth in Section 7.19 for the applicable 13-week period (with a week being deemed to end on Saturday) showing projected cash revenues, receipts, expenses and disbursements by category (including, without limitation, any payments with respect to real property leases), net cash flows, Inventory receipts and levels, Borrowing Base amounts, total available liquidity, Eligible Credit Card Receivables, Eligible Inventory, payable float, loan balances and Excess Availability and other items requested by Agent, in each case on a line-item basis, for the immediately following consecutive 13 weeks, set forth on a weekly basis for Borrowers, including the anticipated uses of the DIP Credit Facility for such period, which budget shall be in form and detail acceptable to Agent.

"DIP Budget Compliance Certificate" means a certificate substantially in the form of Exhibit C-2 to this Agreement executed by the Responsible Officer of Intermediate Holdings or Lead Borrower to Agent.

"DIP Budget Modification" has the meaning set forth in Section 7.19 of this Agreement.

"DIP Budget Variance Report" means a DIP Budget variance report/reconciliation prepared and delivered three (3) Business Days after the end of each calendar week and for the period from the commencement of the initial DIP Budget to the end of the prior week in each case (a) showing actual results for the following items: (i) sales receipts, noting therein variances from values set forth for such periods in the DIP Budget, calculated on a rolling three (3) week basis and on a cumulative basis, (ii) inventory receipts, noting therein variances from values set forth for such periods in the DIP Budget, calculated on a rolling two (2) week basis and on a cumulative basis, (iii) disbursements (other than

disbursements in respect of professional fee escrow payments and actual professional payments), noting therein variances from values set forth for such periods in the DIP Budget, calculated on a rolling three (3) week basis and on a cumulative basis, (iii) disbursements in respect of professional fee escrow payments and actual professional payments, noting therein variances from values set forth for such periods in the DIP Budget, calculated on a rolling three (3) week basis and on a cumulative basis, (iv) net cumulative cash flow, (v) the Excess Availability, noting therein any variance from the amount thereof for such date set forth in the DIP Budget, and (vi) the balance of Loans (and including any loans then outstanding under the Pre-Petition Credit Agreement), noting therein any variance from the amount thereof for such date set forth in the DIP Budget and (b) a detailed narrative and explanation for all material variances, certified by the Responsible Officer of Lead Borrower.  The DIP Budget Variance Report shall be in a form, and shall contain supporting information, satisfactory to Agent.

"DIP Credit Facility" means the senior secured credit facility provided by Lender to Borrowers as debtors and debtors-in-possession during the Chapter 11 Cases as set forth in this Agreement.

"DIP Facility Closing Date" means the first date, which shall be no later than five (5) days after the Petition Date, upon which all the conditions precedent specified in Section 4.1 are satisfied or waived in writing by Agent.

"DIP Measurement Period" means the first three (3) consecutive weeks commencing on the Petition Date (and including the week in which the Petition Date occurs as the first week of such three-week period and including the Saturday of such first week with such initial DIP Measurement Period ending on the third Saturday after the Petition Date) and each rolling three (3) consecutive week period ending on each Saturday thereafter, except for purposes of the DIP Budget, such period for inventory receipts shall be the first two (2) consecutive weeks commencing on the Petition Date (and including such Saturday) and each rolling two (2) consecutive week period ending on each Saturday thereafter.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale, transfer, license or other disposition of (whether in one transaction or in a series of transactions) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, and including any transaction described in this definition that is consummated pursuant to an allocation of assets among newly divided limited liability companies pursuant to a "plan of division".

"Disqualified Equity Interests" means any Equity Interests that, by their terms (or by the terms of any security or other Equity Interests into which they are convertible or for which they are exchangeable), or upon the happening of any event or condition (a) matures or are mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) are redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provide for the scheduled payments of dividends in cash, or (d) are or become convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is one hundred eighty (180) days after the Maturity Date.

"Domestic In-Transit Inventory" means Inventory of a Loan Party that is in transit from a location within the continental United States to a distribution center leased or owned by a Loan Party within the continental United States (or by X Border, LLC in San Diego, California).

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable that satisfies each of the criteria set forth below at the time of creation and thereafter as determined by Agent in its Permitted Discretion:

(a)   such Credit Card Receivable has been earned by performance and represents the bona fide amounts due to a Borrower from a Credit Card Issuer or Credit Card Processor, and in each case originated in the ordinary course of business of such Borrower;

(b)   no Person other than a Borrower is the payee or remittance party;

(c)   such Credit Card Receivable constitutes a "payment intangible" (as defined in the UCC);

(d)   such Credit Card Receivable has not been outstanding for more than five (5) Business Days from the date of the applicable sale;

(e)   such Credit Card Receivable (i) is subject to a perfected first priority security interest in favor of Agent, or (ii) with respect to which a Borrower has good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Agreement);

(f)   such Credit Card Receivable is not disputed or with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(g)   the Credit Card Issuer or Credit Card Processor does not have the right under certain circumstances to require a Loan Party to repurchase the Credit Card Receivable from such Credit Card Issuer or Credit Card Processor;

(h)   such Credit Card Receivable is not due from a Credit Card Issuer or Credit Card Processor which is the subject of any bankruptcy or insolvency proceedings;

(i)   such Credit Card Receivable is a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto;

(j)   the Credit Card Issuer or Credit Card Processor with respect to such Credit Card Receivable has not sent a notice of default and/or notice of its intention to cease or suspend payment to such Borrower in respect of such Credit Card Receivable;

(k)   with respect to such Credit Card Receivable, the applicable Borrower has submitted all sales slips, drafts, charges or other reports or materials required by the Credit Card Issuer or Credit Card Processor obligated in respect of such Credit Card Receivable in order for such Borrower to be entitled to payment in respect thereof;

(l)   the Credit Card Processor or Credit Card Issuer with respect to such Credit Card Receivable is obligated to remit the proceeds of such Credit Card Receivable to a Collection Account subject to a Control Agreement;

(m)  such Credit Card Receivable or the underlying contract does not contravene any Applicable Laws;

(n)  such Credit Card Receivable conforms to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables; and

(o)  Agent has not determined in its Permitted Discretion that such Credit Card Receivable is uncertain of collection.

In determining the amount of Eligible Credit Card Receivables the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Borrower may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by the Loan Parties to reduce the amount of such Credit Card Receivable.

"Eligible DTC Inventory" means Eligible Inventory other than Eligible Inventory at any retail store location of Borrower or such other amount of Eligible Inventory as Agent may from time to time specify.

"Eligible In-Transit Inventory" means, as of any date of determination thereof, without duplication of other Eligible Inventory, In-Transit Inventory of a Borrower that at all times satisfies the following criteria set forth below as determined by Agent in its Permitted Discretion:

(a)  such Inventory is (i) Foreign In-Transit Inventory shipped from a foreign location (other than Mexico) for receipt by a Borrower and either has not been in transit for forty-five (45) days or more from the date of shipment of such Inventory (or prior to August 31, 2023, in the case of Inventory shipped from Vietnam, sixty (60) days or more from the date of shipment), or if such shipment is anticipated to be in transit for forty-five (45) days or more from the date of shipment, such Inventory that is otherwise Eligible Inventory may, at Agent's option, be considered Eligible Inventory on and after the date that is less than forty-five (45) days prior to the date that such Inventory is reasonably expected to arrive in a port in the United States (subject to such evidence thereof as Agent may from time to time require and that is otherwise reasonably satisfactory to Agent), or in the case of Inventory shipped from a location in Mexico, for four (4) days or more from the date of shipment) and Eligible In-Transit Inventory that is Domestic In-Transit Inventory;

(b)  the purchase order for such Inventory is in the name of a Borrower and title and risk of loss has passed to such Borrower (and Agent has received such evidence thereof as it may from time to time request);

(c)  an Acceptable Document of Title has been issued, for such Inventory and Agent has control (as defined in the UCC) over the documents of title which evidence ownership of the subject Inventory (such as by the possession of such documents of title by a freight forwarder party to a Freight Forwarder Agreement);

(d)  the Inventory is insured to the reasonable satisfaction of Agent (including, without limitation, pursuant to satisfactory marine cargo insurance, if applicable); and

(e)  such Inventory would otherwise constitute Eligible Inventory;

provided, that, Agent may, in its Permitted Discretion, after prior written notice to Lead Borrower, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event Agent reasonably determines that such Inventory is subject to any Person's right of reclamation, repudiation, stoppage in transit or any event has occurred or is reasonably anticipated by Agent to arise which may otherwise adversely impact the ability of Agent to realize upon such Inventory, including as a result of the failure of any freight forwarder or carrier to comply with the terms of the applicable Freight Forwarder Agreement.

"Eligible Inventory" means at the time of any determination thereof, items of Inventory of a Borrower consisting of finished goods that are merchantable and readily salable to the public in the ordinary course of the business of such Borrower that at all times satisfy the following criteria set forth below as determined by Agent in its Permitted Discretion:

(a)   a Borrower has good, valid and marketable title thereto;

(b)   it is subject to a first priority perfected security interest in favor of Lender (except as to priority, subject to the liens referred to in clauses (b) and (c) of the definition of the term Permitted Liens), including in the case of any Inventory at any time located in Mexico, a first priority perfected security interest and pledge pursuant to all requirements of the laws of Mexico (except as to priority, subject to the liens refer to in clauses (b) and (c) of the definition of the term Permitted Lien to the extent provided under the laws of Mexico);

(c)   it is not subject to any security interest, lien or other encumbrance other than the security interest and lien of Agent and those permitted in clauses (b), (c), (j), (l) and (p) of the definition of the term Permitted Liens (but as to liens referred to in clauses (j) and (l) only to the extent that Agent has established a Reserve as provided therein) and any other liens permitted under this Agreement that are subject to an intercreditor agreement in form and substance satisfactory to Agent between the holder of such security interest or lien and Agent;

(d)   it is not unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such inventory in the ordinary course of business or unacceptable due to age, type, category and/or quantity;

(e)   any covenant, representation, or warranty contained in this Agreement or any of the other Loan Documents with respect to such inventory has not been breached or is not true in any material respect or it is inventory that does not conform to all standards imposed by any Governmental Authority;

(f)   it is not Inventory in which any Person other than such Borrower shall have any direct or indirect ownership, interest or title or which is subject to any purchase order or invoice which gives or purports to give such other Person an interest therein;

(g)   it does not constitute work-in-process, spare or replacement parts, subassemblies, packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, bill-and-hold goods, returned goods (other than goods that are undamaged and able to be resold in the ordinary course of business), goods that are to be returned or are marked for return to the vendor, repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business of a Borrower;

(h)   it is located at premises owned by a Borrower, except as set forth in clauses (i) and (j) below;

15

(i)   it is not located at any premises leased by a Borrower in the United States unless (i) the lessor has delivered to Agent a Collateral Access Agreement that Agent has acknowledged in writing is acceptable to it or (ii) a Reserve for rent, charges, and other amounts due or to become due with respect to such facility has been established by Agent in its Permitted Discretion;

(j)   it is not located in any third party warehouse or in the possession of a bailee or is being processed offsite at a third party location or outside processor in the United States (except for Inventory located at the premises of X Border LLC (also known as XB Fulfillment) or Soluciones XB Mexico, S. de S.L. de C.V. in Tijuana, Mexico or San Diego, California) and, in any such case, is not evidenced by a warehouse receipt or other document of title, unless such warehouseman or bailee or the owner of such third party location or such outside processor has delivered to Agent a Collateral Access Agreement that Agent has acknowledged in writing is acceptable to it and such other documentation as Agent may require;

(k)   it is stored at locations holding more than $50,000 of the aggregate value of such Borrower's inventory;

(l)   it is not a discontinued product or component thereof and is not immediately usable in a continuing product;

(m)  it is not the subject of a consignment by such Borrower as consignor;

(n)   it does not contain or bears any intellectual property rights licensed to such Borrower unless Agent is satisfied in its Permitted Discretion that it may sell or otherwise dispose of such inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such inventory under the current licensing agreement;

(o)   it is reflected in a current perpetual inventory report of such Borrower;

(p)   it is the subject of a bill of lading or other document of title; or

(q)   reclamation rights have not been asserted in such inventory by the seller.

"Eligible Retail Inventory" means Eligible Inventory held for sale in the retail stores of Triad Retail or in-transit from any distribution center of a Borrower to retail stores of Triad Retail, or such other amount of Eligible Inventory as Agent may from time to time specify.

"Equity Interests" means, with respect to any Person, all of the shares, interests, participations or other equivalents (however designated) of such Person's capital stock or partnership, limited liability company or other equity, ownership or profit interests at any time outstanding, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), but excluding any interests in phantom equity plans and any debt security that is convertible into or exchangeable for such shares.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of any Loan Party under Section 414(b) of the Code,

16

(b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of any Loan Party under Section 414(c) of the Code, (c) solely for purposes of Section 302 of ERISA and Section 412 of the Code, any organization subject to ERISA that is a member of an affiliated service group of which any Loan Party is a member under Section 414(m) of the Code, or (d) solely for purposes of Section 302 of ERISA and Section 412 of the Code, any Person subject to ERISA that is a party to an arrangement with any Loan Party and whose employees are aggregated with the employees of such Loan Party under Section 414(o) of the Code.

"Event of Default" shall have the meaning set forth in Section 10.1 hereof.

"Excess" shall have the meaning set forth in Section 3.7 hereof.

"Excess Availability" means the amount, as determined by Agent, calculated at any date, equal to: (a) the lesser of (i) the Borrowing Base or (ii) the Maximum Credit, minus without duplication, (b) the sum of the amount of all then outstanding and unpaid Obligations and Pre-Petition Obligations.

"Excluded Deposit Account" means (a) any deposit account that is a zero balance account, (b) any deposit account that, together with all other Excluded Deposit Accounts pursuant to this clause (b), each have an individual balance of less than $10,000 at any time and have an aggregate balance of less than $100,000 at any time, and (c) any deposit account that is a payroll, withholding tax, or tax trust or fiduciary account, so long as Borrowers and their Subsidiaries do not deposit or maintain funds in such payroll accounts or tax accounts in excess of amounts necessary to satisfy current payroll liabilities, payroll taxes or other wage and benefit payments.

"Excluded Swap Obligation" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act (7 U.S.C. §1 et seq.), and any successor statute or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) due to such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (7 U.S.C. §1 et seq.), and any successor statute and the regulations thereunder at the time the guaranty of such Loan Party or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guaranty or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to Agent or Lender or required to be withheld or deducted from a payment to Agent or Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of Agent or Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), and (b) any U.S. Federal withholding Taxes imposed under Sections 1471 through 1474 of the Code.

"Fee Letter" means the fee letter, dated of even date herewith, among Loan Parties and Agent, in form and substance satisfactory to Agent.

"Final Financing Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as are approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to Agent, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to

reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless Agent waives such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Agent, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority status of the claims of Agent and Lender.

"Financing Orders" means, until entry of the Final Financing Order, the Interim Financing Order and after the entry of the Final Financing Order, the Final Financing Order, or the Interim Financing Order and the Final Financing Order.

"Floor" means a rate of interest equal to three percent (3.00%).

"Foreign In-Transit Inventory" means Inventory of a Loan Party which is in the possession of a common carrier and is in transit from a seller of such Inventory to a Loan Party from a location outside of the United States to a location that is within the United States or Tijuana, Mexico.

"Freight Forwarder Agreement" means an agreement in form and substance satisfactory to Agent among a Borrower, a customs broker, freight forwarder, consolidator or carrier, and Agent, in which the customs broker, freight forwarder, consolidator or carrier acknowledges and agrees that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of Agent and agrees, upon notice from Agent, to hold and dispose of the subject Inventory solely as directed by Agent, together with such other terms as Agent may require.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board which are applicable to the circumstances as of the date of determination consistently applied.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether national, state, territorial, county, municipal or other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national body exercising such function, such as the European Union or the European Central Bank).

"Guarantor" means (a) Holdings, (b) Intermediate Holdings and (c) any other Person that at any time guaranties all or any portion of the Obligations or who is the owner of any property which is, or purports to be, security for the Obligations (other than Borrowers).

"Guaranty" means a Guaranty at any time executed and delivered by any Loan Party in favor of Agent for the benefit of Agent and Lender.

"Hedge Agreement" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"Holdings" means Soft Surroundings Holdings, LLC, a Delaware limited liability company.

"Illegality Notice" has the meaning set forth in Section 3.5 of this Agreement.

"Indebtedness" means, with respect to any Person, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid or accrued, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services purchased by such Person, and including, without limitation, customary indemnification, adjustment of purchase price or similar obligations, earn-outs or other similar obligations, (but excluding trade debt and accrued expenses incurred in the ordinary course of business on normal trade terms), (f) all obligations of such Person under take-or-pay or similar arrangements or under commodities agreements, (g) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any security interest in, lien or other encumbrance upon, or payable out of the proceeds of production from property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (h) all obligations of such Person (other than endorsements in the ordinary course of business of negotiable instruments for deposit or collection) guaranteeing or intended to guarantee any Indebtedness of any other Person in any manner, whether direct or indirect, (i) the principal portion of all Capital Lease Obligations of such Person, (j) all obligations of such Person under Hedge Agreements, (k) the maximum amount of all standby letters of credit issued or bankers' acceptances facilities created for the account of such Person and, without duplication, all drafts drawn thereunder (to the extent unreimbursed), (l) all preferred Equity Interests issued by such Person and which by the terms thereof could be (at the request of the holders thereof or otherwise) subject to mandatory sinking fund payments, redemption or other acceleration prior to the date which is ninety-one (91) days after the Maturity Date and other Disqualified Equity Interests, (m) the principal balance outstanding under any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product and (n) the Indebtedness of any partnership or unincorporated joint venture in which such Person is a general partner or a joint venturer, but only to the extent such Person is liable for such Indebtedness.

"Indemnitee" has the meaning set forth in Section 12.5 of this Agreement.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in subsection (a), Other Taxes.

"Intellectual Property" means a Loan Party's now owned and hereafter arising or acquired: patents, patent rights, patent applications, copyrights, works which are the subject matter of copyrights, copyright applications, copyright registrations, trademarks, servicemarks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the foregoing and all applications, registrations and recordings relating to any of the foregoing as may be filed in the United States Copyright Office, the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country or jurisdiction, together with all rights and privileges arising under Applicable Law with respect to such Loan Party's use of any of the foregoing; all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing; all rights to sue for past, present and future infringement of any of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards; goodwill (including any goodwill associated with any trademark or servicemark, or the license of any trademark or servicemark); customer and other lists in whatever form maintained; trade secret rights, copyright rights, rights in works of authorship; software and contract rights relating to computer software programs, in whatever form created or maintained.

"Intermediate Holdings" means Soft Surroundings Intermediate Holdings, LLC, a Delaware limited liability company.

"In-Transit Inventory" means (a) Foreign In-Transit Inventory from a location outside of the continental United States to a location of a Borrower or a location of a third-party warehouse that is within the continental United States or Mexico that is reasonably acceptable to Agent and (b) Domestic In-Transit Inventory that is reasonably acceptable to Agent.

"Inventory" means all of each Borrower's now owned and hereafter existing or acquired inventory as such term is defined in the UCC.

"Inventory Reserves" means such reserves as may be established from time to time by Agent, in its Permitted Discretion, with respect to the saleability of the Eligible Inventory and Eligible In-Transit Inventory, or which reflect such other factors as negatively affect the market value of the Inventory or Eligible In-Transit Inventory, or which reflect a cost with respect to the salability of such Inventory or Eligible In-Transit Inventory. Without limiting the generality of the foregoing, (but, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria set forth in the applicable definitions thereof or accounted for in the value of such Inventory in the most recent Inventory appraisal satisfactory to Agent in its Permitted Discretion), in Agent's Permitted Discretion, Inventory Reserves may include (but are not limited to) reserves based on (a) shrink; (b) capitalized freight and internal profit reserves used in Borrowers' calculation of cost of goods sold; (c) obsolescence; (d) seasonality; (e) imbalance; (f) change in Inventory character; (g) change in Inventory mix; (h) reasonably anticipated changes in appraised value of Inventory between appraisals; (i) retail markdowns and markups inconsistent with common business practice; (j) industry standards; current business plans; or advertising calendar and planned advertising events; (k) material variances between the perpetual inventory records of Borrowers and the results of the test counts of Inventory conducted with respect thereto in excess of a percentage reasonably acceptable to Agent; (l) reserves for freight, taxes, duty and other amounts that must be paid (or estimated to be paid) in connection with In-Transit Inventory upon arrival and for delivery to one of Borrowers' locations for Eligible Inventory within the United States of America (or the premises of X Border LLC (also known as XB Fulfillment) or any of its Affiliates (including Soluciones XB Mexico, S. de R.L. de C.V.) located in Tijuana, Mexico), including amounts payable to a freight forwarder or carrier and other third parties; (m) amounts due or to become due to owners and licensors of trademarks and other Intellectual Property used by Borrowers; (n) customer credit liabilities consisting of the aggregate remaining value at such time; (o) outstanding gift certificates and gift cards of Borrowers entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, (p) outstanding merchandise credits of Borrowers, (q) liabilities in connection with frequent shopping programs of Borrowers, (r) deposits made by customers with respect to the purchase of goods or the performance of services and layaway obligations of Borrowers, (s) warehousemen's or bailee's charges, including, but not limited to, amounts payable relating to storage, transportation (including demurrage and terminal charges), insurance, labor and other charges, (t) other Permitted Liens which may have priority over the interests of Agent in the Collateral, and (u) amounts due to vendors on account of consigned goods.

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions, or acquisitions (in one transaction or a series of transactions) of Indebtedness, Equity Interests, or all or a substantial part of the assets of such other Person, or of any division or business line of such other Person, whether through purchase of assets, merger or otherwise, or the formation or acquisition of any Subsidiaries, or any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.  The amount of any Investment shall be the original cost of such Investment

20

plus the cost of all additions thereto, without any adjustment for increases or decreases in value, or write-ups, write-downs, or write-offs with respect to such Investment.

"Investment Bank" means SSG Capital Advisors LLC, together with any replacement or successor investment bank retained by a Loan Party with the consent of Agent (not to be unreasonably withheld).

"Investment Bank Engagement Letter" has the meaning set forth in Section 7.14 of this Agreement.

"Investment Bank Report" has the meaning set forth in Section 7.1 of this Agreement.

"Lead Borrower" means Triad Catalog Co., L.L.C., a Missouri limited liability company.

"Lender" means 1903 Partners, LLC, a Delaware limited liability company, and its successors and assigns.

"Lien" or "lien" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Liquidation Sale" has the meaning set forth in Section 7.18 of this Agreement.

"Loan" means each Loan made (or to be made) hereunder, collectively referred to as the "Loans".

"Loan Account" has the meaning set forth in Section 5.6.

"Loan Documents" means this Agreement, the Control Agreements, each Borrowing Base Certificate, each Security Agreement, each Guaranty, the Fee Letter, any note or notes executed by a Borrower in connection with this Agreement and payable to Agent or Lender, any subordination agreement, and any other instrument or agreement entered into, at any time, by any Loan Party in connection with this Agreement.

"Loan Party" means any Borrower or any Guarantor.

"Management Agreement" means the Corporate Development and Administrative Services Agreement dated as of August 2, 2012, by and among Brentwood, Triad Catalog, and Holdings, as such agreement is in effect on the DIP Facility Closing Date.

"Management Fees" means all management fees, costs, expenses, indemnities and other amounts payable by any Loan Party to Brentwood or any Affiliate of Brentwood pursuant to Section 2.2 of the Management Agreement.

"Management Fee Subordination Agreement" means the Management Fee Subordination Agreement, dated as of July 20, 2023, between Agent and Brentwood.

"Margin Stock" is as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"Material Adverse Effect" means a material adverse effect on (a) business, assets, liabilities, operations, property, prospects or financial condition of a Borrower; (b) the ability of a Borrower to perform its obligations, when such obligations are required to be performed under this Agreement or any of the other Loan Documents or (c) the legality, validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of Agent or Lender hereunder or thereunder or the perfection or priority of any security interest or lien in favor of Agent, in each case other than as a result of the filing, commencement, announcement, prosecution and continuation of the Chapter 11 Cases, the events and conditions related and/or leading up thereto and the effects thereof and any action required to be taken under the Loan Documents or under the Financing Orders.

"Material Contract" means (a) any contract or other agreement (other than the Loan Documents), written or oral, of a Loan Party involving monetary liability of or to any Person in an amount in excess of $1,000,000 in any fiscal year (but excluding for this purpose contracts or other agreements for the purchase and sale of goods or services where the other party thereto has no obligation to purchase or sell such goods or services under such contract or other agreement), (b) any Credit Card Agreements, (c) the agreements of any Loan Party with X Border, LLC or any of its Affiliates, and (d) any other contract or other agreement (other than the Loan Documents), whether written or oral, to which a Loan Party is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto has or could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" means (a) the BA-Molagers Subordinated Debt and (b) any other Indebtedness (other than the Loans), of a Loan Party in an aggregate principal amount exceeding $250,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of a Borrower in respect of any Hedge Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that a Loan Party would be required to pay if such Hedge Agreement were terminated at such time.

"Material Property" means (a) any Intellectual Property that is either (i) material to the conduct of the businesses of a Borrower as conducted or reasonably expected to be conducted, or is otherwise of material value, or (ii) is affixed to or incorporated or embedded in any Inventory and would be material in connection with the enforcement of any rights or remedies of Agent with respect to the Collateral (other than off-the-shelf, shrink-wrapped or "click to accept" software licenses or other licenses to generally commercially available software), (b) any customer contracts comprising Material Contracts and (c) any other property or assets of a Borrower which is sold, disposed or otherwise removed from the business of such Borrower would reasonably be expected to have a Material Adverse Effect.

"Maturity Date" means the earliest of

(a)   the Stated Maturity Date,

(b)   thirty (30) days after the entry of the Interim Financing Order if the Final Financing Order has not been entered prior to the expiration of such thirty (30) day period,

(c)   the date of the entry of an order by the Bankruptcy Court confirming a Chapter 11 Plan,

(d)   the date of the sale of all or a substantial part of the business of any Loan Party or all or substantially all of the assets of any Loan Party,

(e)   without Agent's prior written consent, the date of filing or express written support by the Loan Parties of bidding procedures, 363 sale processes or transactions (or such similar sale processes or transactions), plans of liquidation or reorganization or related disclosure statements or supplemental

22

materials that are not in accordance with the RSA, if applicable, and that are not otherwise satisfactory to Agent,

(f)    the date of any breach by Loan Parties or any other party thereto of any of the terms of the RSA, or the termination of the RSA after the effectiveness thereof,

(g)    the date the Loan Parties' file a motion seeking to convert any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code,

(h)    the date of conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code,

(i)    the appointment or election of a trustee under Chapter 11 of the Bankruptcy Code, or an examiner or responsible officer with enlarged powers relating to the operation of the Loan Parties' business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106 of the Bankruptcy Code,

(j)    the date any Loan Party files a motion seeking a termination or dismissal of any Chapter 11 Case,

(k)    the date Agent sends a Carve-out Trigger Notice (as such term is defined in any Financing Order), or

(l)    the date of dismissal of any Chapter 11 Case.

"Maximum Credit" means $18,000,000.

"Maximum Interest Rate" means the maximum non-usurious rate of interest under applicable Federal or State law as in effect from time to time that may be contracted for, taken, reserved, charged or received in respect of the indebtedness of a Loan Party to a Lender, or to the extent that at any time such Applicable Law may thereafter permit a higher maximum non-usurious rate of interest, then such higher rate.

"Mexican Security Document" means the Non-Possessory Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*) governed by or subject to the laws of Mexico, satisfactory to Agent, by and among each Borrower and Agent  pursuant to which each Borrower has pledged and granted a first priority Lien and security interest in favor of Agent over all of the present and future pledged assets (*Bienes Pignorados*, as defined therein), including, without limitation, Inventory located in Mexico, and any other agreement or instrument at any time executed by a Loan Party or any other Person in connection with this Agreement that is intended to (or purports to) create, perfect or evidence a Lien to secure the Obligations, in each case as amended, restated, supplemented or otherwise modified from time to time.

"Mexico" means the United Mexican States

"Milestones" means the covenants set forth in Section 7.16 of this Agreement.

"Net Cash Proceeds" means: (a) with respect to any Disposition of Collateral (other than Equity Interests), by any Loan Party or any of its Subsidiaries, the aggregate cash proceeds (including cash proceeds received pursuant to policies of insurance and by way of deferred payment of principal pursuant to a note, installment receivable or otherwise, but only as and when received) received by such Loan

Party or Subsidiary pursuant to such Disposition net of (i) the reasonable direct costs related to such Disposition (including sales commissions and legal, accounting and investment banking fees, commissions and expenses), (ii) any portion of such proceeds deposited in an escrow account pursuant to the documents relating to such Disposition or as required under the Financing Orders in respect of the Carve-Out (provided that such amounts shall be treated as Net Cash Proceeds upon their release from such escrow account to any Loan Party), (iii) Taxes paid or reasonably estimated by any Loan Party to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), and (iv) amounts required to be applied to the repayment of any Indebtedness secured by a Permitted Liens prior to the Lien of Agent on the asset subject to such Disposition, all of the costs and expenses reasonably incurred in connection with the collection of such proceeds, award or other payments, and any amounts retained by or paid to parties having superior rights to such proceeds, awards or other payments; and (b) with respect to the Disposition of Equity Interests or the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and Cash Equivalents received by such Loan Party or Subsidiary in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or Subsidiary in connection therewith.

"Net Recovery Percentage" means the fraction, expressed as a percentage, (a) the numerator of which is the amount equal to the recovery on the aggregate amount of the inventory at such time on a net orderly liquidation value basis as set forth in the most recent satisfactory appraisal of inventory received by Agent net of operating expenses, liquidation expenses and customary commissions, and (b) the denominator of which is the applicable original cost of the aggregate amount of the inventory subject to appraisal.

"Obligations" means any and all Loans and all other obligations, liabilities and indebtedness of every kind, nature and description owing by a Borrower to Agent or Lender or Affiliates of Agent or Lender, including principal, interest, charges, indemnities, reimbursement and indemnification obligations, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under any of the Loan Documents, whether now existing or hereafter arising, including such amounts that accrue after the commencement of the Chapter 11 Cases, regardless of whether allowed or allowable in whole or in part as a claim therein), whether arising before, during or after the initial or any renewal term of this Agreement, whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, or secured or unsecured, provided, that, notwithstanding anything to the contrary contained herein, the Obligations shall exclude any Excluded Swap Obligation.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Organization Documents" means, with respect to any Person, the certificate or articles of incorporation, certificate of formation, by-laws, limited liability company agreement, operating agreement or other organizational or governing documents of such Person.

"Other Taxes" means present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies of the United States or any political subdivision thereof or any applicable foreign jurisdiction, and all liabilities with respect thereto, in each case arising from any payment made hereunder or under any of the other Loan Documents or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any of the other Loan Documents.

"Overadvance" means a disbursement, transfer or withdrawal which would immediately after giving effect thereto result in Excess Availability being less than zero.

24

"Patriot Act" has the meaning set forth in Section 6.25.

"Permitted Discretion" means, as used in this Agreement with reference to Agent, a determination made in good faith in the exercise of its reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Dispositions" means each of the following:

(a)   sales of inventory in the ordinary course of business,

(b)   the sale or other disposition of used, worn-out, obsolete machinery, equipment and interests in real property or machinery, equipment and interests in real property no longer used or useful in the conduct of the business of a Loan Party;

(c)   the sale of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business consistent with the practices of a Loan Party as of the date hereof;

(d)   the issuance of Equity Interests of a Loan Party consisting of common stock pursuant to an employee stock option or grant or similar equity plan or 401(k) plans of a Loan Party for the benefit of its employees, directors and consultants; provided, that, in no event shall a Loan Party be required to issue, or shall a Loan Party issue, Equity Interests pursuant to such stock plans or 401(k) plans which would result in a Change of Control or other Default or Event of Default;

(e)   the abandonment or other Disposition of Intellectual Property that is not material and is no longer used or useful in any material respect in the business of a Loan Party and does not appear on is or otherwise not affixed to or incorporated in any inventory or necessary in connection with the Records or have any material value;

(f)   any transfer of property or assets, or issuance of Equity Interests, that is a Restricted Payment permitted under Section 8.8 or Permitted Investment permitted under Section 8.5;

(g)   issuances of Equity Interests by Holdings (other than any issuance of Disqualified Equity Interests) so long as no Change of Control occurs;

(h)   the transfer of cash for the payment of Indebtedness to the extent such payments are permitted hereunder and for the payment of other payables in the ordinary course of the business of a Loan Party; and

(i)   (i) sales or other Dispositions of assets from any Loan Party or any Subsidiary of a Loan Party in each case to a Loan Party and (ii) sales or other Dispositions of assets from any Subsidiary of a Loan Party that is not a Loan Party to any other Subsidiary of a Loan Party that is not a Loan Party;

(j)   any involuntary loss, damage or destruction of property;

(k)   any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(l)   Dispositions of equipment or Real Property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property, or (ii) the proceeds of such disposition are promptly applied to the purchase price of such replacement property; provided, that,

to the extent the property being transferred constitutes Collateral, such replacement property shall constitute Collateral;

(m)  sales or other Dispositions of equipment or fixtures in connection with the closing of the distribution center of Loan Parties located in Mexico, Missouri, provided, that, the proceeds are promptly reinvested in assets of Loan Parties;

(n)  sales or other Dispositions of assets of a Loan Party not otherwise subject to the provisions set forth in this definition, provided, that, as to any such sale or other Disposition, each of the following conditions is satisfied: (i) not less than seventy-five percent (75%) of the consideration to be received by such Loan Party shall be paid or payable in cash and shall be paid contemporaneously with consummation of the transaction; (ii) the consideration paid or payable shall be in an amount not less than the fair market value of the property disposed of; (iii) such transaction does not involve the sale or other Disposition of any accounts, Credit Card Receivables, inventory, Equity Interests or Material Property; (iv) the aggregate fair market value of all property Disposed of in reliance on this clause (n) in any fiscal year of Holdings shall not exceed $500,000, (v) the Net Cash Proceeds from any such sale or other Disposition, shall be applied to the Obligations; and (vi) as of the date of any such sale or other disposition, and after giving effect thereto, no Default or Event of Default shall exist;

(o)  the Sale Transaction.

Notwithstanding anything to the contrary in this Agreement, (a) Holdings shall not, and shall not permit any of its Subsidiaries to (i) sell or otherwise dispose (including any license) of any Material Property from a Loan Party to a Person that is not a Loan Party, or (ii) contribute or otherwise invest any Material Property to or in any Non-Loan Party and (b) no transaction provided for in this definition shall result in a sale or other disposition of all or substantially all of the assets of Holdings and its Subsidiaries.

"Permitted Indebtedness" means:

(a)  the Obligations and the Pre-Petition Obligations;

(b)  Capital Lease Obligations with respect to equipment arising after the date hereof to the extent secured by security interests in equipment acquired after the date hereof in an aggregate outstanding principal amount not to exceed $1,000,000 at any time; provided, that, (i) such Capital Lease Obligations are not secured by any property of a Loan Party other than the specific items of equipment, (ii) the Indebtedness secured thereby does not exceed the cost of the applicable equipment and (iii) as of the date any such Indebtedness is incurred and after giving effect thereto, no Default or Event of Default shall exist;

(c)  Indebtedness of a Loan Party entered into in the ordinary course of business pursuant to a Hedge Agreement; provided, that, (i) such arrangements are not for speculative purposes, and (ii) such Indebtedness shall be unsecured;

(d)  Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts and Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided, that, such Indebtedness is extinguished within five Business Days of incurrence;

(e)  Indebtedness of a Loan Party in respect of bid, payment and performance bonds, workers' compensation claims, unemployment insurance, health, disability and other employee benefits

or property, casualty or liability insurance, or guarantees of the foregoing types of Indebtedness, in the ordinary course of business and consistent with current practices as of the date hereof;

(f)    Subordinated Debt (other than the BA-Molagers Subordinated Debt); provided, that, the aggregate principal amount of such Indebtedness shall not exceed $20,000,000 outstanding at any time; and

(g)    the BA-Molagers Subordinated Debt; provided, that, (i) the aggregate principal amount of such Indebtedness shall not exceed $55,000,000 (exclusive of capitalized interest pursuant to payments-in-kind and earned exit fees), (ii) such Indebtedness shall at all times be subject to the BA-Molagers Subordination Agreement and (iii) Agent shall have received correct and copies of the BA-Molagers Subordinated Loan Documents;

(h)    Indebtedness representing deferred compensation to employees of Holdings or any Subsidiary incurred in the ordinary course of business;

(i)    Indebtedness arising pursuant to Credit Card Agreements and in connection with the utilization by the Loan Parties in the ordinary course of business of credit card processing services;

(j)    Indebtedness consisting of the financing of insurance premiums in the ordinary course of business;

(k)    Indebtedness in respect of Management Fees permitted to accrue under Section 8.8(h);

(l)    Indebtedness consisting of the reimbursement obligations of Loan Parties in respect of the PNC Letter of Credit, not to exceed $800,000 at any time;

(m)    the Indebtedness set forth in Schedule 8.1 which is not otherwise permitted by the other clauses of this definition.

provided, that, notwithstanding the foregoing, no Loan Party or any of its Subsidiaries shall incur any Indebtedness on or after the Petition Date unless such Indebtedness is incurred in accordance with the DIP Budget.

"Permitted Investments" means each of the following:

(a)    Investments consisting of accounts receivables owing to a Loan Party if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms;

(b)    the endorsement of instruments for collection or deposit in the ordinary course of business;

(c)    Investments in cash or Cash Equivalents; provided, that, such Investments are in deposit accounts or securities accounts subject to a Control Agreement to the extent required hereunder and under the other Loan Documents;

(d)    deposits of cash for leases, utilities, worker's compensation and similar matters in the ordinary course of business;

27

(e)   obligations under Hedge Agreements permitted under clause (c) of the definition of Permitted Indebtedness hereof;

(f)   payroll, travel, commission and similar advances to cover matters that in good faith are expected at the time of such advances to be treated as expenses for accounting purposes in accordance with GAAP and that are made in the ordinary course of business consistent with current practices as of the date hereof;

(g)   loans and advances by a Loan Party to directors, officers and employees of such Loan Party in the ordinary course of business for bona fide business purposes (including, without limitation, in connection with the purchase of Equity Interests by such directors, officers and employees) not to exceed $100,000 at any time outstanding;

(h)   stock or obligations issued to a Loan Party by any Person (or the representative of such Person) in respect of Indebtedness of such Person owing to a Loan Party in connection with the insolvency, bankruptcy, receivership or reorganization of such Person or a composition or readjustment of the debts of such Person;

(i)   obligations of account debtors to a Loan Party arising from accounts which are past due evidenced by a promissory note made by such account debtor payable to Loan Party; and

(j)   Investments by: (i) any Loan Party in or to another Loan Party, or (ii) any Subsidiary that is not a Loan Party in or to a Loan Party, provided, that, any such Investment in the form of a loan, advance or other extension of credit shall be subordinated in right of payment to the payment of the Obligations pursuant to a subordination agreement in form and substance acceptable to Agent.

provided, that, notwithstanding the foregoing, no new cash Investments shall be permitted after the Petition Date unless such Investments are made in accordance with the DIP Budget.

"Permitted Liens" means:

(a)   the security interests and liens of Agent and the rights of setoff of Agent or Lender provided for herein or under Applicable Law;

(b)   liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to a Loan Party, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such lien and with respect to which adequate reserves have been set aside on its books in accordance with GAAP;

(c)   non-consensual statutory liens (other than liens arising under ERISA or securing the payment of taxes) arising in the ordinary course of a Loan Party's business that do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's suppliers', repairmen's and mechanics' liens, to the extent: (i) such liens do not in the aggregate materially detract from the value of the property of a Loan Party and do not materially impair the use thereof in the operation of a Loan Party, and (ii) such liens secure Indebtedness which is not overdue or is fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to a Loan Party, in each case prior to the commencement of foreclosure or other similar proceedings, which proceedings (or orders entered in connection with such proceeding) have the effect of preventing the

28

forfeiture or sale of the property subject to any such lien and with respect to which adequate reserves have been set aside on its books in accordance with GAAP;

(d)   zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Real Property which do not interfere in any material respect with the use of such Real Property or ordinary conduct of the business of a Loan Party as presently conducted thereon or materially impair the value or marketability of the Real Property which may be subject thereto;

(e)   security interests in equipment subject to capital leases arising after the date hereof to secure Indebtedness permitted under clause (b) of the definition of Permitted Indebtedness, whether such Indebtedness is assumed or incurred by a Loan Party;

(f)   pledges and deposits of cash by a Loan Party after the date hereof in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of such Loan Party as of the date hereof;

(g)   pledges and deposits of cash by a Loan Party after the date hereof to secure the performance of tenders, bids, leases, trade contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business consistent with the current practices of such Loan Party as of the date hereof;

(h)   liens arising from (i) operating leases and the precautionary UCC financing statement filings in respect thereof and (ii) equipment or other materials which are not owned by a Loan Party located on the premises of a Loan Party (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of such Loan Party and the precautionary UCC financing statement filings in respect thereof;

(i)   statutory or common law liens or rights of setoff of depository banks with respect to funds of a Loan Party at such banks to secure fees and charges in connection with returned items or the standard fees and charges of such banks in connection with the deposit accounts maintained by a Loan Party at such banks (but not any other Indebtedness or obligations);

(j)   judgments and other similar liens arising in connection with court proceedings that do not constitute an Event of Default, provided, that, (i) such liens are being contested in good faith and by appropriate proceedings diligently pursued, (ii) adequate reserves or other appropriate provision, if any, as are required by GAAP have been made therefor, (iii) a stay of enforcement of any such liens is in effect and (iv) Agent may establish a Reserve with respect thereto;

(k)   leases or subleases of Real Property granted by a Loan Party in the ordinary course of business and consistent with current practices of such Loan Party to any Person so long as any such leases or subleases do not interfere in any material respect with the ordinary conduct of the business of such Loan Party as presently conducted thereon;

(l)   liens on goods in favor of customs and revenue authorities arising as a matter of law to secure custom duties in connection with the importation of such goods;

(m)   non-exclusive licenses of patents, trademarks, copyrights, and other Intellectual Property in the ordinary course of business; provided, that, any such license shall not adversely affect, in any material respect, the ability of Lender to use any of such Intellectual Property in the exercise of its remedies under the Loan Documents;

(n)   liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the Indebtedness secured thereby is permitted under clause (j) of the definition of the term Permitted Indebtedness;

(o)   Liens on cash collateral to secure the reimbursement obligations of Loan Parties in respect of the PNC Letter of Credit, provided, that, the total amount of such cash collateral shall not exceed $840,000 at any time;

(p)   Liens in favor of BA-Molagers to secure the BA-Molagers Subordinated Debt permitted under clause (g) of the definition of Permitted Indebtedness, provided, that, such Liens shall at all times be subject and subordinate to the Liens of Agent and otherwise subject to the BA-Molagers Subordination Agreement;

(q)   other Liens on assets (other than accounts, Inventory, deposit accounts and Equity Interests) which do not secure Indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed $100,000;

(r)   the security interests and liens set forth on Schedule 8.2 which are not otherwise permitted under the other clauses of this definition;

(s)   Liens granted pursuant to the Loan Documents to secure the Obligations and Liens granted pursuant to the Pre-Petition Loan Documents to secure the Pre-Petition Obligations.

"Permitted Tax Distributions" means that if the Equity Interests of a Loan Party are owned by a Person that is not a Loan Party and such Loan Party is a pass-through entity for tax purposes, any distribution by Intermediate Holdings to Holdings in respect of the federal, state and local income Taxes imposed on the taxable income of Holdings allocable to Intermediate Holdings. Income Taxes imposed on the taxable income allocable to Intermediate Holdings shall take into consideration (A) the character and nature of such income (i.e., whether such income is subject to income Tax at capital gains rates, ordinary income rates or any special rates) and (B) losses previously allocated to Intermediate Holdings by Holdings to the extent such losses have not previously been applied to reduce the Permitted Tax Distribution hereunder, provided that capital losses and capital loss carry forwards shall be taken into account only to the extent they are currently usable to offset income or gain allocated by Holdings to Intermediate Holdings; and provided, further, that to the extent that any losses allocated by Holdings result in a payback by Holdings to Intermediate Holdings of previous Permitted Tax Distributions pursuant to Section 8.8 hereof, then such losses shall not be taken into account for purposes of determining the Permitted Tax Distribution hereunder. In applying this definition of "Permitted Tax Distribution", Triad Catalog, Triad Retail and any other disregarded entities that are wholly owned (directly or indirectly through disregarded entities) by Holdings shall be treated on a consolidated basis with Holdings as not separate from Holdings, and may make Permitted Tax Distributions to Holdings to the extent that Holdings may itself make Permitted Tax Distributions.

"Person" or "person" means any individual, sole proprietorship, partnership, corporation (including any corporation which elects subchapter S status under the Code), limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

"Petition Date" has the meaning set forth in the Preliminary Statements.

"PNC Letter of Credit" means the Irrevocable Standby Letter of Credit issued by PNC Bank, National Association for the account of Soft Surroundings Intermediate Holdings LLC on behalf of Triad Catalog Co, L.L.C. payable to Avalon Risk Management Insurance Company effective January 21, 2021, in the amount of $800,000.

"Post-Petition" means the time period commencing immediately upon the filing of the applicable Chapter 11 Case.

"Pre-Petition" means the time period ending immediately prior to the filing of the applicable Chapter 11 Case.

"Pre-Petition Agent" means 1903P Loan Agent, LLC, in its capacity as agent for the Pre-Petition Lender under the Pre-Petition Credit Agreement.

"Pre-Petition Credit Agreement" means the Credit Agreement, dated as of July 20, 2023, by and among Borrowers, Intermediate Holdings, the Pre-Petition Lender and Pre-Petition Agent, as in effect immediately prior to the Petition Date.

"Pre-Petition Credit Facility" means the credit facility provided to Borrowers pursuant to the Pre-Petition Credit Agreement.

"Pre-Petition Lender" means 1903 Partners, LLC, a Delaware limited liability company as lender under the Pre-Petition Credit Agreement, immediately prior to the Petition Date.

"Pre-Petition Loans" means "Loans" as such term is defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the Loan Documents (as defined in the Pre-Petition Credit Agreement), including, without limitation, the Pre-Petition Credit Agreement, as in effect immediately prior to the Petition Date.

"Pre-Petition Obligations" means "Obligations" (as defined in the Pre-Petition Credit Agreement as in effect immediately prior to the Petition Date).

"Pre-Petition Collateral" means, collectively, (a) all "Collateral" as such term is defined in the Pre-Petition Credit Agreement as in effect immediately prior to the Petition Date, (b) all "Collateral" and "Pledged Collateral" as such terms are defined in each of the other Pre-Petition Loan Documents as in effect immediately prior to the Petition Date, and (c) all other security for the Pre-Petition Obligations as provided in the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents as in effect immediately prior to the Petition Date.

"Pre-Petition Indebtedness" means Indebtedness outstanding as of the time period ending immediately prior to the filing of the applicable Chapter 11 Case.

"Protective Advance" has the meaning set forth in Section 2.5.

"Qualified Equity Interests" means and refers to any Equity Interests issued by Holdings (and not by one or more of its Subsidiaries) that is not a Disqualified Equity Interest.

"Ratification Agreement" means the Ratification and Amendment Agreement, dated of even date herewith, by and among Agent, Lender and Loan Parties.

"Real Property" means all now owned and hereafter acquired real property of each Loan Party, including leasehold interests, together with all buildings, structures, and other improvements located thereon and all licenses, easements and appurtenances relating thereto, wherever located.

"Records" means all of each Loan Party's present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any account debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of a Loan Party with respect to the foregoing maintained with or by any other person).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System of the United States or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System of the United States or the Federal Reserve Bank of New York, or any successor thereto.

"Reserves" means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, Inventory Reserves and such other reserves as Agent from time to time determines in its Permitted Discretion as being necessary or desirable (a) to reflect material impediments to Agent's ability to realize upon the Collateral, (b) to reflect claims and liabilities that Agent determines in its Permitted Discretion will need to be satisfied in connection with the realization upon the Collateral of the type included in the Borrowing Base, the proceeds thereof and all related types of Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of Loan Parties taken as a whole, (d) to reflect Agent's good faith belief that any collateral report or financial information furnished by or on behalf of a Loan Party to Agent is or may have been inaccurate or misleading in any material respect or (e) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Reserves may include, in the Permitted Discretion of Agent (but are not limited to) reserves based on: (i) rent; (ii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the Pension Benefit Guaranty Corporation and other Taxes which may have priority over the interests of Agent in the Collateral; and (iii) salaries, wages and benefits due to employees of any Borrower, provided, that, the amount of any Reserve shall have a reasonable relationship to the event, condition or other matter that is the basis for such Reserve and no Reserve or changes in Reserves shall be duplicative of reserves or changes already otherwise accounted for in the Borrowing Base.

In addition, and without limitation of, any of the foregoing, reserves will be established in respect of (i) the Carve-Out and any other reserves provided for in any Financing Order to the extent provided for therein, if any, (ii) the amount of any senior liens or claims in or against the Collateral that have priority over the liens and claims of Agent or Pre-Petition Agent, including, without limitation, the amount of any senior liens or priority claims for wages, salary or benefits (including pensions) of any employees, and (iii) the amount of priority or administrative expense claims which are superior to or rank in parity with Agent's super-priority claim (but without duplication of the reserves established as provided in clause (i) above) or which Agent determines Loan Parties would be required to pay before the obligations due Agent and Lender during the Chapter 11 Cases, other than as set forth in the DIP Budget (as defined herein).

32

"Resignation Effective Date" has the meaning set forth in Section 11.5.

"Responsible Officer" means the chief executive officer, president, chief financial officer, chief administrative officer, treasurer or assistant treasurer of a Loan Party or any of the other individuals designated in writing by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of a Loan Party.

"Restricted Payment" means any (a) dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests of a Loan Party, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or on account of any return of capital to a Loan Party's stockholders, partners or members (or the equivalent Person thereof), or payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire any Equity Interests of a Loan Party, or any setting apart of funds or property for any of the foregoing, and (b) the payment by a Loan Party of any management, advisory or consulting fee to any Person or the payment of any extraordinary salary, bonus or other form of compensation to any Person who is directly or indirectly a significant partner, shareholder, owner or executive officer of any such Person, to the extent such extraordinary salary, bonus or other form of compensation is not included in the corporate overhead of a Loan Party.

"RSA" means the Restructuring Support Agreement, dated as of September [10], 2023, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Sale Order" means an order entered by the Bankruptcy Court approving the Sale Transaction which order shall be in form and substance reasonably satisfactory to Agent, and shall provide for, among other things, the receipt by Agent of all Net Cash Proceeds from the Sale Transaction to be applied to the indefeasible payment in full of all Obligations in such manner as Agent shall determine in accordance with the Loan Documents (including the Intercreditor Agreement).

"Sale Transaction" means a sale of all or substantially all of the assets or equity of Loan Parties pursuant to Section 363 of the Bankruptcy Code which shall in any event be on terms and conditions satisfactory to Agent and expressly consented to by Agent.

"Sanctions" mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. Government, including those administered by OFAC or the U.S. Department of State, the United Nations Security Council, the European Union, any European Union member state, or any other Governmental Authority in any jurisdiction.

"Sanctioned Entity" means any target of Sanctions or Person subject to Sanctions, including: (a) Persons on any list of targets identified or designated pursuant to any Sanctions, (b) Persons, countries, or territories that are the target of any territorial or country-based Sanctions program, (c) Persons that are a target of Sanctions due to their ownership or control by any Sanctioned Entity, or (d) otherwise a target of Sanctions, including vessels, planes and ships, that are designated under any Sanctions program.

"Security Agreement" means the Security Agreement, dated as of July 20, 2023, by and among each Loan Party and Agent, as ratified, assumed and adopted pursuant to the Ratification Agreement, and any other agreement or instrument at any time executed by a Loan Party or any other Person in

connection with this Agreement that is intended to (or purports to) create, perfect or evidence a Lien to secure the Obligations.

"Shu Shi" means Shu Shi (Shanghai) Trading Co., Ltd., a foreign invested commercial enterprise organized under the laws of the People's Republic of China, which is a wholly-owned Subsidiary of Triad Catalog.

"Specified Pre-Petition Obligations" means (a) the amount equal to (i) the amount of interest payable by Borrowers at the Default Rate on the principal amount of the Pre-Petition Loans on and after August 31, 2023 pursuant to Amendment No. 1 to Credit Agreement, dated September 6, 2023, with respect to the Pre-Petition Credit Agreement minus (ii) the amount of interest payable by Borrowers at the interest rate on the principal amount of the Pre-Petition Loans on and after such date pursuant thereto at the interest rate that would be applicable but for the Default Rate being used for the determination of the amount of interest and (b) the amount of the Pre-Petition Loans equal to the earned, but unpaid portion of the Monitoring Fee (as such term is defined in the Fee Letter, dated July 20, 2023, by Borrowers and Intermediate Holdings with respect to the Pre-Petition Credit Facility) as of the Petition Date, which fee is capitalized as a Pre-Petition Loan as of such date pursuant to the terms of such Fee Letter.

"Sponsor" means Brentwood and its Affiliates, successors and assigns.

"Stated Maturity Date" means December 1, 2023.

"Subject Holder" has the meaning set forth in Section 5.5.

"Subordinated Debt" means (a) any Indebtedness of any Loan Party incurred from time to time that is subordinated in right of payment to the Obligations and is subject to a subordination agreement in form and substance reasonably satisfactory to Agent, and is otherwise on terms (including maturity, interest, fees, repayment, covenants and subordination) satisfactory to Agent and (b) the BA-Molagers Subordinated Debt.

"Subsidiary" means, with respect to any Person, a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the Equity Interests having ordinary voting power to elect a majority of the board of directors (or equivalent) of such corporation, partnership, limited liability company, or other entity.

"Successor Cases" means, with respect to the Chapter 11 Cases, any subsequent proceedings under chapter 7 of the Bankruptcy Code.

"Supplemental Availability" means, at any time, the lesser of (a) the amount by which (i) the principal amount of the Loans set forth in the DIP Budget exceed (ii) the amount of the Borrowing Base calculated without regard to the Supplemental Availability (the "Adjusted Borrowing Base") as such amount is set forth in the applicable line item in the DIP Budget plus $250,000, and (b) the amount equal to (i) the purchase price for the Sale Transaction minus (ii) the amount of the Adjusted Borrowing Base.

"Swap Obligation" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (a) the Maturity Date, or (b) the date on which the maturity of the Obligations is accelerated (or deemed accelerated).

"Term SOFR" means, for any calculation with respect to a Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of each calendar month as such rate is published by the Term SOFR Administrator; provided, that, (i) if as of 5:00 p.m. (New York City time) on any Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Term SOFR Determination Day and (ii) if Term SOFR determined as provided above (including pursuant to clause (i) above) shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Agent in its reasonable discretion).

"Term SOFR Determination Day" has the meaning set forth in the definition of Term SOFR.

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"UCC" means the Uniform Commercial Code as in effect in the State of New York and any successor statute, as in effect from time to time (except that terms used herein which are not otherwise defined herein and defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as Agent may otherwise determine).

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"United States" and "U.S." mean the United States of America.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association, or any successor thereto, recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities; provided, that, for purposes of notice requirements in Section 2.2, such day is also a Business Day.

"US Trustee" means the United States Trustee responsible for overseeing the administration of the Chapter 11 Cases.

"Value" or "value" means, with respect to the Inventory of Borrowers, the lower of (a) cost computed on a first-in first-out basis in accordance with GAAP based upon Borrowers' accounting practices, known to the Agent, which practices are in effect on the DIP Facility Closing Date as such calculated cost is determined from invoices received by Borrowers, Borrowers' purchase journals or the Borrowers' stock ledger or (b) market value; provided, that, for purposes of the calculation of the Borrowing Base, (i) the Value of the inventory shall not include:  (A) the portion of the value of inventory

equal to the profit earned by any Affiliate on the sale thereof to a Borrower or (B) write-ups or write-downs in value with respect to currency exchange rates, (ii) cost shall not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrowers' calculation of cost of goods sold and (iii) notwithstanding anything to the contrary contained herein, the cost of the inventory shall be computed in the same manner and consistent with the most recent appraisal of the inventory received and accepted by Agent prior to the date hereof, if any.

1.2    Interpretive Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    General. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, modified, supplemented, extended, renewed, restated or replaced (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to the "DIP Budget" shall be construed to refer to the DIP Budget as modified as provided in Section 7.19 and in each case to the extent such modification is approved by Agent, (iii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iv) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (v) all references in a Loan Document to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (vi) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, recodifying, supplementing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document. An Event of Default shall exist or continue or be continuing until such Event of Default is waived in accordance with Section 11.3. Loan Parties shall have the burden of establishing any alleged negligence, misconduct or lack of good faith by Agent under any Loan Documents. No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision. Reference to a Loan Party's "knowledge" or similar concept means actual knowledge of a Responsible Officer, or knowledge that a Responsible Officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter. References to the "ordinary course of business" of any Loan Party shall mean the ordinary course of business of such Loan Party as of the DIP Facility Closing Date or as permitted in Section 8.7.

(b)    UCC Terms. Any term used in this Agreement that is defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, that, to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

(c)    Time References. Unless otherwise indicated herein, all references to time of day refer to Eastern standard time or Eastern daylight saving time, as in effect in New York City on such day. For

purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to and including"; provided, that, with respect to a computation of fees or interest payable to Agent or Lender, such period shall in any event consist of at least one full day.

       (d)   Payment in Full.  Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations and the Pre-Petition Obligations shall mean (i) the payment in full in cash of the principal and accrued and unpaid interest with respect to the Loans (and in the case of Pre-Petition Obligations, the "Loans" as defined in the Pre-Petition Credit Agreement, except as to the Specified Pre-Petition Obligations to the extent otherwise addressed in an Acceptable Plan of Reorganization), (ii) the payment in full of all fees, charges and expenses that have accrued and are unpaid regardless of whether payment has been demanded or is otherwise due, (iii) the delivery to Agent of cash collateral, or at Agent's option, the delivery to Agent of a letter of credit payable to Agent issued by a bank acceptable to Agent and in form and substance satisfactory to Agent in respect of continuing obligations of Agent under Control Agreements and other contingent Obligations for which a claim or demand for payment has been made at such time or in respect of matters or circumstances known to Agent or Lender at the time, and which are reasonably expected to result in any loss, cost, damage or expense (including reasonable attorneys' fees and legal expenses) to Agent or Lender for which Agent or Lender would be entitled to indemnification by a Borrower hereunder and (iv) the termination of the Commitment and the financing arrangements provided by Lender to each Borrower hereunder.

     1.3   Accounting Terms.

       (a)   Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of Intermediate Holdings and its Subsidiaries delivered to Agent; provided, that, in the event of any change in GAAP after the date hereof that affects any covenant herein, a Borrower may by notice to Agent, or Agent may by notice to a Borrower require that such covenants be calculated in accordance with GAAP as in effect, and as applied by a Borrower immediately before the applicable change in GAAP became effective, until either the notice from the applicable party is withdrawn or such covenant is amended in a manner satisfactory to such Borrower and Agent.  Each Borrower shall deliver to Agent at the same time as the delivery of any financial statements given in accordance with the provisions of Section 7.1 hereof (i) a description in reasonable detail of any material change in the application of accounting principles employed in the preparation of such financial statements from those applied in the most recently preceding monthly, quarterly or annual financial statements, (ii) a reasonable estimate of the effect on the financial statements on account of such changes in application and (iii) a reconciliation between calculations permitted to be made hereunder other than based on GAAP as permitted hereunder and such calculations based on GAAP.

       (b)   Notwithstanding anything to the contrary contained herein, (i) all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards Board's Accounting Standards Codification Topic 825 (or any similar accounting principle) permitting a Person to value its financial liabilities or Indebtedness at the fair value thereof, and (ii) the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that is (A) unqualified, and (B) does not include any explanation, supplemental comment, or other comment concerning the ability of the applicable Person to continue as a going concern or concerning the scope of the audit.

1.4     Rounding.  Any financial ratios required to be maintained by a Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result down to the nearest number (with a rounding-up if there is no nearest number).

1.5     [Reserved].

1.6     Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time. Any reference in any Loan Document to a merger, transfer, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person.

1.7     Rates.  The Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to SOFR, the Term SOFR Reference Rate, Term SOFR or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, or with respect to any alternative, successor or replacement rate thereto (including any then-current Benchmark or any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement), as it may or may not be adjusted pursuant to Section 3.4, will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, SOFR, the Term SOFR Reference Rate, Term SOFR or any other Benchmark, prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  Agent and its affiliates or other related entities may engage in transactions that affect the calculation of SOFR, the Term SOFR Reference Rate, Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto and such transactions may be adverse to a Borrower.  Agent may select information sources or services in its reasonable discretion to ascertain SOFR, the Term SOFR Reference Rate, or Term SOFR, or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to any Borrower, Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

**SECTION 2.**   CREDIT FACILITY

2.1     Loans.  Subject to the terms and conditions set forth herein, Lender agrees to make Loans denominated in Dollars to Borrowers from time to time in amounts requested by or on behalf of such Borrower (including any Loans requested on behalf of a Borrower by Lead Borrower) until the Termination Date, provided, that, after giving effect to any such Loan, the aggregate principal amount of the Loans outstanding (plus the aggregate principal amount of any Pre-Petition Loans then outstanding) shall not exceed the lesser of the Borrowing Base or the Maximum Credit.  Subject to the terms and conditions hereof, a Borrower may from time to time borrow, prepay and reborrow Loans.

2.2   Requests for Loans.

(a)   To request a Borrowing, Borrowers (or Lead Borrower on behalf of Borrowers) shall notify Agent of such request in a writing (delivered by hand, telecopy or e-mail) substantially in the form attached hereto as Exhibit D or such other writings approved by Agent and, in each case, signed by a Borrower, not later than 11:00 a.m. (or such later time as Agent may consent to in its discretion), (x) on the DIP Facility Closing Date in the case of any Borrowing on the DIP Facility Closing Date and (y) two (2) Business Days before the proposed Borrowing of any Loan thereafter. Each such Borrowing Request shall be irrevocable and shall specify the following information:

(i)   the aggregate principal amount of such Borrowing; provided that each Borrowing of a Loan shall be in a principal amount of $100,000 or a whole multiple of $100,000 in excess thereof;

(ii)   the date of such Borrowing, which shall be a Business Day;

(iii)   the deposit account of a Borrower specified on Schedule 7.9 or the location and number of any other account of a Borrower (together with such other information with respect thereto as Agent may request) that shall be specified in a written notice signed by a Responsible Officer of a Borrower and delivered to and approved by Agent to which the proceeds of such Borrowing are to be paid;

(iv)   that the conditions precedent set forth in Sections 4.1 or 4.2, as applicable, have been satisfied as of the date of the Borrowing Request.

(b)   In addition to the conditions precedent set forth in Sections 4.1 and 4.2, as applicable, and the receipt of any Borrowing Request as provided herein, at the time of each Borrowing Request as a condition to the making of any Loan pursuant to such request:

(i)   Agent shall have received a Borrowing Base Certificate in accordance with Section 7.1(e) prior to the date of such requested Loan with the Borrowing Base determined as of the immediately preceding Saturday (subject to the rights of Agent with respect to any Reserves set forth in the definition of the term "Borrowing Base");

(ii)   as of the date of each Loan, or the use of the proceeds thereof, and after giving effect to any of the foregoing, no Overadvance would result;

(iii)   there shall be no more than two (2) Borrowing Requests in any calendar week during the term of this Agreement (or such other number as Agent may hereafter agree) and no more than one (1) Loan made in any week (or up to one (1) additional Loan in any such week at Agent's discretion).

(c)   Agent and Lender may act without liability upon the basis of written notice believed by Agent or Lender in good faith to be from or on behalf of a Borrower (or from any Responsible Officer thereof designated in writing purportedly from a Borrower to Agent).  Agent and Lender shall be entitled to rely conclusively on any Responsible Officer's authority to request a Loan on behalf of a Borrower until the Agent receives written notice to the contrary.  Agent and Lender shall have no duty to verify the authenticity of the signature appearing on any written Borrowing Request. All Loans shall be conclusively presumed to have been made to, and at the request of and for the benefit of, a Borrower when deposited to the credit of a Borrower or otherwise disbursed or established in accordance with the instructions of a Borrower or in accordance with the terms and conditions of this Agreement.

2.3   [Reserved].

2.4    [Reserved].

2.5    [Reserved].

2.6    Protective Advances.  Without limitation of any other rights of Agent or Lender, Lender is authorized by each Borrower, from time to time in Agent's sole discretion to make Loans at any time that any condition precedent set forth in Section 4.2 has not been satisfied or waived, or otherwise which Agent, in its Permitted Discretion, deems appropriate (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations or (iii) to pay any other amount chargeable to or required to be paid by any Borrower or any other Loan Party pursuant to the terms of this Agreement or any other Loan Document, including payments of reimbursable expenses and other sums (each such Loan, a "Protective Advance"). Each Protective Advance shall be secured by the Liens in favor of Agent on the Collateral and shall constitute Obligations hereunder. Each Protective Advance shall mature and be due on the earliest of (i) the Maturity Date and (ii) the Termination Date, and shall accrue interest at the rate then applicable to the other Loans. The making of a Protective Advance on any one occasion shall not obligate Agent or Lender to make any Protective Advance on any other occasion.

2.7    Pre-Petition Obligations.

(a)    Continuation of Liens. Subject to the terms of the Interim Financing Order or the Final Financing Order, as applicable, until (i) the indefeasible payment in full in cash of the Obligations (and the Pre-Petition Obligations), (ii) all objections and challenges (including, without limitation, any Objection (as defined in the Interim Financing Order)) to (A) the liens, security interests and claims of the Pre-Petition Agent and Pre-Petition Lender (including, without limitation, liens granted for adequate protection purposes) and/or (B) the Pre-Petition Obligations have been waived, denied or barred, and (iii) all of the Debtors' Acknowledgments and Agreements set forth in Paragraph F of the Interim Financing Order have become binding on their estates and parties in interest in accordance with the Interim Financing Order, all liens, security interests and claims of the Pre-Petition Agent (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein and the Pre-Petition Loan Documents shall remain in full force and effect; provided, that, (1) subject to the results of any applicable Objection (as defined in the Interim Financing Order), to the extent that Pre-Petition Obligations have been paid pursuant to this Agreement and have become and are Obligations, such Pre-Petition Obligations shall not be due or owing separately under the Pre-Petition Loan Documents, (2) nothing in the foregoing clause (1) shall alter or diminish, or be deemed to alter or diminish, the adequate protection of the Pre-Petition Agent and the Pre-Petition Lender and (3) the "Commitment" (as such term is defined in the Pre-Petition Credit Agreement) of Pre-Petition Lender shall be terminated.

(b)    Avoided Payments. In the event that Pre-Petition Agent or Pre-Petition Lender are required to repay or disgorge to any Loan Party or any representatives of the Loan Parties' estate (as agents, with derivative standing or otherwise) all or any portion of the Pre-Petition Obligations authorized and directed to be repaid pursuant to the Interim Financing Order or the Final Financing Order, or any payment on account of the Pre-Petition Obligations made to Pre-Petition Agent or Pre-Petition Lender is rescinded for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of the Bankruptcy Code or other applicable debtor relief law or any applicable state law, or any other similar provisions under any other state or federal statutory or common Law (all such amounts being hereafter referred to as the "Avoided Payments"), then, in such event, unless otherwise expressly ordered by the Bankruptcy Court, the Loan Parties shall prepay the Loans, in an amount equal to one hundred percent (100%) of such

Avoided Payments immediately upon receipt of the Avoided Payments by any Loan Party or any representative of the Loan Parties' estate.

**SECTION 3.**   INTEREST AND FEES

    3.1   <u>Rates and Payment of Interest</u>.

        (a)   All Obligations (including, to the extent permitted by law, interest not paid when due) shall bear interest at Term SOFR as in effect from time to time plus the Applicable Margin for SOFR Loans, except to the extent that the Default Rate is applicable as provided in Section 3.1(c) below or as otherwise provided in Section 3.4 or Section 3.5.  Base Rate Loans shall bear interest at the Base Rate plus the Applicable Margin, except to the extent that the Default Rate is applicable as provided in Section 3.1(c) below.

        (b)   Interest shall accrue from the date a Loan is made or Obligation is incurred or payable until paid in full by a Borrower.  Interest accrued on Loans shall be due and payable in arrears, (i) on the first day of each calendar month and (ii) on the Termination Date; provided, that, in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment other than prepayments pursuant to Section 7.9.  Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable on earlier of the first day of the calendar month after incurred or demand or the Termination Date.  Notwithstanding the foregoing, interest accrued at the Default Rate shall be due and payable on demand. The Specified Pre-Petition Obligations consisting of interest on Pre-Petition Loans as set forth in clause (a) of the definition of such term shall be due and payable in arrears quarterly, commencing on November 1, 2023 and on the first day of each third month thereafter, except as otherwise provided in an Acceptable Plan of Reorganization.

        (c)   Notwithstanding the foregoing, at the election of Agent at any time any Event of Default exists or has occurred and is continuing, all Obligations shall, to the extent permitted by Applicable Law, bear interest, after as well as before judgment, at a per annum rate equal to the Default Rate.

    3.2   <u>Computation of Interest and Fees</u>.

        (a)   Interest with respect to any Loan shall accrue from the most recent date on which interest has been paid on such Loan, and if no interest has been paid, from the date the Loan was initially made.  All interest and fees hereunder calculated on a per annum basis shall be computed on the basis of a year of three hundred sixty (360) days, except that interest computed by reference to the Base Rate shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The Term SOFR for each calendar month shall be equal to Term SOFR as in effect two (2) U.S. Government Securities Business Days prior to the first day of such calendar month (except as otherwise provided in the definition of such term) and shall be adjusted as of the first day of each calendar month accordingly. If at any time there are Base Rate Loans, the interest rate shall increase or decrease by an amount equal to each increase or decrease in the Base Rate effective on the date of any change in the Base Rate.  Each determination by Agent of any interest, fees or interest rate hereunder shall be final, conclusive and binding for all purposes, absent manifest error.  All fees shall be fully earned when due and shall not be subject to rebate, refund or proration.

        (b)   In connection with the use or administration of Term SOFR, Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become

effective without any further action or consent of any other party to this Agreement or any other Loan Document. Agent will promptly notify the Lead Borrower and Lender of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

      3.3    <u>Fees</u>.  Borrowers agree to pay (a) to Agent, for its own account, the agency and other fees payable in the amounts and at the times separately agreed upon between Borrowers and Agent in the Fee Letter and (b) to Lender, for its own account, the closing and other fees payable in the amount and at the time separately agreed upon between Borrowers and Lender in the Fee Letter.  All fees shall be paid on the dates due, in immediately available funds, to Agent for the respective accounts of Agent and Lender as provided herein. Once due, all fees shall be fully earned and shall not be refundable under any circumstances.

      3.4    <u>Inability to Determine Rates</u>.

      (a)    <u>General</u>.  Subject to Section 3.4(b), if at any time:

      (i)    Agent determines (which determination shall be conclusive and binding absent manifest error) that "Term SOFR" cannot be determined pursuant to the definition thereof, or

      (ii)    Agent or Lender determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Term SOFR for any period does not adequately and fairly reflect the cost to Lender of making or maintaining such Loan,

then, in each case, Agent will promptly so notify Lead Borrower.

Upon notice thereof by Agent to Lead Borrower, any obligation of Lender to make SOFR Loans, and any right of Borrowers to continue SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans) until Agent revokes such notice.  Upon receipt of such notice, (A) Lead Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans) or, failing that, Lead Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans in the amount specified therein and (B) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans at the end of the then current month.  Upon any such conversion, Borrowers shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 3.4. Subject to Section 3.4(b), if Agent determines (which determination shall be conclusive and binding absent manifest error) that "Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on Base Rate Loans shall be determined by Agent without reference to clause (b) of the definition of "Base Rate" until Agent revokes such determination.

      (b)    <u>Benchmark Replacement</u>.

      (i)    Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, Lender and Lead Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after Lender has provided such proposed amendment to Lead Borrower.  No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 3.4(b)(i) will occur prior to the applicable Benchmark Transition Start Date.

      (ii)    Benchmark Replacement Conforming Changes.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, Lender will have the right to

make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(iii)   Notices; Standards for Decisions and Determinations.  Lender will promptly notify Lead Borrower of (A) the implementation of any Benchmark Replacement and (B) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  Lender will notify Lead Borrower of (1) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 3.4(b)(iv) and (2) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by Lender pursuant to this Section 3.4(b), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 3.4(b).

(iv)   Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (A) if the then-current Benchmark is a term rate and either (1) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by Lender in its reasonable discretion or (2) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then Lender may establish (or modify, as applicable) the interest period used (or any similar or analogous term) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (B) if a tenor that was removed pursuant to clause (A) above either (1) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (2) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then Lender may modify the interest period used (or any similar or analogous term) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(v)   Benchmark Unavailability Period.  Upon Lead Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (A) Lead Borrower may revoke any pending request for a SOFR Loan of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, Lead Borrower will be deemed to have converted any such request into a request for a SOFR Loan of or conversion to Base Rate Loans and (B) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans immediately.

3.5   Illegality.  If Lender determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to SOFR or Term SOFR, or to determine or charge interest based upon SOFR or Term SOFR, then, upon notice thereof by Lender to Lead Borrower (through Agent) (an "Illegality Notice"), (a) any obligation of Lender to make SOFR Loans, and any right of Borrowers to continue SOFR Loans or to convert Base Rate Loans to SOFR Loans, shall be suspended, and (b) the interest rate on which Base Loans shall, if necessary to avoid such illegality, be determined by Agent without reference to clause (b) of the definition of "Base Rate", in each case until Lender notifies Agent and Lead Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of an Illegality Notice, Lead Borrower shall, if necessary to

avoid such illegality, upon demand from Lender, prepay or, if applicable, convert all SOFR Loans to Base Rate Loans (the interest rate on which Base Rate Loans shall, if necessary to avoid such illegality, be determined by Agent without reference to clause (b) of the definition of "Base Rate"), on the last day of the month, if Lender may lawfully continue to maintain such SOFR Loans to such day, or immediately, if Lender may not lawfully continue to maintain such SOFR Loans to such day.  Upon any such prepayment or conversion, Borrowers shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 3.6.

3.6    Compensation for Losses.  In the event of (a) the payment of any principal of any SOFR Loan other than on the last day of the interest period applicable thereto (including as a result of an Event of Default), (b) the conversion of any SOFR Loan other than on the last day of the interest period applicable thereto (including as a result of an Event of Default), or (c) the failure to borrow, convert, continue or prepay any SOFR Loan on the date specified in any notice delivered pursuant hereto, then, in any such event, Borrowers shall compensate Lender for any loss, cost and expense attributable to such event, including any loss, cost or expense arising from the liquidation or redeployment of funds or from any fees payable.  A certificate of Lender (or Agent on behalf of Lender) setting forth any amount or amounts that Lender is entitled to receive pursuant to this Section shall be delivered to Lead Borrower and shall be conclusive absent manifest error.  Borrowers shall pay Agent for the account of Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

3.7    Maximum Interest.  Notwithstanding anything to the contrary contained in this Agreement or any of the other Loan Documents, in no event whatsoever shall the aggregate of all amounts that are contracted for, charged or received by Agent or Lender pursuant to the terms of this Agreement or any of the other Loan Documents and that are deemed interest under Applicable Law exceed the Maximum Interest Rate (including, to the extent applicable, the provisions of Section 5197 of the Revised Statutes of the United States of America as amended, 12 U.S.C. Section 85, as amended).  In the event any interest is charged or received in excess of the Maximum Interest Rate ("Excess"), each Borrower acknowledges and stipulates that any such charge or receipt shall be the result of an accident and bona fide error, and that any Excess received by Agent or Lender shall be applied, first, to the payment of the then outstanding and unpaid principal hereunder; second to the payment of the other Obligations then outstanding and unpaid; and third, returned to a Borrower.  All monies paid to Agent or Lender hereunder or under any of the other Loan Documents, whether at maturity or by prepayment, shall be subject to any rebate of unearned interest as and to the extent required by Applicable Law.

**SECTION 4.**   CONDITIONS PRECEDENT

4.1    Conditions Precedent to Initial Term Loans .  The agreement of Lender to make the Term Loan shall become effective upon the satisfaction, or waiver, immediately prior to or concurrently therewith of each of the conditions precedent:

(a)    Commencement of Chapter 11 Cases, Etc.  Loan Parties shall have commenced the Chapter 11 Cases by no later than September 12, 2023.  Loan Parties shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner acceptable to Agent and its counsel, with respect to the Interim Financing Order (including notices to establish the priority of the liens and claims under the DIP Credit Facility) and Agent shall have received such evidence thereof as it shall reasonably require.  No trustee, or other disinterested person with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code shall have been appointed or designated with respect to any Loan Party or their respective business, properties or assets and no motion shall be pending seeking any such relief. All of the first day orders entered by Bankruptcy Court at the time of the commencement of the Chapter 11 Cases shall be in form and substance satisfactory to Agent.

(b)   Cash Management Order.  The Cash Management Order approving the cash management arrangements of Loan Parties consistent with the requirements under the DIP Credit Facility shall have been entered in the Chapter 11 Cases, and shall contain provisions with respect to cash management, in form and substance satisfactory to Agent, and shall be in full force and effect.

(c)   Interim Financing Order.  The Interim Financing Order shall have been entered by the Bankruptcy Court within three (3) Business Days after the commencement of the Chapter 11 Cases and the Interim Financing Order shall be in full force and effect and not have been vacated, reversed, modified amended or stayed and not be subject to a pending appeal or motion or motion for leave to appeal or other proceeding to set aside any such order or the challenge to the relief provided for in it, except as consented to by Agent.

(d)   DIP Asset Purchase Documents. Agent shall have received the DIP Asset Purchase Agreement and the other DIP Asset Purchase Documents, duly authorized, executed and delivered by the parties thereto, providing for the Sale Transaction, in each case on terms and conditions acceptable to Agent.

(e)   RSA.  Agent shall have received the RSA, as duly authorized, executed and delivered by the parties thereto, in form and substance satisfactory to Agent.

(f)   Acceptable Plan of Reorganization.  Loan Parties shall have filed an Acceptable Plan of Reorganization, together with the disclosure statement and such other applicable motions related thereto as Agent may require be filed at such time, with the Bankruptcy Court.

(g)   Closing Excess Availability.  The Excess Availability as of the DIP Facility Closing Date shall be not less than $2,500,000 after giving effect to any Loans to be made on such date in connection with the initial transactions hereunder and after payment of all fees and expenses payable on the DIP Facility Closing Date.

(h)   Borrowing Base Certificate and Request.  Agent shall have received a Borrowing Request and a Borrowing Base Certificate which calculates the Borrowing Base as of the end of the week immediately preceding the DIP Facility Closing Date completed in a manner reasonably satisfactory to Agent in its Permitted Discretion and duly authorized, executed and delivered by a Responsible Officer of Lead Borrower.

(i)   Good Standing Certificates.  Agent shall have received, if applicable, a certificate of status with respect to each Loan Party, dated within ten (10) days of the DIP Facility Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Loan Party, which certificate shall indicate that such Borrower is in good standing in such jurisdiction.

(j)   Certificate of Directors' Resolutions, Incumbency, Etc.  Agent shall have received a certificate of a Responsible Officer of Borrowers, in form and substance satisfactory to it in its Permitted Discretion, certifying (i) that attached copies of the Organization Documents of Loan Parties are true and complete, and in full force and effect, without amendment except as shown (and which Organization Documents shall include amendments to the operating agreements of Borrowers to opt out of Article 8 of the UCC); (ii) that an attached copy of resolutions authorizing execution, delivery and performance of the Loan Documents is true and complete, and that such resolutions are in full force and effect, were duly adopted, have not been amended, modified or revoked, and constitute all resolutions adopted with respect to this Credit Facility; and (iii) to the title, name and signature of each Person authorized to sign the Loan Documents.

45

(k)   Closing Certificate.  Agent shall have received a certificate, signed by a Responsible Officer of Borrowers, dated as of the DIP Facility Closing Date, stating (i) that no Default or Event of Default exists or has occurred and is continuing, (ii) all of the conditions to the closing of the DIP Credit Facility have been satisfied, (iii) the representations and warranties contained in the Loan Documents are true and correct in all material respects, except where such representations and warranties are themselves qualified as to materiality in which case, such representations and warranties are true and correct, (iv) Loan Parties have complied with all agreements and conditions to be satisfied by it under the Loan Documents as of the DIP Facility Closing Date in all material respects and (v) certifying any other factual matters as may be reasonably requested by Agent in its Permitted Discretion.

(l)   Lien Searches.  Agent shall have received the results of a recent lien search in each jurisdiction where each Loan Party is organized, and such search shall not show any security interests, liens or other encumbrances on any of the assets of Loan Parties, except for Permitted Liens.

(m)   Pledged Equity Interests; Stock Powers; Pledged Notes.  Agent shall have received (i) the original certificates representing Equity Interests pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (ii) each original promissory note (if any) pledged to Agent pursuant to the Security Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(n)   Insurance.  Agent shall have received evidence of insurance coverage in form, scope and substance reasonably satisfactory to Agent, and lender's loss payable endorsements, in form and substance reasonably satisfactory to Agent, and certificates of insurance policies and/or endorsements naming Agent as lender's loss payee and additional insured.

(o)   Tax Withholding.  Agent shall have received a properly completed and signed IRS Form W-8 or W-9, as applicable, for each Borrower.

(p)   Cash Management.  Borrowers shall have established a cash management system as provided in this Agreement.

(q)   Perfected Security Interest. Agent shall have received evidence, in form and substance satisfactory to Agent, that Agent has a valid perfected first priority security interest in all of the Collateral, except as to priority, subject to the liens permitted under clauses (b), (c), (i) and (l) of the definition of Permitted Liens, to the extent that such liens have priority over the liens of Agent under Applicable Law and except for such items of Collateral as Agent may determine not to perfect its security interest in, and none of the Collateral shall be subject to any other pledges, security interests, mortgages or assignments as security, except for Permitted Liens.

(r)   No Material Adverse Effect shall have occurred since January 28, 2023 (it being understood that the commencement of the Chapter 11 Cases, the events that customarily occur following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code, any defaults under agreements that have no material effect on Loan Parties under the terms of the Bankruptcy Code as a result of the commencement thereof, reduction in payment terms by suppliers, and reclamation claims shall not be deemed a Material Adverse Effect).

(s)   Initial Approved DIP Budget.  Agent shall have received and approved the initial DIP Budget.

(t)   Credit Agreement and other Loan Documents.  Agent shall have received each of the following documents, in form and substance reasonably satisfactory to Agent, duly executed and delivered, and each such document shall be in full force and effect and Loan Parties shall be in compliance with the terms thereof:

(i)    the Ratification Agreement;

(ii)   the Joinder of Holdings to the Security Agreement and Guaranty, together with related schedules;

(iii)  the Mexican Security Document as amended to include the Obligations and with such other amendments as Agent may require;

(iv)   the Perfection Certificate;

(v)    [reserved];

(vi)   [reserved];

(vii)  [reserved].

(u)   DIP Facility Closing Date.  The DIP Facility Closing Date shall have occurred on or before September 15, 2023.

4.2   <u>Conditions Precedent to each Loan</u>.  The obligation of Lender to fund any Loan shall be subject to the satisfaction, or waiver, immediately prior to or concurrently therewith of each of the conditions precedent set forth in this Section 4.2.

(a)   Borrowing Request.  Agent shall have received a Borrowing Request as required by Section 2.2.

(b)   Representations and Warranties.  All representations and warranties contained herein and in the other Loan Documents that are qualified as to materiality or Material Adverse Effect shall be true and correct and the representations and warranties that are not so qualified shall be true and correct in all material respects, in each case with the same effect as though such representations and warranties had been made on and as of the date of the making of each such Loan and after giving effect thereto, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and correct on and as of such earlier date);

(c)   No Default or Event of Default.  As of the date of any such Loan, or the use of the proceeds thereof, and after giving effect to any of the foregoing, no Default or Event of Default shall exist.

(d)   Borrowing Base.  As of the date of any such, or the use of the proceeds thereof, and after giving effect to any of the foregoing, the aggregate principal amount of the Loans plus the Pre-Petition Loans shall not exceed the lesser of the Maximum Credit or the Borrowing Base.

(e)   DIP Budget Compliance Certificate.  Agent shall have received with respect to the week in which such Loan is to be made, (i) if applicable, the DIP Budget Compliance Certificate for such week required to be delivered to Agent pursuant to Section 7.19 (attaching the DIP Budget Variance Report for

the prior week) and (ii) the DIP Budget for such week required to be delivered to Agent pursuant to Section 7.19.

(f)   Financing Order.  The Interim Financing Order or the Final Financing Order, as applicable, shall not have been vacated, stayed, reversed, modified, or amended without Agent's prior written consent and shall otherwise be in full force and effect and no motion for reconsideration of the Interim Financing Order or the Final Financing Order, as applicable, shall have been timely filed by any Loan Party or any of its Subsidiaries or Affiliates.

(g)   No Protective Advance.  After giving effect to such proposed Loan, (i) no Protective Advance shall be outstanding, and (ii) there shall not exist or have occurred since the Petition Date, any event or circumstance that could reasonably be expected to have a Material Adverse Effect.

Each request for a Loan submitted by a Borrower shall be deemed to be a representation and warranty by each Borrower that the conditions specified in Section 4.2 have been satisfied on and as of the date of the request for the applicable Loan and after giving effect thereto.  The making of any Loan shall not be deemed a modification or waiver by Agent or Lender of any of the terms of this Agreement or any Default or Event of Default.

**SECTION 5.**   PAYMENTS AND ADMINISTRATION

5.1   Payments Generally, Allocation of Proceeds.

(a)   All payments of Obligations shall be made in US Dollars, without offset, counterclaim or defense of any kind, free and clear of (and without deduction for) any Taxes, and in immediately available funds, not later than 12:00 noon on the due date.  Any payment after such time shall be deemed made on the next Business Day.  If any payment is due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day.  All Obligations shall be payable to the Agent Payment Account or such other place as Agent may designate in writing to a Borrower from time to time.

(b)   Subject to the other terms and conditions contained herein, Agent shall apply payments received or collected from a Borrower or for the account of a Borrower or any other Loan Party (including the monetary proceeds of collections or of realization upon any Collateral) as follows: first, to the payment in full of any fees, indemnities or expense reimbursements then due to Agent and Lender from any Loan Party, provided, that, to the extent any Pre-Petition Obligations are then outstanding, before application to any such fees, indemnities or expense reimbursements, such amount shall be applied to the payment in full of the Pre-Petition Obligations (other than the Specified Pre-Petition Obligations) and then to the amounts provided for in this clause; second, to the payment in full of interest due in respect of any Loans; third, to the payment in full of principal due in respect of the Loans; fourth, to the payment or prepayment in full of any other Obligations whether or not then due, in such order and manner as Agent determines and at any time an Event of Default exists or has occurred and is continuing, provided, that, proceeds of Collateral shall be applied to the Pre-Petition Obligations as provided in the Financing Orders or herein.

(c)   At the election of Agent, all payments of principal, interest, fees, expenses and other amounts payable under the Loan Documents may be paid from the proceeds of any cash collateral, if any, at any time in the possession of Agent or Lender. Each Borrower is hereby irrevocably deemed to request that, and authorizes Agent, at its option (but it shall not be obligated to) to (i) make a Loan for the purpose of paying each payment of principal, interest, fees, expenses and other amounts as it becomes due hereunder or under any other Loan Document and agrees that all such amounts charged shall constitute a

Loan unless any such payment is received within three (3) Business Days of the date due or (ii) charge any deposit account maintained in the name of Agent for the benefit of a Borrower or Borrowers for each payment of principal, interest, fees, expenses and other amounts due hereunder or under any other Loan Document, and the Loan Account of Borrowers that it maintains for any sum due and payable by any Borrower to Agent or Lender hereunder or under any of the other Loan Documents.

(d)   No Loan Party will fund any repayment of the DIP Credit Facility with proceeds, or provide as Collateral any property, that is directly or indirectly derived from any transaction or activity that is prohibited by Sanctions, Anti-Money Laundering Laws or Anti-Corruption Laws, or that could otherwise cause Agent, Lender or any other party to any Loan Document to be in breach of Sanctions, Anti-Money Laundering Laws or Anti-Corruption Laws.

5.2   [Reserved.]

5.3   Indemnity for Returned Payments.  If after receipt of any payment of, or proceeds of Collateral applied to the payment of, any of the Obligations, Agent or Lender is required to surrender or return such payment or proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue and this Agreement shall continue in full force and effect as if such payment or proceeds had not been received by Agent or Lender.  Each Borrower shall be liable to pay to Agent and Lender, and does hereby agree to indemnify and hold Agent and Lender harmless for the amount of any payments or proceeds surrendered or returned.  This Section 5.3 shall remain effective notwithstanding any contrary action which may be taken by Agent or Lender in reliance upon such payment or proceeds.  This Section 5.3 shall survive the payment in full of the Obligations and the termination of the Commitment.

5.4   Maturity; Effect of Maturity. The Loans shall be due and payable in full on the Maturity Date, or if earlier, the Termination Date.  All Obligations and fees and reimbursement for expenses, shall be paid by Borrowers as provided herein and in the other Loan Documents or, if no payment date is specified, within ten (10) days after demand.  On the Maturity Date, or if earlier, the Termination Date, the Commitment shall automatically terminate and all of the Obligations (and all Pre-Petition Obligations then outstanding) shall become due and payable without notice or demand and each Borrower shall be required to pay in full all of the Obligations (and such Pre-Petition Obligations).  No termination of the Commitment shall relieve or discharge any Loan Party of its duties, obligations, or covenants under any Loan Document and the Liens of Agent in the Collateral shall continue to secure the Obligations and shall remain in effect until payment in full of all Obligations.

5.5   Prepayments of Loans.

(a)   Optional Prepayments.  Subject to Section 3.4 and the requirements of Section 3.6, Borrowers shall have the right, at any time, upon prior written notice to Agent in accordance with Section 5.5(d), to prepay the Loans, in whole or in part, subject to the requirements of this Section 5.5; provided that each partial prepayment shall be in an amount not less than $500,000 or, if less, the then outstanding principal amount of the Loans.  Any prepayment of a Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.6.

(b)   Mandatory Prepayments.

(i)   Subject to the terms of the Financing Orders, within three (3) Business Days following the receipt by any Loan Party of any Net Cash Proceeds from Asset Sales or Casualty Events, Borrowers shall prepay the Pre-Petition Obligations and thereafter the Loans made to it in an amount equal to one hundred percent (100%) of such Net Cash Proceeds, provided, that, notwithstanding

anything to the contrary herein, in the case of a Sale Transaction, Borrowers shall make such prepayment on the date of the closing of the sale and such amount shall be not less than the amount required for the payment in full of the Obligations (and to the extent then outstanding, all of the Pre-Petition Obligations).

(ii)    Subject to the terms of the Financing Orders, within three (3) Business Days following the receipt by any Loan Party of Net Cash Proceeds from a Debt Issuance or issuance of Disqualified Equity Interests, Borrowers shall prepay the Pre-Petition Obligations and thereafter the Loans in an amount equal to one hundred percent (100%) of such Net Cash Proceeds.

(iii)    Subject to the terms of the Financing Orders, within three (3) Business Days following the receipt by any Loan Party of Net Cash Proceeds from the issuance by any Loan Party or any of its Subsidiaries of any Equity Interests (other than (A) in the event that any Loan Party or any of its Subsidiaries forms any Subsidiary in accordance with the terms hereof, the issuance by such Subsidiary of Equity Interests to such Loan Party, (B) the issuance of Equity Interests to any Person that is an equity holder of such Loan Party prior to such issuance (a "Subject Holder") so long as such Subject Holder did not acquire any such Equity Interests so as to become a Subject Holder concurrently with, or in contemplation of, the issuance of such Equity Interests to such Subject Holder, (C) the issuance of Equity Interests of such Loan Party to directors, officers and employees of such Loan Party pursuant to employee stock option plans (or other employee incentive plans or other compensation arrangements) approved by the Board of Directors), Borrowers shall prepay the Pre-Petition Obligations and thereafter the Loans in an amount equal to one hundred percent (100%) of such Net Cash Proceeds.

(iv)    Subject to the terms of the Financing Orders, all amounts received in a Collection Account shall be applied first to prepay the Pre-Petition Obligations (other than the Specified Pre-Petition Obligations), and thereafter the Loans as set forth in Section 7.9 and to the other Obligations when due (and including for this purpose the Specified Pre-Petition Obligations when due).

(c)    Priority of Application of Payments.  Each prepayment pursuant to this Section 5.5 shall, subject to the Financing Orders be applied, first, to the Pre-Petition Obligations (other than the Specified Pre-Petition Obligations), and second, to the outstanding principal amount of the Loans (or in the case of a Sale Transaction, all of the Obligations) and to the other Obligations (and including for this purpose the Specified Pre-Petition Obligations) when due.  In the event that for any reason, including pursuant to any Financing Order or other order of the Bankruptcy Court or other Applicable Law, any payments provided for herein are no permitted to be applied first to the Pre-Petition Obligations, then at Agent's election, such payments may be applied Obligations.

(d)    [Reserved].

(e)    Notice of Prepayment.  Lead Borrower shall notify Agent by written notice of any prepayment hereunder (i) in the case of prepayment of SOFR Loans pursuant to Section 5.5(a), not later than 11:00 a.m., New York City time, three (3) Business Days before the date of prepayment, (ii) in the case of prepayment of Base Rate Loans pursuant to Section 5.5(a), not later than 11:00 a.m., New York City time, one (1) Business Day before the date of prepayment and (iii) in the case of prepayment of Loans pursuant to Section 5.5(b), not later than 11:00 a.m., three (3) Business Days (or such shorter period as agreed to Agent) before the date of prepayment. Each such notice shall be irrevocable. Each notice shall specify the prepayment date, the principal amount of Loans to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Prepayments shall be accompanied by accrued interest and any compensation required by Section 3.6.

5.6    <u>Maintenance of Loan Account; Statements</u>.

(a)    Agent shall maintain an account on its books in the name of Borrowers (the "Loan Account") on which Borrowers will be charged with all Loans, and with all other payment Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses payable hereunder or under the other Loan Documents.  In accordance with Section 5.1, the Loan Account will be credited with all payments received by Agent from Borrowers or for Borrowers' account.

(b)    Agent shall render to a Borrower each month a statement setting forth the balance in the Loan Account(s) maintained by Agent for a Borrower pursuant to the provisions of this Agreement, including principal, interest, fees, costs and expenses.  Each such statement shall be subject to subsequent adjustment by Agent but shall, absent manifest errors or omissions, be considered correct and deemed accepted by Borrowers and conclusively binding upon Borrowers as an account stated except to the extent that Agent receives a written notice from a Borrower of any specific exceptions of a Borrower thereto within thirty (30) days after the date such statement has been received by a Borrower; provided that the failure of Agent or Lender to maintain such accounts or any error therein shall not in any manner affect the obligations of each Borrower to repay the Loans made to it in accordance with their terms..  Until such time as Agent shall have rendered to a Borrower a written statement as provided above, the balance in such Borrower's Loan Account(s) shall be presumptive evidence of the amounts due and owing to Agent and Lender by Borrowers, absent manifest error.

5.7    <u>Taxes</u>.

(a)    <u>Withholding of Taxes; Gross-Up</u>.  Any and all payments by or on account of any obligation of a Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by a Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 5.7) Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    <u>Payment of Other Taxes by Loan Parties</u>.  Loan Parties shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of Agent timely reimburse it for, Other Taxes.

(c)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by a Loan Party to a Governmental Authority pursuant to this Section 5.7, such Loan Party shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment satisfactory to Agent.

(d)    <u>Indemnification by Loan Parties</u>.  Loan Parties shall indemnify Agent and Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by Agent or Lender or required to be withheld or deducted from a payment to Agent or Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A

51

certificate as to the amount of such payment or liability delivered to a Borrower by Agent or Lender shall be conclusive absent manifest error.

(e)   <u>Treatment of Certain Refunds</u>.  If Agent or Lender determines, in its sole discretion, exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 5.7 (including by the payment of additional amounts pursuant to this Section 5.7), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 5.7 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of Agent or Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of Agent or Lender, shall repay to Agent or Lender the amount paid over pursuant to this Section 5.7(e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that Agent or s Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 5.7(e), in no event will Agent or Lender be required to pay any amount to an indemnifying party pursuant to this Section 5.7 the payment of which would place Agent or Lender in a less favorable net after-Tax position than Agent or Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.  This Section 5.7(e) shall not be construed to require Agent or Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

5.8   <u>Triad Catalog as Agent for Loan Parties</u>.  Each Loan Party hereby irrevocably appoints Triad Catalog as the borrowing agent and attorney-in-fact for all Loan Parties (the "Lead Borrower") which appointment shall remain in full force and effect unless and until Agent shall have received prior written notice signed by each Loan Party that such appointment has been revoked and that another Loan Party has been appointed Lead Borrower.  Each Loan Party hereby irrevocably appoints and authorizes Lead Borrower (a) to provide Agent with all notices with respect to Loans and all other notices and instructions under the Loan Documents (and any notice or instruction provided by Lead Borrower shall be deemed to be given by Loan Parties hereunder and shall bind each Loan Party), (b) to receive all notices, instructions and  other information from Agent (and any notice, instructions or other information provided by Agent to Lead Borrower shall be deemed to have been given to each Loan Party), and (c) to take such action as Lead Borrower deems appropriate on its behalf to obtain Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  Each Loan Party agrees that the handling of the Credit Facility, with Loan Parties and Collateral in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Loan Parties in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that Agent, and Lender shall not incur liability to any Loan Party as a result hereof.  Each Loan Party expects to derive benefit, directly or indirectly, from the handling of the Credit Facility, with Loan Parties and Collateral in a combined fashion, since the successful operation of each Loan Party is dependent on the continued successful performance of the integrated group.  This Section shall survive the termination of this Agreement and the payment in full of the Obligations.

**SECTION 6.**   REPRESENTATIONS AND WARRANTIES

Each Loan Party hereby represents and warrants to Agent and Lender the following:

6.1   <u>Organization; Powers</u>.  Each Loan Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and is qualified to do business, and is in good standing in, every jurisdiction where such qualification is required.

6.2    Authorization; Enforceability.  Subject to the entry of the Interim Financing Order or the Final Financing Order, the execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary organizational actions and, if required, actions by equity holders.  Each Loan Document to which a Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

6.3    No Conflicts.  The execution, delivery, and performance by each Loan Party of the Loan Documents to which it is a party do not and will not (a) violate any material provision of Federal, State, or local law or regulation applicable to such Loan Party, the Organization Documents of such Loan Party, or any order,  judgment, or decree of any court or other Governmental Authority binding on such Loan Party or its property, (b) except as otherwise excused by the Bankruptcy Code, conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material agreement of such Loan Party where any such conflict, breach or default could individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (c) result in the creation or imposition of, or require or give rise to any obligation to grant, any lien, security interest, charge or other encumbrance upon any property of such Loan Party, other than Permitted Liens, or (d) require any approval of any holder of Equity Interests of such Loan Party or any approval or consent of any Person under any material agreement of such Loan Party, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of material agreements, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Effect.

6.4    Governmental Approvals.  Subject to the entry of the Interim Financing Order or the Final Financing Order, the execution, delivery, and performance by each Loan Party of the Loan Documents to which such Loan Party is a party and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than registrations, consents, approvals, notices, or other actions that have been obtained and that are still in force and effect and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Agent for filing or recordation, as of the DIP Facility Closing Date.

6.5    Financial Statements; No Material Adverse Effect.  The consolidated and consolidating balance sheets, and related statements of income, cash flow and shareholders' equity, of Intermediate Holdings and its Subsidiaries that have been and are hereafter delivered to Agent and Lender, have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments and excluding the impact of accounting required under ASC 851-10 Reorganization as a result of the Chapter 11 Cases) and present fairly in all material respects, the financial condition of each Borrower as of the date thereof and results of operations for the period then ended.  Since January 28, 2023, no event, circumstance, or change has occurred that has or could reasonably be expected to have a Material Adverse Effect with respect to a Loan Party, except for the Chapter 11 Cases.  No financial statement delivered to Agent or Lender at any time contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make such statement not materially misleading.  Each projected consolidated and consolidating balance sheet, income statement, funds flow statement and availability, and including each DIP Budget, received by Agent and Lender have been prepared in light of the past operations of the businesses of each Loan Party and are based upon estimates and assumptions stated therein, all of which such Loan Party believes to be reasonable and fair in light of the then current conditions and current facts and reflect the good faith and reasonable estimates of such Loan Party of the future financial performance of  such Loan Party and of the other information projected therein for the periods set forth therein.

53

6.6    Properties; No Liens.  Each Loan Party has (a) good, sufficient and legal title to (in the case of fee interests in Real Property), (b) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (c) good and marketable title to (in the case of all other personal property), all of its assets reflected in its most recent financial statements delivered pursuant to Section 7.1 (or until such financial statements are delivered hereunder, the most recent financial statements delivered under the Pre-Petition Credit Agreement), in each case except for assets disposed of since the date of such financial statements to the extent permitted hereby.  All of such assets are free and clear of Liens except for Permitted Liens

6.7    Litigation.  Except as set forth on Schedule 6.7, and except for the Chapter 11 Cases, there are no actions, suits, proceedings or investigations pending or, to each Loan Party's knowledge, threatened in writing against a Loan Party, or its business or assets, that (a) relate to any Loan Documents or transactions contemplated thereby or (b) either individually or in the aggregate has or could reasonably be expected to have a Material Adverse Effect.

6.8    Compliance with Laws.  Each Loan Party is in compliance with the requirements of all applicable laws, rules, regulations, executive orders or codes and all final judgments, orders, writs, injunctions, decrees, rules or regulations of any court or any Governmental Authority, in each case where the failure to comply individually or in the aggregate has or could reasonably be expected to have a Material Adverse Effect.  There have been no citations, notices or orders of material noncompliance issued to a Loan Party under any Applicable Laws, rules, regulations, executive orders or codes.  No inventory has been produced in violation of the Fair Labor Standards Act of 1938.

6.9    Environmental Condition.  Except as set forth on Schedule 6.9, each Loan Party is in compliance in all material respects with all applicable Federal, State and local environmental, hazardous waste, health and safety statutes, and any rules or regulations related to such statutes, which govern or affect the operations or properties of such Loan Party. None of the operations of any Loan Party is the subject of any Federal, State or local investigation evaluating whether any remedial action involving a material expenditure is needed to respond to a release of any toxic or hazardous waste or substance into the environment. No Loan Party has any material contingent liability in connection with any release of any toxic or hazardous waste or substance into the environment.

6.10    No Defaults.  No event or circumstance has occurred or exists that constitutes a Default or Event of Default.

6.11    Material Contracts.  Schedule 6.11 sets forth all Material Contracts to which a Loan Party is a party or is bound as of the date hereof.  Loan Parties have delivered true, correct and complete copies of such Material Contracts that are in effect as of the date hereof to Agent on or before the date hereof.  Except as otherwise excused by the Bankruptcy Code, no Loan Party is in breach or in default in any material respect under any Material Contract and has not received any notice of the intention of any other party thereto to terminate any Material Contract.

6.12    Restrictive Agreements.  Except as set forth on Schedule 6.12, as of the date hereof, no Loan Party is a party or subject to any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party to create, incur or permit to exist any security interest, lien or other encumbrance on any of its property or assets, or (b) the ability of such Loan Party to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to such Loan Party or to guarantee Indebtedness or to transfer assets.

6.13    Taxes.  Each Loan Party has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it,

except Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party has set aside on its books adequate reserves.  No tax liens have been filed and no claims are being asserted with respect to any such Taxes.

6.14  ERISA.  No Loan Party, nor any of its ERISA Affiliates, maintains or contributes to any Benefit Plan.

6.15  Insurance.  Schedule 6.15 sets forth a description of all insurance maintained by or on behalf of a Loan Party as of the date hereof.  As of the date hereof, all premiums in respect of such insurance have been paid.  Each Loan Party maintains with financially sound and reputable insurance companies, insurance on all of its property in such amounts, subject to such deductibles and self-insurance retentions and covering such properties and risks as are adequate and customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

6.16  Capitalization and Subsidiaries.  Schedule 6.16 sets forth (a) a correct and complete list of the name and relationship to each Loan Party of each Subsidiary, (b) a true and complete listing of each class of each Loan Party's authorized Equity Interests, all of which issued shares are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified on Schedule 6.16, and (c) the type of entity of each Loan Party and each Subsidiary.  There are no outstanding commitments or other obligations of a Loan Party to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of such Loan Party.

6.17  Security Interest in Collateral.  The Security Agreements create legal and valid security interests in all of the Collateral in favor of Agent, and such security interests constitute perfected and continuing security interests on the Collateral, securing the Obligations, enforceable against each Loan Party and having priority over all other security interests, liens or other encumbrances on the Collateral except (a) Permitted Liens, to the extent any such Permitted Liens would have priority over the security interests of Agent pursuant to any Applicable Law and (b) security interests perfected only by possession or the notation of the security interest on the certificate of title with respect thereto to the extent Agent has not obtained or does not maintain possession of such Collateral or has not had its security interest noted on the certificate of title.

6.18  Brokers.  There are no brokerage commissions, finder's fees or investment banking fees payable in connection with any transactions contemplated by the Loan Documents.

6.19  Intellectual Property.  Each Loan Party owns, or is licensed to use, all Intellectual Property necessary to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth on Schedule 6.19, and the use thereof by such Loan Party does not infringe on the rights of any other Person, and except as set forth on such Schedule, such Loan Party's rights thereto are not subject to any licensing agreement or similar arrangement.  No material trademark, servicemark, copyright or other material Intellectual Property at any time used by a Loan Party which is owned by another Person, or owned by such Loan Party subject to any security interest, lien or other encumbrance in favor of any Person other than Agent, is affixed to or incorporated in any Eligible Inventory, except (a) to the extent permitted under the terms of the license agreements listed on Schedule 6.19 and (b) to the extent the sale of inventory to which such Intellectual Property is affixed or incorporated is permitted to be sold by a Loan Party under Applicable Law (including the United States Copyright Act of 1976).

6.20  Trade Relations.  There exists no actual or threatened termination, limitation or modification of any business relationship between a Borrower and any customer or supplier, or any group of customers or suppliers, who individually or in the aggregate are material to the business of a Borrower.

55

To the knowledge of each Loan Party, there exists no condition or circumstance that could reasonably be expected to impair the ability of a Borrower to conduct its business at any time hereafter in substantially the same manner as conducted on the date hereof.

6.21  Labor Relations.  Except as described on Schedule 6.21, no Loan Party is a party to or bound by any collective bargaining agreement, management agreement or consulting agreement.  There are no material grievances, disputes or controversies with any union or other organization of a Loan Party's employees or any threatened strikes, work stoppages or demands for collective bargaining.

6.22  [Reserved.]

6.23  Margin Regulations, Investment Company Act, Etc.  No Loan Party is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No proceeds of Loans will be used by a Loan Party to purchase or carry, or to reduce or refinance any Indebtedness incurred to purchase or carry, any Margin Stock or for any related purpose governed by Regulations T, U or X of the Board of Governors.  Each Loan Party is not (a) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940, or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other Applicable Law regarding its authority to incur Indebtedness.

6.24  Complete Disclosure.  No Loan Document contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make the statements contained therein not materially misleading.  There is no fact or circumstance that a Loan Party has failed to disclose to Agent and Lender in writing that has, or could reasonably be expected to have, a Material Adverse Effect.

6.25  OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws; Patriot Act.  (a) No Loan Party or any officer, director or agent acting on its or their behalf is a Sanctioned Entity or is owned or controlled by, or is acting on behalf of, a Sanctioned Entity, (b) each Loan Party has instituted, maintains and complies with policies, procedures and controls reasonably designed to assure compliance with Sanctions, Anti-Money Laundering Laws and Anti-Corruption Laws, and (c) to the knowledge of each Loan Party, no Loan Party or any officer, director or agent acting on its or their behalf is in violation of, or under investigation by a Governmental Authority for an alleged breach of, Sanctions or of Anti-Money Laundering Laws or Anti-Corruption Laws. Each Loan Party is in compliance, in all material respects, with the (i) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001, as amended) (the "Patriot Act").

6.26  BA-Molagers Subordinated Loan Documents.  Agent has received a true, correct and complete copy of the BA-Molagers Subordinated Loan Documents as set forth in a certificate of a Responsible Officer of Lead Borrower with such agreements. The BA-Molagers Subordinated Loan Documents have not been amended or supplemented, nor have any of the provisions thereof been waived, in any manner that is adverse to interests of Agent or Lender except pursuant to a written agreement or instrument which has been delivered to Agent prior to the DIP Facility Closing Date.

6.27  Credit Card Agreements.  Schedule 6.27 sets forth a list of all of the Credit Card Issuers and Credit Card Processors with which Borrowers conduct business as of the DIP Facility Closing Date. The Credit Card Agreements with the Credit Card Issuers and Credit Card Processors listed on Schedule 6.27 constitute all material agreements necessary for each Borrower to operate its business as conducted with

respect to credit cards and debit cards. No default or event of default, or act, condition or event which after notice or passage of time or both, would constitute a default or event of default under any of the Credit Card Agreements has occurred and is continuing. Each Borrower has complied in all material respects with all of the terms and conditions of the Credit Card Agreements to the extent necessary for such Borrower to be entitled to receive all payments thereunder.

6.28   <u>DIP Budget</u>.  The initial DIP Budget, attached hereto as Exhibit A, which was delivered to Agent on or prior to the DIP Facility Closing Date, and thereafter each then-applicable DIP Budget, has been (or will be, as applicable) prepared in good faith upon assumptions Borrowers believe to be reasonable assumptions on the date of delivery of the then-applicable DIP Budget or update thereto. To the knowledge of Loan Parties, no facts exist that (individually or in the aggregate) would result in any material change in the then-applicable DIP Budget.

6.29   <u>Chapter 11 Cases; Super-Priority Administrative Expense Claim</u>.

(a)   The Chapter 11 Cases were commenced on the Petition Date in accordance with Applicable Law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents, the Interim Financing Order, and the Final Financing Order, (ii) the hearing for the entry of the Interim Financing Order, and (iii) the hearing for the entry of the Final Financing Order.

(b)   After the entry of the Interim Financing Order, and pursuant to, and to the extent permitted in, the Interim Financing Order and the Final Financing Order, the Obligations will at all times constitute allowed super-priority administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against Loan Parties now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject to the Carve-Out and such other exceptions, if any, as are set forth in the Interim Financing Order and the Final Financing Order, as applicable.

(c)   After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Interim Financing Order and the Final Financing Order, as applicable, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral of Loan Parties, subject, as to priority, only to (i) in the case of Loan Parties, the Carve-Out, and (ii) such other exceptions as are set forth in the Interim Financing Order and the Final Financing Order, as applicable.

6.30   <u>DIP Asset Purchase Documents</u>.  Borrowers have delivered to Agent a complete and correct copy of the DIP Asset Purchase Documents, including all schedules and exhibits thereto (to the extent that Agent may require the delivery thereof on or prior to the date hereof).  At the time of the execution and delivery thereof, the execution, delivery and performance of each of the DIP Asset Purchase Documents has been duly authorized by all necessary action on the part of each Loan Party who is a party thereto.  Each DIP Asset Purchase Document is the legal, valid and binding obligation of each Loan Party who is a party thereto, enforceable against each such Loan Party in accordance with its terms, in each case, except ai) as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting generally the enforcement of creditors' rights, and (b) the availability of the remedy of specific performance or injunctive or other equitable relief is subject to the discretion of the court before which any proceeding therefor may be brought.  No Loan Party is in default in the performance or compliance with any material provisions thereof.  All representations and warranties made by a Loan Party in the DIP Asset Purchase Documents and in the certificates delivered in connection therewith are true and correct in all material respects. To the knowledge of each Loan Party, none of the representations or warranties by any party thereto in the DIP Asset Purchase Documents

contain any untrue statement of a material fact or omit any fact necessary to make the statements therein not misleading in any material respect.

## SECTION 7.   AFFIRMATIVE COVENANTS

7.1   <u>Financial Statements, Borrowing Base Certificate and Other Information</u>.  Each Loan Party will deliver to Agent each of the financial statements, reports, and other items set forth below no later than the times specified therein.

(a)   <u>Financial Statements</u>.

(i)   Annual Financial Statement.  As soon as available, but in any event within ninety (90) days after the end of each fiscal year of Intermediate Holdings and each of the Borrowers, audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year for Intermediate Holdings and each of the Borrowers, respectively, setting forth in each case in comparative form the figures for the previous fiscal year, and the accompanying notes thereto, all in reasonable detail, fairly presenting in all material respects the financial position and results of operations of Intermediate Holdings and each of the Borrowers, respectively;

(ii)   Quarterly Financial Statements.  As soon as available, but in any event within forty-five (45) days after the end of each fiscal quarter of Intermediate Holdings, the consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of Intermediate Holdings and its Subsidiaries as of the end of and through such fiscal quarter, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, subject to normal year-end audit adjustments and the absence of footnotes;

(iii)   Monthly Financial Statements.  As soon as available, but in any event within thirty (30) days after the end of each fiscal month of each of the Borrowers, the consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal month, all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of each of the Borrowers as of the end of and through such fiscal month, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, subject to normal year-end audit adjustments and the absence of footnotes;

(b)   <u>Accountant's Certificate</u>.  Concurrently with the delivery of the financial statements referred to in clause (a) above, the unqualified opinion of independent certified public accountants with respect to the audited consolidated financial statements, which independent accounting firm shall be selected by shareholders of Borrowers and reasonably acceptable to Lender, that such audited consolidated financial statements have been prepared in accordance with GAAP, and present fairly in all material respects the results of operations and financial condition of Borrowers as of the end of and for the fiscal year then ended and stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, or if any such Default or Event of Default shall exist, stating the nature and status of such event;

(c)   <u>Compliance Certificate</u>. Concurrently with the delivery of the financial statements referred to in clauses (a)(i) and (a)(ii) above, a Compliance Certificate by a Responsible Office of Borrowers (or Administrative Borrower on behalf of Borrowers), (i) certifying, in the case of the financial statements delivered under clause (iii), as presenting fairly in all material respects the financial condition

and results of operations of Intermediate Holdings and each of Borrowers, as applicable, on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, (ii) certifying as to whether an Event of Default has occurred and, if an Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in clause (a)(i) above and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(d)      Annual Projections.  As soon as available, but in any event no later than the end of, and no earlier than thirty (30) days prior to the end of each fiscal year of Borrowers, a copy of the projected balance sheets, income statements, statements of cash flow and availability of Borrowers on a monthly basis for each month of the upcoming fiscal year in form reasonably satisfactory to Lender;

(e)      Borrowing Base Certificate. As soon as possible after the end of each calendar week (but in any event within three (3) Business Days after the end thereof), a Borrowing Base Certificate (together with the schedules and other supporting documentation with respect thereto) setting forth the calculation of the Borrowing Base as of the last Business Day of the immediately preceding period, duly completed and executed by a Responsible Officer of Borrowers (and nothing contained in any Borrowing Base Certificate shall be deemed to limit, impair or otherwise affect the rights of Agent contained herein and in the event of any conflict or inconsistency between the calculation of the Borrowing Base as set forth in any Borrowing Base Certificate and as determined by Agent in good faith, the determination of Agent shall govern and, absent manifest error, be conclusive and binding upon Borrowers);

(f)      Collateral Reports.  Each of the reports and other items set forth on Schedule 7.1 no later than the times specified therein and a weekly report of in-transit inventory in form and substance satisfactory to Agent delivered as soon as possible after the end of each calendar week (but in any event within three (3) Business Days after the end thereof);

(g)      DIP Budget; Variance Report.  The updates and other information with respect to the DIP Budget in accordance with Section 7.19.

(h)      Chapter 11 Plan Process. On Friday of each week (or on such other day as the parties may agree), the Loan Parties and the Chief Restructuring Officer shall have a call with Agent to give Agent an update as to the business of the Loan Parties, including, without limitation, updates on operations, production volumes, sales, collections, vendor management, employee matters, recent cash disbursements, budget variances, upcoming expected spending and report to Agent with respect to the status of the solicitation and votes cast in connection with any Chapter 11 Plan.

(i)      Tax Returns.  As soon as possible and in any event within ten (10) Business Days of filing thereof, copies of all tax returns filed by each Loan Party with the U.S. Internal Revenue Service (if any);

(j)      Additional Information.  As soon as possible after the end of each calendar month (but in any event within ten (10) Business Days after the end thereof), on a monthly basis or more frequently as Agent may request;

(i)      a certificate by a Responsible Officer of Administrative Borrower consisting of: (A) a statement confirming the retail store rental payments in the immediately preceding calendar month and the payment of rent and other amounts due to owners and lessors of real property leased by Borrowers in the immediately preceding month, subject to year-end or monthly percentage rent payment adjustments,

(B) the addresses of all locations of any Borrower acquired or opened since the date of the most recent certificate delivered to Agent containing the information required under this clause, (C) a report of any new deposit account established or used by any Loan Party with any bank or other financial institution and any existing deposit account currently established or used by such Loan Party with any bank or other financial institution that is at any time identified after the date hereof and was not set forth in the Perfection Certificate, including in each case, the account number, the name and address of the financial institution at which such account is maintained, the purpose of such account and, if any, the amount held in such account on or about the date of such report, (D) a statement that all sales and use taxes payable by or on behalf of Borrowers have been paid when due as of the date of the certificate, except as specifically described in such certificate and (E) a list of (1) all applications, if any, for Intellectual Property made since the date of the prior certificate (or, in the case of the first such certificate, the date hereof), and (2) all issuances of registrations or letters on existing applications for Intellectual Property received since the date of the prior certificate (or, in the case of the first such certificate, the date hereof);

(ii)    upon Agent's request, (A) reports of sales for each category of Inventory, (B) summary reports on sales and use tax collections, deposits and payments, including monthly sales and use tax accruals, and (C) true, correct and complete copies of all agreements, documents or instruments evidencing or otherwise related to Indebtedness that Agent has not otherwise received; and

(k)    Bankruptcy Court Documents.  To the extent not otherwise provided for herein, all financial reports, schedules and other materials and documents at any time filed by or on behalf of any Loan Party with the Bankruptcy Court or the US Trustee or distributed by or on behalf of any Loan Party to any Committee or the US Trustee, substantially concurrently with the delivery thereof to the Bankruptcy Court, Committee or the US Trustee, as the case may be, provided, that:

(i)    at least three (3) Business Days' prior written notice to Agent and its advisors (or such shorter period as agreed to by Agent) prior to any assumption or rejection by any Loan Party or any Subsidiary of a Material Contract or material non-residential real property lease pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected, if such assumption or rejection adversely impacts the Collateral or any Liens thereon (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens);

(ii)    (A) as soon as practicable (and, in any event, at least three (3) Business Days or such shorter period as agreed to by Agent) in advance of filing with the Bankruptcy Court or delivering to the Committee appointed in a Chapter 11 Case, if any (or the professionals to any such Committee), or to the US Trustee, as the case may be, the proposed Final Financing Order and all other proposed orders and pleadings related to the DIP Credit Facility, any other financing or any use of cash collateral, any sale or other disposition of Collateral outside the ordinary course (and including any sale contemplated in accordance with the Milestones), cash management, adequate protection, any Chapter 11 Plan and/or any disclosure statement or supplemental document related thereto (all of which must be in form and substance satisfactory to Agent), and (B) substantially simultaneously with the filing with the Bankruptcy Court or delivering to the Committee appointed in any Chapter 11 Case, if any (or the professionals to any such Committee), or to the US Trustee, as the case may be, monthly written operating reports and all other written notices, filings, motions, pleadings or other written information concerning the financial condition of the Loan Parties or their Subsidiaries that may be filed with the Bankruptcy Court or delivered to the Committee appointed in any Chapter 11 Case, if any (or the professionals to any such Committee), or to the US Trustee, or, to the extent not required to be delivered pursuant to clause (A) above, any request for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure that may be filed with the Bankruptcy Court or delivered to the Committee appointed in any Chapter 11 Case, if any (or the professionals to any such Committee).

60

(l)   _Professional Fee Monitoring_. Agent shall receive such reports as to professional fees as provided for in the Financing Orders.  The professionals shall also be subject to a customary interim compensation order reasonably satisfactory to Agent and Lead Borrower.

(m)   _General_.

(i)   Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of Loan Parties or compliance with the terms of this Agreement, as Agent may reasonably request;

(ii)   Each Loan Party shall maintain, or contract with a third party to maintain, a system of accounting that enables each Loan Party to produce financial statements in accordance with GAAP; and

(iii)   Each Loan Party will, or will contract with a third party to, (i) keep a reporting system that shows all additions, sales, claims, returns, and allowances with respect to its sales, and (ii) maintain its billing systems and practices substantially as in effect as of the DIP Facility Closing Date and shall only make material modifications thereto with notice to, and with the consent of, Agent, such consent not to be unreasonably withheld or delayed.

(n)   _Retention of Documents_.  Any documents, schedules, invoices or other papers delivered to Agent may be destroyed or otherwise disposed of by Agent or Lender one (1) year after the same are delivered to Agent or Lender.

7.2   _Notices of Material Events_.  Loan Parties will promptly (but in any event within three (3) Business Days) notify Agent in writing of: (a)  the occurrence of any Default or Event of Default; (b) any matter that has, or could reasonably be expected to have, a Material Adverse Effect; (c) any breach or non-performance of, or any default under, a Material Contract or with respect to Material Indebtedness of such Loan Party thereof; (d) any dispute, litigation, investigation, proceeding or suspension between a Loan Party and any Governmental Authority or the commencement of, or any material development in, any litigation or proceeding affecting such Loan Party; (e) any material change in accounting policies or financial reporting practices of a Loan Party; (f) any change in a Loan Party's senior executive officers; (h) the discharge by a Loan Party of its independent accountants or any withdrawal or resignation by such accountants; (i) any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent; (j)  the filing of any lien for unpaid Taxes against any Loan Party; (k) any loss, damage, or destruction to, or commencement of any action or proceeding for the taking under eminent domain, condemnation or similar proceeding, of Collateral in the amount of $50,000 or more, whether or not covered by insurance; (l) the satisfaction of each Milestone together with such information with respect thereto as Agent may request as provided in Section 7.16 hereof, and (m) any transaction occurring after the DIP Facility Closing Date consisting of: (i) the entry into a Material Contract (together with a copy of such Material Contract upon Agent's request), (ii) the incurrence of Material Indebtedness, (iii) the voluntary or involuntary grant of any Lien other than a Permitted Lien upon any property of a Loan Party, notify Agent at the same time as the next Borrowing Base Certificate to be delivered to Agent) and (iv) the entry into a Credit Card Agreement (together with a copy of such Credit Card Agreement upon Agent's request); _provided_, _that_, each such notice under these clauses (i), (ii), (iii) (as to a voluntary grant), or (iv) shall be received by Agent not less than ten (10) Business Days prior thereto, together with such other information with respect thereto as Agent may request.  Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of a Borrower setting forth details of the occurrence referred to therein and stating what action such Loan Party has taken and proposes to take with respect thereto.

61

7.3     Existence.  Each Loan Party will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted.

7.4     Payment of Obligations.  Each Loan Party will pay or discharge all Taxes before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest does not have, and could not reasonably be expected to have, a Material Adverse Effect; provided, that, each Loan Party will remit withholding taxes and other payroll taxes to the appropriate Governmental Authority as and when claimed to be due, notwithstanding the foregoing exceptions.

7.5     Maintenance of Properties.  Each Loan Party will keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

7.6     Compliance with Laws; OFAC; Sanctions, Etc.  Each Loan Party will (a) comply with all laws, rules, regulations, licenses, approvals and orders applicable to it and duly observe all requirements of any foreign, Federal, State or local Governmental Authority applicable to it or its property, in each case where the failure to comply individually or in the aggregate has or could reasonably be expected to have a Material Adverse Effect, (b) comply with Sanctions, (c) comply with Anti-Money Laundering Laws and Anti-Corruption Laws in all material respects and (d) perform in all material respects its obligations under Material Contracts to which it is a party.

7.7     Insurance.  Each Loan Party will maintain with financially sound and reputable carriers (a) insurance in such amounts (with no greater risk retention) and against such risks and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to the Security Agreements.  Each Loan Party will from time to time upon Agent's request furnish to Agent information in reasonable detail as to the insurance so maintained.

7.8     Inspection Rights; Field Examinations; Appraisals.  Upon the request of Agent after reasonable prior notice to any Borrower, each Loan Party will permit Agent or a firm engaged by Agent for such purpose to (a) conduct field examinations, including with respect to such Loan Party's practices in the calculation of the Borrowing Base and the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and (b) conduct appraisals of the Collateral, including, without limitation, the assets included in the Borrowing Base, provided, that, commencing after the DIP Facility Closing Date, Agent shall not conduct, or cause to be conducted, at the expense of a Borrower, more than two (2) field examinations in any twelve (12) month period or two (2) appraisals of the Collateral in form, scope and methodology acceptable to Agent in any twelve (12) month period, provided, that, (i) Agent may conduct, or cause to be conducted, at the expense of Borrowers, such other field examinations and appraisals as Agent may request at any time as may be required by law or regulation or when an Event of Default exists and (ii) Agent may conduct additional field examinations at any time at its own expense.  Upon the request of Agent, after reasonable prior notice to a Borrower when no Event of Default exists, as part of any field examination or at other reasonable times during normal business hours when no Event of Default exists or such other times as Agent may request otherwise, each Loan Party will permit representatives and other professionals (including investment bankers, consultants, accountants, and lawyers) engaged by Agent for such purpose to visit and inspect any of its properties, to examine its corporate, financial and operating

records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and accountants, all at the expense of each Loan Party.

7.9    Cash Management; Collection of Proceeds of Collateral.

(a)    Each Loan Party shall establish and maintain, at its expense, deposit accounts and cash management services of a type and on terms, and with the banks, set forth on Schedule 7.9 and, subject to Section 7.9(b) below, such other banks as such Loan Party may hereafter select (such other banks, together with the banks set forth on Schedule 7.9, collectively, the "Cash Management Banks" and individually, a "Cash Management Bank"). Each Loan Party shall deliver, or cause to be delivered to Agent, a Control Agreement with respect to each of its deposit accounts duly authorized, executed and delivered by each Cash Management Bank where a deposit account is maintained, such Loan Party and Agent; provided, that, a Loan Party shall not be required to deliver a Control Agreement with a Cash Management Bank as to any Excluded Deposit Account.

(b)    Each Loan Party shall direct all Credit Card Issuers, Credit Card Processors, account debtors or other obligors (other than purchasers in the retail stores) in respect of any amounts payable to such Loan Party to make payment of all such amounts to a Collection Account and otherwise take all reasonable actions to cause such payments to be made to a Collection Account.  On or prior to the DIP Facility Closing Date, Loan Parties shall deliver to Agent copies of notifications (each, a "Credit Card Notification") substantially in the form attached hereto as Exhibit H which have been executed on behalf of such Loan Party and delivered to such Loan Party's Credit Card Issuers and Credit Card Processors listed on Schedule 6.27 (with evidence of such delivery received by Agent).  Each Loan Party and its respective employees, agents and Subsidiaries shall, acting as trustee for Agent, receive, as the property of Agent, any monies, checks, notes, drafts or any other payment relating to and/or proceeds of accounts or other Collateral which come into its possession or under its control and promptly upon receipt thereof, shall deposit or cause the same to be deposited in the Collection Account, or remit the same or cause the same to be remitted, in kind, to Agent.  In no event shall the same be commingled with a Loan Party's own funds.  Commencing on the DIP Facility Closing Date, (i) all amounts in each Collection Account shall be transferred on a weekly basis (or with such other frequency as Agent may otherwise specifically require) to the Agent Payment Account for application to the Obligations and (ii) amounts in the Collection Account shall only be transferred to the Agent Payment Account and Loan Parties shall not have any right of withdrawal or other rights to direct the transfer of such funds, other than for the transfer of funds to the Agent Payment Account. All payments made to a Collection Account shall be treated as payments to Agent in respect of the Obligations and therefore shall constitute the property of Agent to the extent of the then outstanding Obligations. Each Control Agreement shall provide, among other things, that (A) the Cash Management Bank will comply with any instructions originated by Agent directing the disposition of the funds in each applicable deposit account without further consent by the applicable Loan Party, (B) the Cash Management Bank waives or subordinates, and agrees not to exercise any rights of setoff or recoupment or any other claim against each applicable deposit account other than for payment of its service fees and other charges directly related to the administration of such deposit account and for returned checks or other items of payment credited to such deposit account, and (C) the Cash Management Bank will forward, by daily sweep (or with such other frequency as Agent may agree), all amounts in each applicable deposit account to the Agent Payment Account.

(c)    So long as no Default or Event of Default exists, upon not less than five Business Days' prior written notice to Agent, a Loan Party may amend Schedule 7.9 to add or replace a deposit account or Cash Management Bank and shall upon such addition or replacement provide to Agent an amended Schedule 7.9; provided, that, (i) such prospective Cash Management Bank shall be reasonably satisfactory to Agent, and (ii) prior to the time of the opening of such deposit account such Loan Party and such prospective Cash Management Bank shall have executed and delivered to Agent a Control Agreement.  A

Loan Party shall close any of its deposit accounts (and establish replacement deposit accounts in accordance with the foregoing sentence) as promptly as practicable and in any event within forty-five (45) days after notice from Agent that the operating performance, funds transfer, or availability procedures or performance of the Cash Management Bank with respect to deposit accounts or Agent's liability under any Control Agreement with such Cash Management Bank is no longer satisfactory to Agent in Agent's reasonable judgment.

7.10   Additional Collateral; Further Assurances.

(a)   In the case of the formation or acquisition by any Loan Party of any Subsidiary after the date hereof, as to any such Subsidiary, (i) such Loan Party shall cause such Subsidiary to execute and deliver to Agent, in form and substance satisfactory to Agent, a joinder agreement to the Loan Documents in order to make such Subsidiary a party to this Agreement as a borrower or a guarantor, as Agent may specify, and shall cause it to execute and deliver a guarantee and such other agreements, documents or instruments and to deliver other consents, waivers, acknowledgments and other agreements from third persons which Agent may deem necessary or desirable in order to permit, protect and perfect its security interests in and liens upon the assets of such Subsidiary and the Equity Interests of such Loan Party in such Subsidiary, corporate resolutions and other organization and authorizing documents of such Person, and favorable opinions of counsel to such person, (ii) such Loan Party shall execute and deliver to Agent, a pledge and security agreement, in form and substance satisfactory to Agent, granting to Agent a first pledge of and lien on all of the issued and outstanding Equity Interests of any such Subsidiary, such other agreements, documents and instruments as Agent may require in connection with the documents referred to above, including, but not limited to, supplements and amendments hereto, corporate resolutions and other organization and authorizing documents and favorable opinions of counsel to such person and (iii) and such information as Agent or Lender requires to complete its customary individual background checks for such Subsidiary.

(b)   Without limiting the foregoing, each Loan Party will, and will cause each Subsidiary to, execute and deliver, or cause to be executed and delivered, to Agent such documents, agreements and instruments, and take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents and such other actions or deliveries of the type required by Section 4.1, as applicable), which Agent may, from time to time, request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the security interests and liens created or intended to be created by the Security Agreements, all in form and substance satisfactory to Agent and at the expense of Borrowers. Without limitation of the foregoing, upon the request of Agent, each Loan Party will use its commercially reasonable efforts to cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Freight Forwarder Agreement) to Agent covering such matters and in such form and substance as the Agent may require and to cause any of its landlords (other than for a retail store location) to deliver a Collateral Access Agreement to Agent in such form as the Agent may require.

7.11   End of Fiscal Years; Fiscal Quarters.  Each Loan Party shall, for financial reporting purposes, cause its fiscal year to end on the Saturday closest to January 31 of each year, and fiscal quarters to end on a 13-week cadence thereafter, except in the case of a 53-week fiscal year, in accordance with the fiscal accounting calendar of the Loan Parties.

7.12   Costs and Expenses.  Each Loan Party shall pay Agent on demand (a) all reasonable and documented out-of-pocket expenses incurred by Agent, Lender and their Affiliates (including the reasonable fees, charges and disbursements of any counsel for Agent) in connection with the preparation, negotiation, execution, delivery and administration of this Agreement, the other Loan Documents, the

Financing Orders or other motions, briefs, orders or other documents and materials in connection with the Chapter 11 Cases, or any amendments, modifications or waivers of the provisions hereof or thereof or otherwise in connection with any Financing Order or the Chapter 11 Plan, or transactions contemplated thereby or in connection with the Chapter 11 Cases, Successor Cases or the Chapter 11 Plan (whether or not the transactions contemplated hereby or thereby shall be consummated and including fees and expenses of Agent Advisors) or any refinancing of the DIP Credit Facility or any "exit financing" requested by or on behalf of the Loan Parties (whether or not the transactions contemplated hereby or thereby shall be consummated) (b) exclusive of out-of-pocket costs and expenses, all of Agent's customary fees and charges imposed or incurred in connection with this Agreement, the other Loan Documents, or any Financing Order or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including, without limitation, for background checks, with respect to the disbursement of funds or the receipt of funds to or for the account of any Loan Party, or resulting from the dishonor of checks, or for field examinations or appraisals or otherwise in connection with the Chapter 11 Cases, Successor Cases or Chapter 11 Plan (whether or not the transactions contemplated hereby or thereby shall be consummated and including fees and expenses of Agent Advisors) or any refinancing of the DIP Credit Facility or any "exit financing" requested by or on behalf of the Loan Parties, (c) all reasonable and documented out-of-pocket expenses incurred by Agent or Lender (including the fees, charges and disbursements of any counsel for Agent or Lender), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 7.12, or (B) in connection with the Loans made, including all such out-of-pocket expenses incurred during any restructuring or negotiations in respect of such Loans.  Without limiting the generality of the foregoing, such costs and expenses shall include: (i) all costs and expenses of filing or recording (including UCC financing statement filing taxes and fees, documentary taxes, intangibles taxes and mortgage recording taxes and fees, if applicable), (ii) costs and expenses and fees for insurance premiums, environmental audits, title insurance premiums, surveys, assessments, engineering reports and inspections, appraisal fees and search fees, background checks, costs and expenses of remitting loan proceeds, collecting checks and other items of payment, together with Agent's customary charges and fees with respect thereto; (iii) costs and expenses of preserving and protecting the Collateral (including, but not limited to, the payment of fees and expenses of Gordon Brothers Retail Partners, LLC in connection with the Collateral, without duplication); (iv) actual costs and expenses paid or incurred in connection with obtaining payment of the Obligations, enforcing the security interests and liens of Agent in the Collateral, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of the Loan Documents or defending any claims made or threatened against Agent or Lender arising out of the transactions contemplated hereby and thereby (including preparations for and consultations concerning any such matters); (v) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Agent during the course of periodic field examinations; and (vii) the reasonable fees and disbursements of counsel (including legal assistants) to Agent and Lender in connection with any of the foregoing. Each Loan Party's obligations under this Section shall survive the termination of the Loan Documents and payment of the Obligations hereunder.

7.13   [Reserved].

7.14   Investment Bank. Borrowers have retained the Investment Bank to assist Loan Parties in the sale of all or substantially all businesses and properties of Loan Parties, which shall, among other things, include assistance in obtaining confirmation of an Acceptable Plan of Reorganization. Each Loan Party has authorized and directed the Investment Bank to share with Agent all reports and other information prepared by or in the possession of the Investment Bank relating to the plan process (provided, that, (a) in no event shall any Loan Party be required to disclose reports or other information if it would be a direct violation of Applicable Law in the opinion of outside counsel and (b) if a document, in the good faith judgment of the Loan Parties, cannot be provided in order to preserve an attorney-client privilege, then

such document may be redacted as necessary to preserve such privilege).  At all times the Loan Parties shall continue to retain the Investment Bank, or any replacement thereof from time to time that is satisfactory to Agent and engaged promptly after the resignation or dismissal of the then existing Investment Bank, as their investment banker pursuant to the scope of engagement previously entered into on or before the DIP Facility Closing Date, between the Investment Bank and Lead Borrower (the "Investment Bank Engagement Letter"), or a replacement scope of engagement upon substantially similar terms as the Investment Bank Engagement Letter or otherwise acceptable to Agent.

      7.15  <u>Chief Restructuring Officer</u>.  Borrowers shall retain on terms and conditions reasonably acceptable to Agent and at the sole cost and expense of Borrowers, Curt Kroll or such other Person acceptable to Agent, as represented by SierraConstellation Partners, LLC or such other Person acceptable to Agent as its chief restructuring officer (the "Chief Restructuring Officer").  The Chief Restructuring Officer shall be responsible subject to the continued authority of the board of managers or equivalent, as applicable, for coordinating the turnaround, restructuring and transaction activities of the Loan Parties and engagement with internal and external stakeholders including making decisions affecting the businesses of Loan Parties with respect to such matters (which shall control as among the officers of the applicable Loan Party), and shall, among other things, assist in the preparation of the DIP Budget and compliance with the terms and conditions set forth in the Loan Documents. The Chief Restructuring Officer shall report directly to the board of managers or equivalent, as applicable, of Loan Parties.  Each Loan Party hereby authorizes and directs the Chief Restructuring Officer to consult with Agent and to share with Agent all budgets, records, projections, financial information, reports and other information prepared by or in the possession of the Chief Restructuring Officer relating to the Collateral, or the financial condition or operations of the business of Loan Parties and respond fully to any inquiries of Agent regarding the assets, prospects, business and operations of Loan Parties and communicate and fully cooperate with Agent in accordance with the terms of this Agreement and the other Loan Documents.  Promptly following any request therefor, each Loan Party shall provide, and cause the Chief Restructuring Officer to provide, Agent with such information regarding the operations, business affairs and financial condition of any Loan Party as Agent may request, provided, that, (a) in no event shall any Loan Party be required to disclose reports or other information if it would be a direct violation of Applicable Law in the opinion of outside counsel and (b) if a document, in the good faith judgment of the Loan Parties, cannot be provided in order to preserve an attorney-client privilege, then such document may be redacted as necessary to preserve such privilege).  Each Loan Party agrees to provide the Chief Restructuring Officer with complete access to and supervision over all of the books and records of such Loan Party, all of the premises of such Loan Party and to all management and employees of such Loan Party as and when deemed necessary by the Chief Restructuring Officer.  Each Loan Party shall not amend or modify, or terminate, the retention agreement with the Chief Restructuring Officer without the prior written consent of Agent.  If the Chief Restructuring Officer resigns, Borrowers shall promptly notify Agent in writing and provide Agent with a copy of any notice of resignation promptly upon the sending of such notice by such Chief Restructuring Officer.  Any replacement or successor Chief Restructuring Officer shall be reasonably acceptable to Agent, and shall be retained pursuant to a new retention agreement on substantially similar terms and conditions and scope of duties, reasonably acceptable to Agent within seven (7) Business Days immediately following the notice of resignation of the resigning Chief Restructuring Officer, or within such longer period of time as Agent may agree in writing.

      7.16  <u>Milestones</u>.  Each Loan Party shall deliver or shall cause to be delivered to Agent or to occur, as applicable, each of the Milestones set forth on Schedule 7.16 at the times (or at such later dates as Agent may agree in writing) and in the manner set forth on such Schedule. The failure of such events to occur at such times and such manner shall constitute an Event of Default or in the event that any agreement required to be delivered pursuant to such Milestone is terminated or otherwise ceases to be in full force and effect or the parties thereto fail to comply with any of the material terms thereof, it shall constitute an Event of Default.  Without limitation of any other rights of Agent or Lender, any asset

purchase agreement and related documents or any related motions in the event of any case under the Bankruptcy Code, and any related amendments and modifications to any of the foregoing, shall be on terms and in form and substance satisfactory to Agent and the failure to deliver such documents and motions (if applicable) that are reasonably satisfactory in all respects to Agent by the applicable Milestone shall constitute an Event of Default.

7.17  <u>Advisors to Agent and Lender</u>.  Without limitation of any rights or remedies of Agent and Lender under this Agreement, the other Loan Documents or Applicable Law, (a) Agent, on behalf of itself and Lender, shall be entitled to retain or to continue to retain (either directly or through counsel) one financial advisor, auditor or other consultant at any time prior to an Event of Default and up to one additional consultant at any time on and after an Event of Default, in each case as it may deem reasonably necessary (individually, an "Agent Advisor", and collectively, the "Agent Advisors") on terms and conditions acceptable to Agent or its counsel to provide advice, analysis and reporting for the benefit of Agent and Lender, (b) Loan Parties shall pay all reasonable and documented fees and expenses of each Agent Advisor and all such reasonable and documented fees and expenses shall constitute Obligations and be secured by the Collateral, provided, that, the applicable DIP Budget shall be updated to include such fees and expenses of the Agent Advisors, (c) Agent may charge such reasonable, documented fees and expenses to the Loan Account of Borrowers, and such amounts shall be payable on demand, and (d) Loan Parties and their advisors shall grant reasonable access to, and reasonably cooperate with, Agent, Lender, the Agent Advisors, and any other representatives of the foregoing and provide all information that such parties may reasonably request in a timely manner (other than communications that are subject to attorney/client or other forms of legal privilege, provided, that, Borrowers shall immediately notify Agent if it is withholding any such information for such reason and shall deliver a redacted copy of, or detailed summary of, such information that can be disclosed without loss of privilege), including allowing reasonable access to the books and records of the Loan Parties, all of the premises of the Loan Parties, and to all management of the Loan Parties as and when deemed necessary by Agent or such Agent Advisor, in each case with reasonable advance notice to any Borrower.

7.18  <u>Inventory Matters</u>.  On or before September 30, 2023 (or such later date as Agent may agree), all of the Inventory of Loan Parties (other than in-transit inventory or inventory at retail store locations) shall be located either at (i) the existing distribution center of Borrowers in Mexico, Missouri or (ii) the premises of X Border LLC (also known as XB Fulfillment) or Soluciones XB Mexico, S. de S.L. de C.V. in Tijuana, Mexico, except as Agent may otherwise hereafter agree in writing.

7.19  <u>DIP Budget</u>.

(a)  Borrowers have prepared and delivered to Agent and Lender the initial DIP Budget, which has been prepared by Borrowers in good faith and based upon Borrowers' best information as to the items contained therein.  The initial DIP Budget sets forth projected receipts, disbursements, net cash flow, net sales, Eligible Credit Card Receivables, Eligible Inventory, payable float, Loan balances and availability for the immediately following consecutive 13 weeks, set forth on a weekly basis for Borrowers, including the anticipated uses of the DIP Credit Facility for such period.  The initial DIP Budget is and shall be the DIP Budget unless and until replaced or amended in accordance with terms set forth below.  Borrowers will act in accordance with, and comply with, each DIP Budget that is in form and substance satisfactory to Agent and has been approved by it.  Agent and Lender have relied upon the initial DIP Budget in determining to enter into this Agreement and have relied upon, and will be relying on, in providing the DIP Credit Facility.  No DIP Budget shall be updated, amended or modified except with the prior written consent of Agent.  In addition, except as Agent may otherwise hereafter agree, Borrowers shall deliver a revised DIP Budget for the period prior to the payment in full of the Obligations or such other period as Agent may specify, for review and approval by Agent on or about September [10], 2023, accompanied by such supporting documentation as requested by Agent.  Upon written approval by

Agent such revised DIP Budget shall become the DIP Budget for purposes hereof.  Such revised DIP Budget thereto shall be prepared in good faith based upon assumptions which Borrowers believe to be reasonable at the time made.  In the event Agent does not approve any such revised DIP Budget for the applicable period, then the DIP Budget previously delivered and approved by Agent for the applicable period shall continue in effect.

(b)   On or before three (3) Business Days after the end of each calendar week following the week of the DIP Facility Closing Date, Borrowers shall deliver to Agent commencing on the Wednesday of the second full calendar week following the Petition Date an updated DIP Budget for the next succeeding thirteen week period each in form satisfactory to Agent and with any revisions projected in the DIP Budget for the same periods covered by the prior DIP Budget (any such revision being a "DIP Budget Modification") required to be satisfactory to, and approved in writing by, Agent; provided, that, (i) in the event Agent does not approve any such DIP Budget Modification for the applicable period, then the DIP Budget previously delivered and approved by Agent for the applicable period shall continue in effect, and (ii) in the case of a DIP Budget Modification that constitutes an adverse change with respect to ending cash or Excess Availability, or any change with respect to ending cash or Excess Availability as a result of delays in the making of disbursements shall be satisfactory to, and approved by, Agent.  Each DIP Budget Modification included in a DIP Budget shall be accompanied by such supporting documentation as requested by Agent. Upon Agent's written approval of any DIP Budget Modification, the DIP Budget shall be deemed updated to include the revisions constituting such DIP Budget Modification. The DIP Budget and each DIP Budget Modification thereto shall be prepared in good faith based upon assumptions which Borrowers believe to be reasonable.  The line items in any DIP Budget for payment of interest, expenses and other amounts to Agent and Lender are estimates only, and Borrowers remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents, regardless of whether such amounts exceed such estimates. Nothing in any DIP Budget (including, without limitation, any estimates of a loan balance in excess of the Borrowing Base) shall constitute an amendment or other modification of this Agreement or any other Loan Document or any of the Borrowing Base restrictions or other lending limits set forth herein or therein.

(c)   On or before three (3) Business Days after the end of each calendar week following the week of the DIP Facility Closing Date, Borrowers shall deliver to Agent commencing on the Wednesday of the second full calendar week following the Petition Date a DIP Budget Compliance Certificate and such DIP Budget Compliance Certificate shall include such detail as is satisfactory to Agent, signed by a Responsible Officer of Borrowers (i) certifying that (A) Borrowers are in compliance with the covenant contained in clause (d) of this Section 7.19, as applicable, and (B) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (ii) attaching a DIP Budget Variance Report for the prior week and for the period from the commencement of the initial DIP Budget to the end of the prior week.  For purposes hereof, projected disbursements may not be reallocated among line items set forth in the DIP Budget, except as specifically agreed in writing by Agent.

(d)   Commencing on the fourth calendar week following the Petition Date (and including the week in which the Petition Date occurs as the first week for such purpose), Borrowers shall not permit:

(i)   the total aggregate disbursements (excluding disbursements for professional fees and expenses paid or paid into escrow) during any DIP Measurement Period to exceed the aggregate amount for such disbursements for such DIP Measurement Period in the applicable DIP Budget by more than ten percent (10.0%),

(ii)    the total aggregate disbursements for professional fees and expenses paid or paid into escrow during any DIP Measurement Period to exceed the aggregate amount for such disbursements for such DIP Measurement Period in the applicable DIP Budget by more than ten percent (10.0%),

(iii)    the total aggregate inventory receipts during any DIP Measurement Period to be less than eighty-five percent (85%) of the aggregate amount thereof for such DIP Measurement Period in the applicable DIP Budget,

(iv)    the total aggregate sales receipts during any DIP Measurement Period to be more than ten percent (10%) less than the aggregate amount thereof for such DIP Measurement Period in the applicable DIP Budget,

(v)    as of the Saturday of every third calendar week following the Petition Date (and including the week in which the Petition Date occurs as the first week of such three-week period), the Excess Availability to be more than ten percent (10.0%) less than the amount thereof as of such time in the DIP Budget, or

(vi)    the Loan balance under the DIP Credit Facility (together with any then outstanding loans under the Pre-Petition Credit Facility) as of the Saturday of any week to exceed the amount thereof as of such time in the DIP Budget by more than ten percent (10.0%) of such amount in the DIP Budget.

(e)    Agent and Lender (i) may assume that Loan Parties will comply with the DIP Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay any unpaid expenses incurred or authorized to be incurred pursuant to any DIP Budget. The line items in the DIP Budget for payment of interest, expenses and other amounts to Agent and Lender are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Financing Order regardless of whether such amounts exceed such estimates. Nothing in any DIP Budget (including any estimates of a loan balance in excess of a Borrowing Base) shall constitute an amendment or other modification of any Loan Document or a Borrowing Base or other limitations set forth herein.  Notwithstanding any projected amounts set forth in any DIP Budget relating to the costs and expenses of Agent or Lender that are reimbursable by any Loan Party or any other amounts owing by any Loan Party to Agent or Lender (including, without limitation, attorneys and consulting fees and expenses) in accordance with this Agreement, the other Loan Documents and the Financing Orders, such projections shall not limit, impair, modify or waive the obligations of any Loan Party to pay the actual amounts due to Agent or Lender in respect of such costs, expenses and other amounts owing to Agent and Lender in accordance with this Agreement, the other Loan Documents and the Financing Orders.  Agent and Lender shall not be responsible for, or have any liability or obligation to ensure the payment of, any costs and expenses set forth in any DIP Budget or any other claims asserted or incurred in connection with any Loan Parties' business or in the Chapter 11 Cases, and nothing in this Agreement or otherwise shall be construed to obligate Agent or Lender in any way, to pay, fund, or ensure that any Loan Party has sufficient funds to pay any such costs and expenses.

(f)    Notwithstanding anything to the contrary herein or in the other Loan Documents, or otherwise, all Loans shall be used by Borrowers only in accordance with the then applicable DIP Budget and it shall be an additional Event of Default hereunder if Borrowers use proceeds of any Loans made by or on behalf of Agent or Lender on and after the DIP Facility Closing Date for any expense that is not set forth in the DIP Budget for the period of time on or before the date such expense is to be paid in the applicable DIP Budget, except as Agent may consent in writing.

7.20   Compliance with Financing Orders, Etc.  Each Loan Party will comply (a) in all respects, after entry thereof, with all of the requirements and obligations set forth in the Financing Orders and the

69

Cash Management Order, as each such order may be amended and in effect from time to time in accordance with this Agreement, (b) in all material respects, after entry thereof, with any Sale Order, as each such order may be amended and in effect from time to time in accordance with this Agreement, (c) in all material respects, after entry thereof, any other order entered by the Bankruptcy Court that (i) is in form and substance reasonably satisfactory to Agent, (ii) has not been vacated, reversed or stayed and (iii) has not been amended or modified except in a manner reasonably satisfactory to Agent, and including after entry thereof, the orders  approving the "first day" and "second day" relief obtained in any Chapter 11 Cases, and (d) in a timely manner with its obligations and responsibilities as a debtor-in-possession or debtor under the Bankruptcy Code, the Bankruptcy Rules and any other order of the Bankruptcy Court.

7.22   No Discharge.  Unless in accordance with an Acceptable Plan of Reorganization, each Loan Party agrees that prior to payment in full of the Obligations, (a) its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a Chapter 11 Plan (and each of the Loan Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the superiority claims granted to Agent and Lender pursuant to the Financing Orders and the Liens granted to Agent pursuant to the Financing Orders shall not be affected in any manner by the entry of an order confirming a Chapter 11 Plan.

7.23   Waiver of Certain Rights.  Each Loan Party hereby agrees that it shall not, and hereby waives any right that it may have to, seek authority to, (a) use cash collateral of Agent and Lender under Section 363 of the Bankruptcy Code except to the extent provided in any Financing Order, without the prior written consent of Agent, (b) obtain post-petition loans or other financial accommodations, other than from Agent and Lender, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code that does not provide for the indefeasible payment in full and satisfaction in cash of all Obligations and Pre-Petition Obligations without the prior written consent of Agent, (c) challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of Agent's post-petition liens and claims, (d) to challenge the application of any payments or collections received by Agent or Lender to the obligations of Loan Parties as provided for herein, (e) propose or support a Chapter 11 Plan that does not provide for the indefeasible payment in full and satisfaction in cash of all Obligations and all Pre-Petition Obligations (to the extent still outstanding) on the effective date of such plan (except in the case of Specified Pre-Petition Obligations as Agent may agree), (f) subject to entry of the Final Financing Order, surcharge the Collateral pursuant to Section 506(c) of the Bankruptcy Code, (g) seek relief under the Bankruptcy Code, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent such relief would restrict or impair the rights and remedies of Agent or Lender as set forth herein, the other Loan Documents or any Financing Order, or (h) take any action to amend or modify the rights or remedies of Agent or Lender under the DIP Loan Documents, the Financing Orders or the Pre-Petition Loan Documents, or that has the effect of amending or modifying such rights or remedies, without the prior written consent of Agent.

7.24   Post-Closing Actions.  Each Loan Party hereby agrees to execute and deliver all documents and certificates, and to perform all obligations, listed on Schedule 7.24 on or prior to the applicable dates set forth on such Schedule (as any such dates may be extended by Agent in its sole discretion).  Any delay in taking such actions or delivering such agreements shall not constitute a Default or an Event of Default or a breach of any representation and warranty or covenant in any Loan Document until the date specified for each item listed on Schedule 7.24 (as such date may be extended by Agent in its sole discretion).

**SECTION 8.**   NEGATIVE COVENANTS

8.1   Indebtedness.  Each Loan Party shall not incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise

become responsible for (directly or indirectly), the Indebtedness, performance, obligations or dividends of any other Person, except for the Permitted Indebtedness.

8.2    Liens.  Each Loan Party shall not create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any security interest or lien with respect to any such assets or properties, except for the Permitted Liens.  Notwithstanding anything in this Section 8.1 to the contrary, other than as set forth in the Financing Orders, after the DIP Facility Closing Date, in no event shall any Lien be granted in any Collateral to secure any Indebtedness other than the Obligations hereunder and under the Pre-Petition Credit Agreement.  Without limitation of the foregoing, no Loan Party will, or support directly or indirectly any Committee or other party in interest in the Chapter 11 Cases, to seek to prime or create pari passu to any claims, Liens or interests of (A) Agent and Lender or (B) until the indefeasible payment in full in cash of the Pre-Petition Obligations, the Pre-Petition Agent and the Pre-Petition Lender, any Lien, in each case, other than as set forth in the applicable Financing Order and irrespective of whether such claims, Liens or interests may be "adequately protected".

8.3    Fundamental Changes.  Except with the prior written consent of Agent, each Loan Party shall not directly or indirectly, (a) change its name or conduct business under any fictitious name; (b) change its tax, charter or other organizational identification number; (c) change its form or state of organization; (d) suspend operations, wind up, liquidate or dissolve; (e) enter into any merger, consolidation, reorganization, recapitalization, division or plan of division, or reclassify its Equity Interests, except for any merger between Loan Parties, provided, that, a Borrower must be the surviving entity of any such merger to which it is a party; or (f) form any Subsidiary or directly or indirectly, purchase or otherwise acquire all or substantially all of the assets of (or any division or business line of) any other Person, or fifty percent (50%) or more of any class of Equity Interests of any other Person.

8.4    Asset Dispositions.  Each Loan Party shall not sell, issue, assign, lease, license, transfer, abandon or otherwise dispose of any Equity Interests or any of its assets (including by an allocation of assets among newly divided limited liability companies pursuant to a "plan of division"), except, subject to the Financing Orders, for Permitted Dispositions.

8.5    Investments.  Each Loan Party shall not, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment except, subject to the Financing Orders, for Permitted Investments.

8.6    Transactions with Affiliates.  Each Loan Party shall not directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, director or other Affiliates of such Loan Party, except pursuant to the reasonable requirements of such Loan Party's business and upon fair and reasonable terms no less favorable to such Loan Party than such Loan Party would obtain in a comparable arm's length transaction with an unaffiliated person, except for the following: (a) any employment or compensation arrangement or agreement, employee benefit plan or arrangement, officer or director indemnification agreement or any similar arrangement or other compensation arrangement entered into by a Loan Party or a Subsidiary in the ordinary course of business and payments, issuance of securities or awards pursuant thereto, and including the grant of stock options, restricted stock, stock appreciation rights, phantom stock awards or similar rights to employees and directors in each case approved by the board of directors or equivalent governing body of such Loan Party, (b) Restricted Payments permitted under Section 8.8 hereof, (c) transactions disclosed on Schedule 8.6 hereto, (d) commercial sourcing transactions between any Loan Party and Shu Shi pursuant to which Shu Shi will be paid a commission on a cost plus basis on purchases made, sourced or arranged by Shu Shi on behalf of the Loan Parties, provided that such commission rate shall not exceed ten percent

71

(10.0%) and (e) [reserved].  Notwithstanding anything to the contrary set forth in this Section 8.5, or otherwise herein or in any Loan Document, no dividends, distributions, payments on the Management Fees or any other return of capital in any form whatsoever may be made to the Sponsor (including its Controlled Investment Affiliates) and no other payments referred to above shall be permitted after the Petition Date unless such payments are made in accordance with the DIP Budget.  Nothing in this Agreement or any Loan Document, or any act or omission by or on behalf of Agent or Lender (or Pre-Petition Agent or any Pre-Petition Lender) shall be construed as a consent or authorization to the transfer of title to any assets by a Loan Party to another Loan Party in any manner that adversely affects the Lien of Agent (or Pre-Petition Agent) or waiver of any rights or remedies of Agent (or Pre-Petition Agent) with respect thereto.

8.7   Change in Business.  Each Loan Party shall not engage in any business other than the business of such Loan Party on the date hereof and any business reasonably related, ancillary or complimentary to the business in which such Loan Party is engaged on the date hereof or acquire any properties or assets that are not reasonably related or ancillary thereto.

8.8   Restricted Payments.  Each Loan Party shall not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except:

(a)   any Subsidiary of Holdings may make Restricted Payments to Holdings or to any other Subsidiary of Holdings that is a Loan Party;

(b)   a Loan Party may declare and make dividend payments or other distributions payable solely in the Qualified Equity Interests of such Loan Party,

(c)   Holdings may make Restricted Payments payable in Qualified Equity Interests pursuant to and in accordance with stock option or restricted stock plans or other benefit plans for management or employees of Holdings and the Subsidiaries in the ordinary course of business;

(d)   [reserved];

(e)   any Loan Party may pay reasonable compensation to officers, directors, employees, consultants and advisors for actual services rendered to the Loan Parties and for the reimbursement of out-of-pocket expenses actually incurred by such officers, directors, employees, consultants and advisors in the ordinary course of business (in each case, other than management fees, costs, expenses, indemnities and other amounts payable by any Loan Party under the Management Agreement);

(f)   a Loan Party may declare and pay a dividend the proceeds of which are used on the date of the payment thereof for a Permitted Tax Distribution, on a timely basis to fund payment of the applicable income Taxes imposed on the taxable income related to such Tax Distributions, including in respect of estimated income Tax payments, so long as: (i) no notice of termination of this Agreement shall be outstanding at the time any such distribution is made; and (ii) in the event that the actual distribution to Holdings made pursuant to this Section 8.8(f) exceeds the correct amount of such Permitted Tax Distribution, then unless and until Holdings at its election repays to Intermediate Holdings the amount of such excess, or Intermediate Holdings recoups such excess from distributions or other amounts payable to Holdings, Intermediate Holdings shall not pay or make any distribution with respect to, or purchase, redeem or retire, any Equity Interest of Holdings held or controlled by, directly or indirectly, Holdings until such payment or recoupment has been made;

(g)   any Loan Party may pay, or Intermediate Holdings may pay dividends or other distributions to Holdings for the purpose of paying, any indemnification claims made by directors or

officers of such Holdings in respect of liabilities for serving in such capacity, and customary directors' fees to such board members, and reimbursement of out-of-pocket expenses incurred by such board members in such capacity; and

(h)   [reserved].

Notwithstanding anything to the contrary set forth in this Section 6.7, or otherwise herein or in any other Loan Document, no such Restricted Payments shall be permitted after the Petition Date unless such Restricted Payments are made in accordance with the DIP Budget.

8.9   <u>Restrictive Agreements</u>.  Each Loan Party shall not directly, or indirectly, create or otherwise cause or suffer to exist any agreement or other arrangement that prohibits, restricts or imposes any condition on the ability of such Loan Party to pay dividends or make other distributions or pay any Indebtedness owed by or to such Loan Party or make loans or advances or grant security interests in or liens on any of its assets or transfer any of its assets, except such an agreement or other arrangement that (a) is in effect on the DIP Facility Closing Date, (b) relates to secured Indebtedness permitted hereunder, as long as the restrictions apply only to collateral for such Indebtedness or (c) constitute customary restrictions on assignment in leases and other contracts.

8.10   <u>Certain Payments of Indebtedness, Etc</u>.  Subject to the proviso below, each Loan Party shall not make, or agree to make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except: (a) payment of the Obligations; (b) payment of regularly scheduled principal and interest payments, and other mandatory payments, as and when due in respect of any Permitted Indebtedness, provided, that, any payments in respect of Subordinated Debt shall only be made to the extent permitted under the subordination provisions thereof; and (c) payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted under Section 8.4; provided, that, except pursuant to the DIP Budget, without express prior written consent of Agent and pursuant to an order of the Bankruptcy Court (including any Financing Order) after notice and a hearing, no Loan Party shall make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the Petition Date that is subject to the automatic stay provisions of the Bankruptcy Court whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

8.11   <u>Amendment of Material Documents</u>.  Each Loan Party shall not  amend, modify or waive any of the terms of: (a) its Organization Documents except for amendments, modifications or other changes that do not affect the rights and privileges of such Loan Party and do not affect the ability of such Loan Party to amend, modify, renew or supplement the terms of any Loan Documents, or otherwise affect the interests of Agent and so long as at the time of any such amendment, modification or waiver, no Default or Event of Default shall exist or have occurred and be continuing, (b) any agreement, document or instrument evidencing or governing any Material Indebtedness, except, that, a Loan Party may, after prior written notice to Agent, amend or modify the terms thereof to forgive, or cancel any portion of such Indebtedness (other than pursuant to payments thereof), or to reduce the interest rate or any fees in connection therewith, or to make the terms thereof less restrictive or burdensome to such Loan Party, or (c) (the DIP Asset Purchase Documents (and including any exhibits to the DIP Asset Purchase Agreement) in any material respect, without the prior written consent of Agent.

8.12   <u>Accounting Methods</u>.  Each Loan Party will not modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

8.13   <u>Use of Proceeds</u>.

(a)   Each Loan Party shall not use the proceeds of any Loan made hereunder for any purpose other than (i) to repay obligations of Borrowers under the Pre-Petition Credit Facility in accordance with the Financing Orders and to repay or discharge other debt as set forth in the Financing Orders, (ii) to pay costs, expenses and fees in connection with the DIP Credit Facility and the Pre-Petition Credit Facility incurred during the Chapter 11 Cases in accordance with the terms of the Financing Orders and in the amounts set forth in the DIP Budget, (iii) to make adequate protection payments to the Pre-Petition Agent and Pre-Petition Lender, in each case in accordance with the Financing Orders and the DIP Budget, and (iv) for working capital, capital expenditures and other general corporate purposes of Borrowers (including allowed administrative expenses incurred during the Chapter 11 Cases), in each case only in accordance with the applicable DIP Budget, provided, that, no part of the proceeds of the Loans will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors.  Each Loan Party will not, directly or indirectly, use any of the Loans to fund, finance or facilitate any activities, business or transactions that would be prohibited by Sanctions, Anti-Money Laundering Laws or Anti-Corruption Laws.  Without limiting the foregoing, Loan Parties shall not be permitted to use the proceeds of Loans in contravention of the terms hereof, the applicable Financing Order or the Bankruptcy Code, including any restrictions or limitations on the use of proceeds contained therein.  Any Post-Petition payment of Pre-Petition Obligations, including principal, interest, fees, penalties or recoverable costs, due and payable in connection with the Pre-Petition Credit Agreement with the proceeds of the Collateral (as defined herein) or Collateral (as defined in the Pre-Petition Credit Agreement) shall be made in accordance herewith and with the Financing Orders or the terms hereof.

(b)   For greater certainty, Borrowers may not use the proceeds of the DIP Credit Facility to pay any obligations that are not included in the then applicable DIP Budget without the written consent of Agent. Notwithstanding anything herein to the contrary, no portion or proceeds of the Loans or the Collateral, and no disbursements set forth in the DIP Budget, shall be used for the payments or purposes which would violate the terms of the Financing Orders.

(c)   In addition, notwithstanding the foregoing, proceeds of Loans shall not be used by the Loan Parties to affirmatively commence or support, or to pay any professional fees incurred in connection with, any adversary proceeding, motion or other action that seeks to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of the Liens of Agent or Pre-Petition Agent, or claims and rights under the Pre-Petition Credit Facility; provided, that, in the Chapter 11 Cases, the Carve-Out and such collateral proceeds and Loan proceeds may be used for allowed fees and expenses in an amount not to exceed the amount set forth in any Financing Order.

8.14   <u>Reclamation Claims; Pre-Petition Payables</u>.

(a)   Each Loan Party will not, except as set forth in the DIP Budget, enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under section 546(c) of the Bankruptcy Code, or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise.

(b)   No Loan Party shall pay any Pre-Petition claim arising under Section 503(b)(9) of the Bankruptcy Code or otherwise except to the extent specifically set forth in the DIP Budget or with the consent of Agent.

8.15  <u>Insolvency Proceeding Claims</u>.  Each Loan Party will not incur, create, assume, suffer to exist or permit any other super-priority administrative claim which is pari passu with or senior to the claim of Agent or Lender (or Pre-Petition Agent or Pre-Petition Lender) against the Loan Parties or to file any motion or otherwise support any other Person seeking such a claim, except as set forth in the applicable Financing Order.

8.16  <u>Bankruptcy Actions</u>.  Each Loan Party will not seek, consent to, or permit to exist, without the prior written consent of Agent, any order granting authority to take any action that is prohibited by the terms of this Agreement, any Financing Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, any Financing Order or any of the other Loan Documents.

8.17  <u>Carve-Out</u>.  The Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party, including any Loan Party, any Committee or any professional, in connection with (a) the investigation, initiation or prosecution of any claims or defenses in connection with the Pre-Petition Credit Facility or the DIP Credit Facility, or preventing, hindering, or delaying the assertion of enforcement of any lien, claim, right or security interest or realization upon any Collateral in connection with the Pre-Petition Credit Facility or DIP Credit Facility (except solely to the extent of such fees incurred for a motion by Loan Parties asserting that an Event of Default does not exist in which a final, non-appealable order of the Bankruptcy Court determines that such Event of Default does not exist), including, in each case, without limitation, for any claim relating to lender liability or pursuant to Section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise, (b) in the Chapter 11 Cases, a request to use cash collateral (as such term is defined in Section 363 of the Bankruptcy Code) except as may be provided for in the Loan Documents or the Financing Orders, without the prior written consent of Agent, (c) a request, without the prior written consent of Agent, for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code or otherwise that does not indefeasibly repay in full in cash the Pre-Petition Obligations and the Obligations on terms and conditions acceptable to Agent, (d) seeking relief under the Bankruptcy Code,  including, without limitation, in each case under Section 105 of the Bankruptcy Code, to the extent such relief would restrict or impair the rights and remedies of Agent or Lender as set forth herein, the other Loan Documents or any Financing Order, or (e) taking any action to amend or modify the rights or remedies of Agent or Lender under the Loan Documents, the Financing Orders or the Pre-Petition Credit Facility, or that has the effect of amending or modifying such rights or remedies, without the prior written consent of Agent.

**SECTION 9.**  [Reserved]

**SECTION 10.**  EVENTS OF DEFAULT AND REMEDIES

10.1  <u>Events of Default</u>.  The occurrence or existence of any one or more of the following events are referred to herein individually as an "Event of Default", and collectively as "Events of Default":

(a)   (i) a Loan Party fails to make any principal payment hereunder when due or fails to pay interest, fees or any of the other Obligations within three (3) Business Days after the due date thereof, or (ii) a Loan Party fails to perform any of the covenants contained in Sections 2.2, 2.3, 3, 7.1, 7.2, 7.3, 7.6, 7.7, 7.8, 7.9, 7.13, 7.14, 7.15, 7.16, 7.17, 7.18, 7.23, and 8, or (iii) a Loan Party or any of its Subsidiaries fails to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Loan Documents other than those described in Sections 10.1(a)(i) and 10.1(a)(ii) above and such failure shall continue for five (5) Business Days; provided, that, such five (5) Business Day period shall not apply in the case of any failure to observe any such covenant which is not capable of being cured at all or within such period or which has been the subject of a prior failure within a six (6) month period;

(b)   any representation, warranty or statement of fact made by a Loan Party or any of its Subsidiaries to Agent or Lender in this Agreement, the other Loan Documents or any other written agreement, schedule, confirmatory assignment or otherwise that are qualified as to materiality or Material Adverse Effect shall when made or deemed made be incorrect, false or misleading and any other such representation, warranty or statement of fact made by a Loan Party or its Subsidiary to Agent or Lender shall when made or deemed made be incorrect, false or misleading in any material respect;

(c)   any judgment for the payment of money is rendered against a Loan Party or any of its Subsidiaries in excess of $100,000 in the aggregate (to the extent not covered by independent third party insurance where the insurer has not declined or disputed coverage) and shall remain undischarged or unvacated for a period in excess of thirty (30) days or execution shall at any time not be effectively stayed, or any judgment other than for the payment of money, or injunction, attachment, garnishment or execution is rendered against a Loan Party or any of its Subsidiaries or any of the Collateral having a value in excess of $100,000;

(d)   a Loan Party or any of its Subsidiaries makes an assignment for the benefit of creditors or makes or sends notice of a bulk transfer;

(e)   [reserved];

(f)   [reserved];

(g)   any default by a Loan Party in respect of any Material Contract or Material Indebtedness, or a material default by a Loan Party under the inventory monitoring engagement letter with Gordon Brothers Retail Partners, LLC (including the failure to provide reasonable access and information reasonably available or the termination thereof), in each case which default continues for more than the applicable cure period, if any, with respect thereto, or the subordination provisions contained in any agreement related to any Subordinated Debt shall cease to be in full force and effect or to give Agent the rights, powers and privileges purported to be created thereby; provided, that, in the case of such Material Contract (but not including the inventory monitoring engagement letter) or Material Indebtedness it shall not constitute an Event of Default under this Section 10.1(g) to the extent that (i) any default with respect to such Indebtedness as described in this Section 10.1(g) is solely as a result of the commencement of the Chapter 11 Cases or (ii) such default occurred prior to the Petition Date, so long as any action as a result of such default is stayed during the Chapter 11 Cases (except as Agent may otherwise agree);

(h)   any material provision hereof or of any of the other Loan Documents shall for any reason cease to be valid, binding and enforceable with respect to any party hereto or thereto (other than Agent) in accordance with its terms, or any such party shall challenge the enforceability hereof or thereof, or shall assert in writing, or take any action or fail to take any action based on the assertion that any provision hereof or of any of the other Loan Documents has ceased to be or is otherwise not valid, binding or enforceable in accordance with its terms, or any security interest provided for herein or in any of the other Loan Documents shall cease to be a valid and perfected first priority security interest in any of the Collateral purported to be subject thereto (except as otherwise permitted herein or therein);

(i)   a Loan Party or any of its Subsidiaries shall be prohibited or otherwise restrained from conducting the business theretofore conducted by it in any manner that has or could reasonably be expected to result in a Material Adverse Effect by virtue of any determination, ruling, decision, decree or order of any court or Governmental Authority of competent jurisdiction;

(j)   any Change of Control;

(k)   there shall be an event of default under any of the other Loan Documents; or

(l)   the conversion of any Chapter 11 Case to a Chapter 7 case(s), or any Loan Party shall file a motion or other pleading seeking the conversion of any Chapter 11 Case to chapter 7 of the Bankruptcy Code in each case, without the prior written consent of Agent;

(m)   the dismissal of any Chapter 11 Case (or any subsequent Chapter 7 case), or any Loan Party shall file a motion or other pleading seeking the dismissal of any Chapter 11 Case under Section 1112 of the Bankruptcy Code in each case, without the prior written consent of Agent;

(n)   any violation, breach, or default by any Loan Party with respect to any of its obligations under any Financing Order;

(o)   the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or any Financing Order without the written consent of Agent or the filing of a motion by any Loan Party or its Affiliate for any such order, or any Financing Order shall otherwise not be in full force and effect or without the prior written consent of Agent, any Financing Order is revoked, remanded, vacated, reversed, stayed or rescinded or modified (other than, in the case of a modification as consented to by Agent);

(p)   the appointment or election of a trustee under Chapter 11 of the Bankruptcy Code, or a responsible officer or examiner or disinterested person with expanded powers to operate or manage the financial affairs, the business or reorganization of any Loan Party, or any administrative expense claim is allowed having priority or ranking in parity with the rights of Agent or Lender (other than the Carve-Out);

(q)   (i) the filing of any Chapter 11 Plan or disclosure statement attendant thereto, or any amendment to such plan or disclosure statement, by a Loan Party that is not an Acceptable Plan of Reorganization, or any Loan Party or its Subsidiary, seeks, supports or fails to contest in good faith the filing or confirmation of any such plan or entry of any such order, (ii) the entry of any order terminating or modifying any Loan Party's exclusive right to file a Chapter 11 Plan without the prior written consent of Agent, or (iii) the expiration of any Loan Party's exclusive right to file a Chapter 11 Plan;

(r)   the payment of, or application for authority to pay, any Pre-Petition claim without Agent's prior written consent unless in accordance with the DIP Budget or pursuant to an order of the Bankruptcy Court;

(s)   Liens or super-priority claims with respect to the DIP Credit Facility or the Pre-Petition Credit Facility shall at any time cease to be valid, perfected and enforceable in all respects with the priority described herein;

(t)   the entry of an order in any Chapter 11 Case avoiding or permitting recovery of any portion of the payments made on account of the Obligations or any of the Pre-Petition Obligations;

(u)   subject to the entry of the Final Financing Order, an order in any Chapter 11 Case shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against Agent, Lender or with respect to any Collateral (including, without limitation, an allowance of any claim thereunder);

(v)   (i) the total aggregate disbursements (excluding disbursements for professional fees and expenses into the professional fee escrow account or otherwise) during any DIP Measurement Period to exceed the aggregate amount for such disbursements for such DIP Measurement Period in the applicable

77

DIP Budget by more than ten percent (10%), (ii) the total aggregate disbursements for professional fees and expenses paid into the professional fee escrow account or otherwise paid during any DIP Measurement Period to exceed the aggregate amount for such disbursements for such DIP Measurement Period in the applicable DIP Budget by more than ten percent (10%), (iii) the total aggregate sales receipts during any DIP Measurement Period to be less than ninety percent (90%) of the aggregate amount thereof for such DIP Measurement Period in the applicable DIP Budget, (iv) the total aggregate inventory receipts during any DIP Measurement Period to be less than ninety percent (90%) of the aggregate amount thereof for such DIP Measurement Period in the applicable DIP Budget, (v) as of the Saturday of every third calendar week following the Petition Date (and including the week in which the Petition Date occurs as the first week of such three-week period), the Excess Availability to be more than ten percent (10%) less than the amount thereof as of such time in the DIP Budget, or (vi) the Loan balance under the DIP Credit Facility (together with any then outstanding loans under the Pre-Petition Credit Facility) as of the Saturday of any week to exceed the amount thereof as of such time in the DIP Budget by more than ten percent (10%) of such amount in the DIP Budget;

(w)  the making of a motion, taking of any action or the filing of any Chapter 11 Plan or disclosure statement or supplemental materials attendant thereto by any of the Loan Parties in any Chapter 11 Case: (i) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (ii) to grant any Lien other than Liens permitted pursuant to Section 8.2 upon or affecting any Collateral; (iii) except as provided in the Interim Financing Order or the Final Financing Order, as the case may be, to use cash collateral of Agent under Section 363(c) of the Bankruptcy Code without the prior written consent of Agent; or (iv) any other action or actions materially adverse to Agent and Lender or their rights and remedies hereunder, under any other Loan Document, or their interest in the Collateral;

(x)  any Loan Party shall file a motion or other pleading in any court seeking an order that any material provision of any Financing Order is not valid and binding on it or its assets, without the prior written consent of Agent;

(y)  any Loan Party shall challenge, support or encourage a challenge of any payments made to Agent or Lender with respect to the Obligations, or without the prior written consent of Agent;

(z)  entry of an order granting any super-priority claim which is senior to or pari passu with the claims of Agent and Lender under the DIP Credit Facility or the Pre-Petition Credit Facility without the prior written consent of Agent (or the filing of any motion by any Loan Party seeking such relief);

(aa)  the Final Financing Order is not entered on or prior to that date that is thirty (30) days after the Petition Date (or such other date as Agent may agree);

(bb)  the DIP Asset Purchase Agreement shall terminate or any notice of termination or of the intention to terminate the DIP Asset Purchase Agreement shall be sent by or on behalf of the purchaser or the sellers thereunder;

(cc)  the failure to comply with the Milestones;

(dd)  the RSA is terminated by any Loan Party or by any other party pursuant to the terms thereof, or is modified, amended or waived in any manner adverse to Agent or Lender in any material respect, or

(ee)  the filing of a Chapter 11 Plan other than an Acceptable Plan of Reorganization.

10.2   <u>Remedies</u>.

(a)   At any time an Event of Default exists, subject to the Financing Orders (including the Default Notice Period and related notice provisions), Agent shall have all rights and remedies provided in this Agreement, the other Loan Documents, the UCC and other Applicable Law, all of which rights and remedies may be exercised without notice to or consent by any Loan Party, except as such notice or consent is expressly provided for hereunder or required by Applicable Law.  All rights, remedies and powers granted to Agent hereunder, under any of the other Loan Documents, the UCC or other Applicable Law, are cumulative, not exclusive and enforceable, in Agent's discretion, alternatively, successively, or concurrently on any one or more occasions, and shall include, without limitation, the right to apply to a court of equity for an injunction to restrain a breach or threatened breach by a Loan Party of this Agreement or any of the other Loan Documents.  Agent may at any time or times an Event of Default exists, proceed directly against any Loan Party to collect the Obligations without prior recourse to the Collateral.

(b)   Without limiting the generality of the foregoing, at any time an Event of Default exists, subject to the Financing Orders (including the Default Notice Period and related notice provisions), Agent may, and at the request of Lender shall, by notice to Lead Borrower, take any or all of the following actions, at the same or different times:

(i)   terminate the Commitment, and thereupon the Commitment shall terminate immediately;

(ii)   declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations accrued hereunder and any Pre-Petition Obligations, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Loan Party;

(iii)   establish such Reserves as Agent determines, without limitation or restriction, notwithstanding anything to the contrary contained herein; and

(iv)   exercise all rights and remedies available to it, Agent and Lender under the Loan Documents, the Financing Orders and Applicable Law.

(c)   Subject to the Financing Orders, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Agent and Lender to exercise all rights and remedies under this Agreement, the other Loan Documents or Applicable Law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

(d)   Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions with respect to the Default Notice Period set forth in the Interim Financing Order or the Final Financing Order, as the case may be, notwithstanding anything to the contrary contained herein or in any other Loan Document, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, Agent and Lender shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable Law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

(e)   Agent (together with its agents, representatives and designees) is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty

79

or other compensation to any Person) any or all Intellectual Property of the Loan Parties, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral, in each case, after the occurrence and during the continuance of an Event of Default, Agent (together with its agents, representatives and designees) is hereby granted a non-exclusive right to have access to, and a rent-free right to use, any and all owned or leased locations (including, without limitation, warehouse locations and distribution centers) for the purpose of arranging for and effecting the sale or disposition of Collateral, subject to the Financing Orders, including the production, completion, packaging and other preparation of such Collateral for sale or disposition, and to engage in bulk sales of Collateral, which rights shall be subject to the Financing Orders. It is further understood and agreed that Agent and its representatives (and persons employed on their behalf) may continue to operate, service, maintain, process and sell the Collateral, subject to the Financing Orders. Upon the occurrence and the continuance of an Event of Default and the exercise by Agent or Lender of their rights and remedies under this Agreement and the other Loan Documents, the Loan Parties shall assist Agent and Lender in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to Agent, subject to the Financing Orders.

10.3   Application of Funds. After the exercise of remedies provided for in Section 10.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by Agent in such order and manner as Agent and Lender may determine (including in respect of Pre-Petition Obligations).

10.4   Right of Setoff.  If an Event of Default shall have occurred and be continuing, Agent and Lender, and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by Agent or Lender or any such Affiliate, to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party now or hereafter existing under this Agreement or any other Loan Document to Agent or Lender or their respective Affiliates, irrespective of whether or not Agent, Lender or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Loan Party may be contingent or unmatured or are owed to an Affiliate of Lender different from the or Affiliate obligated on such indebtedness. The rights of Agent and Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that Agent and Lender or their respective Affiliates may have.

10.5   Crediting of Payments and Proceeds.  In the event that the Obligations have been accelerated pursuant to Section 10.2 or Agent or Lender has exercised any remedy set forth in this Agreement or any other Loan Document, all payments received by Agent or Lender upon the Obligations and all net proceeds from the enforcement of the Obligations shall be applied as determined by Agent.

10.6   Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Agent shall have made any demand on Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)   to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of Agent and Lender (including

any claim for the reasonable compensation, expenses, disbursements and advances of Agent or Lender and their respective agents and counsel and all other amounts due Agent and Lender under Section 7.12) allowed in such judicial proceeding; and

(b)   to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, interim receiver, receiver and manager, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by Lender to make such payments to Agent and, in the event that Agent shall consent to the making of such payments directly to Lender, to pay to Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Agent and its agents and counsel, and any other amounts due Agent.

## SECTION 11.   AGENCY

11.1   <u>Appointment and Authority</u>.  Lender hereby irrevocably appoints 1903P Loan Agent., LLC to act on its behalf as Agent hereunder and under the other Loan Documents and authorizes Agent to take such actions on its behalf and to exercise such powers as are delegated to Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Except as otherwise provided in Section 11.6(b), the provisions of this Section are solely for the benefit of Agent and Lender, and Loan Parties shall not have rights as a third-party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.  For purposes of the laws of Mexico, Lender hereby grants to Agent a *comisión mercantil con representación* in accordance with Articles 273, 274, and other applicable Articles of the Mexican Commerce Code (*Código de Comercio*) to act on its behalf as its agent and *comisionista* in connection with this Agreement and the Mexican Security Document, in the terms and for the purposes set forth in this Section. Furthermore, Lender hereby authorizes Agent to delegate the above mentioned *comisión mercantil con representación* pursuant to Article 280 and any other applicable Articles of the Mexican Commerce Code (*Código de Comercio*) to the extent permitted by and under the terms provided in any of the Loan Documents.

11.2   <u>Exculpatory Provisions</u>.

(a)   The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.

(b)   Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Section 4 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to Agent.

11.3   <u>Reliance by Agent</u>.  Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it

to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of Lender, Agent may presume that such condition is satisfactory to Lender unless Agent shall have received notice to the contrary from Lender prior to the making of such Loan.  Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

11.4   Delegation of Duties.  Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by Agent.  Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the Revolving Facility as well as activities as Agent.  Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

11.5   Resignation of Agent.

(a)   Agent may at any time give notice of its resignation to Lender and Lead Borrower.  Upon receipt of any such notice of resignation, Lender shall have the right to appoint a successor.  If no such successor shall have been so appointed by Lender and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by Lender) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to), on behalf of Lender appoint a successor Agent meeting the qualifications set forth above.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)   With effect from the Resignation Effective Date (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (ii) except for any indemnity payments owed to the retiring Agent, all payments, communications and determinations provided to be made by, to or through Agent shall instead be made by or to Lender directly, until such time, if any, as Lender appoints a successor Agent as provided for above.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent (other than any rights to indemnity payments owed to the retiring Agent), and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.  The fees payable by Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Section and Section 7.12 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

**SECTION 12.**  JURY TRIAL WAIVER; AMENDMENTS AND OTHER WAIVERS CONSENTS; GOVERNING LAW

12.1   Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver.

82

(a)    The validity, interpretation and enforcement of this Agreement and the other Loan Documents (except as otherwise provided therein) and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York, and to the extent applicable, the Bankruptcy Code.

(b)    Each Loan Party, Agent and Lender irrevocably consents and submits to the non-exclusive jurisdiction of the of the Supreme Court of the State of New York, New York County and the United States District Court for the Southern District of New York and the Bankruptcy Court, whichever Agent may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Loan Documents (except as otherwise provided therein) or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Loan Documents (except as otherwise provided therein) or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Agent shall have the right to bring any action or proceeding against a Loan Party or its property in the courts of any other jurisdiction which Agent deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against a Loan Party or its or their property).

(c)    Each Loan Party hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified mail (return receipt requested) directed to its address set forth herein and service so made shall be deemed to be completed five days after the same shall have been so deposited in the U.S. mails, or, at Agent's option, by service upon a Loan Party in any other manner provided under the rules of any such courts.  Within thirty (30) days after such service, a Loan Party shall appear in answer to such process, failing which such Loan Party shall be deemed in default and judgment may be entered by Agent against such Loan Party for the amount of the claim and other relief requested.

(d)    EACH LOAN PARTY, AGENT AND LENDER EACH HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.  EACH LOAN PARTY, AGENTAND LENDER EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT A LOAN PARTY, AGENT AND LENDER MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(e)    Agent and Lender shall not have any liability to a Loan Party (whether in tort, contract, equity or otherwise) for losses suffered by a Loan Party in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Agreement, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order binding on Agent or Lender, that the losses were the result of its acts or omissions constituting gross negligence or willful misconduct.  Each Loan Party: (i) certifies that neither Agent, Lender nor any representative, agent or attorney acting for or on behalf Agent or Lender has represented, expressly or

otherwise, that Agent or Lender would not, in the event of litigation, seek to enforce any of the waivers provided for in this Agreement or any of the other Loan Documents and (ii) acknowledges that in entering into this Agreement and the other Loan Documents, Agent and Lender are relying upon, among other things, the waivers and certifications set forth in this Section 12.1 and elsewhere herein and therein.

12.2   <u>Waiver of Notices</u>.  Each Loan Party hereby expressly waives demand, presentment, protest and notice of protest and notice of dishonor with respect to any and all instruments and chattel paper, included in or evidencing any of the Obligations or the Collateral, and any and all other demands and notices of any kind or nature whatsoever with respect to the Obligations, the Collateral and this Agreement, except such as are expressly provided for herein or required by Applicable Law and cannot be waived thereunder.  No notice to or demand on a Loan Party which Agent may elect to give shall entitle a Loan Party to any other or further notice or demand in the same, similar or other circumstances.

12.3   <u>Amendments and Waivers</u>. Neither this Agreement nor any other Loan Document nor any terms hereof or thereof may be amended, waived, discharged or terminated unless such amendment, waiver, discharge or termination is in writing signed by Agent, and as to amendments to any of the Loan Documents, by a Loan Party and such amendment, waiver, discharge or termination shall be effective and binding as to Agent and Lender only in the specific instance and for the specific purpose for which given. Agent and Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its or their rights, powers and/or remedies unless such waiver shall be in writing and signed as provided herein.  Any such waiver shall be enforceable only to the extent specifically set forth therein.  A waiver by Agent or Lender of any right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such right, power and/or remedy which Agent or Lender Bank would otherwise have on any future occasion, whether similar in kind or otherwise.

12.4   <u>Waiver of Counterclaims</u>.  Each Loan Party waives all rights to interpose any claims, deductions, setoffs or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto.

12.5   <u>Indemnity; Damage Waiver</u>.

(a)   <u>Indemnification</u>.  Each Loan Party shall indemnify and hold Agent and Lender, and their respective officers, directors, agents, employees, advisors and counsel and their respective Affiliates (each such person being an "Indemnitee"), harmless from and against any and all losses, claims, damages, penalties, liabilities, costs or expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any Loan Party) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document, any Pre-Petition Loan Document, any Financing Order, Chapter 11 Plan or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or the monitoring of compliance by any Loan Party and its Subsidiaries with the terms of the Loan Documents, and any refinancing of the DIP Credit Facility or any "exit financing" requested by or on behalf of the Loan Parties in connection with the Chapter 11 Cases, Successor Cases or the Chapter 11 Plan (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any other liability related environmental matters of any Loan Party or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing,

whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party, and regardless of whether any Indemnitee is a party thereto; provided, that, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (A) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (B) result from a claim brought by a Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (C) result from a claim not involving an act or omission of a Loan Party and that is brought by an Indemnitee against another Indemnitee (other than against Agent in its capacity as such). This Section shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.  To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section may be unenforceable because it violates any law or public policy, each Loan Party shall pay the maximum portion which it is permitted to pay under Applicable Law to Agent or Lender in satisfaction of indemnified matters under this Section.

(b)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by Applicable Law, Loan Parties shall not assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan, or the use of the proceeds thereof.  No Indemnitee referred to in Section 12.5(a) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(c)    Payments.  All amounts due under this Section shall be payable not later than five (5) Business Days after demand therefor.

(d)    Survival.  Each Loan Party's obligations under this Section shall survive the termination of the Loan Documents and payment of the Obligations hereunder.

**SECTION 13.**    NOTICES; MISCELLANEOUS

13.1    Notices.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone or electronic method of transmission (and subject in each case to clause (c) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service or mailed by certified or registered mail, as follows:

| | |
|---|---|
| If to a Loan Party: | c/o Triad Catalog Co., LLC<br>1100 N. Lindbergh Blvd<br>St. Louis, MO 63132<br>Attention:  Bridgit Lombard, Executive Chair and Dan Karpel, Chief Financial Officer<br>Email:  blombard@softsurroundings.com; dlkarpel@softsurroundings.com |
| With a copy to: | Katten Muchin Rosenman LLP<br>50 Rockefeller Plaza<br>New York, NY 10020-1605<br>Attention:  Cindi M. Giglio<br>Email:  cgiglio@katten.com<br><br>Katten Muchin Rosenman LLP<br>515 South Flower Street, Suite 4150<br>Los Angeles. California 90071-2212<br>Attention:  William B. Freeman<br>Email: bill.freeman@katten.com |
| If to Agent or Lender: | 1903P Loan Agent, LLC, as Agent<br>101 Huntington Avenue, Suite 1100<br>Boston, Massachusetts 02199<br>Attention: Kyle C. Shonak, Senior Managing Director<br>Email: kshonak@gordonbrothers.com |
| With a copy to: | Otterbourg P.C.<br>230 Park Avenue<br>New York, New York 10169<br>Attention:  David W. Morse; Chad B. Simon<br>Email: dmorse@otterbourg.com; csimon@otterbourg.com |

Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

(b)   All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received or (ii) delivered through an electronic method of transmission to the extent provided in clause (c) below shall be effective as provided in such clause.

(c)   Notices and other communications to Agent hereunder may be delivered or furnished by e-mail or any internet or extranet-based site providing for access to data protected by passcodes or other security systems approved by Agent for such purpose and in each case to the extent that Agent may approve the same pursuant to procedures approved by the Agent; provided, that, at any time upon notice by Agent to a Borrower, at the option of Agent, the foregoing shall not apply to notices pursuant to Section 2 or Section 7.2 or such other notices as Agent may specifically designate. Unless otherwise specified by Agent, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) posted to an internet or extranet-based site shall be deemed received upon the deemed receipt by

86

the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

13.2   <u>Disclosure</u>.  Agent and Lender, in consultation with Lead Borrower, may (a) publish in any trade or other publication or otherwise publicize to any third party (including its Affiliates) a tombstone, article, press release or similar material relating to the Credit Facility, (b) publish or disseminate general information describing the Credit Facility, including the names and addresses of Loan Parties and a general description of Loan Parties' business, and may have a non-exclusive, non-transferable license to use Loan Parties' logos, trademarks or product photographs solely in advertising or marketing materials and (c) provide to industry trade organizations related information necessary and customary for inclusion in league table measurements.

13.3   <u>Partial Invalidity</u>.  If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by Applicable Law.

13.4   <u>Successors and Assigns</u>.

(a)   This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties and shall bind all persons who become bound as a debtor to this Agreement; provided, however, that neither this Agreement nor any rights hereunder may be assigned by a Loan Party without Agent's prior written consent, which consent may be granted or withheld in Agent's sole discretion. Lender shall have the right without the consent of or notice to any Loan Party to sell, assign, transfer, negotiate, or grant participation in all or any part of, or any interest in, Lender's obligations, rights and benefits hereunder.

(b)   This Agreement, the other Loan Documents, and all Liens created pursuant to any Loan Document shall be binding upon each Loan Party, the estate of each Loan Party, and any trustee or successor in interest of any Loan Party in any Chapter 11 Case or any Successor Case or under any other bankruptcy or insolvency laws, and shall not be subject to Section 365 of the Bankruptcy Code. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under chapter 7 of the Bankruptcy Code, or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Agent or Lender file financing statements or otherwise perfect its security interests or Liens under Applicable Law.

13.5   <u>Entire Agreement</u>.  This Agreement, the other Loan Documents, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith represents the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written.  In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

13.6   <u>USA Patriot Act</u>.  Lender hereby notifies each Loan Party that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each person or corporation who opens an account and/or enters into a business relationship with it, which information includes the name and address of each Loan Party and other information that will allow Lender to identify such person in accordance with the Patriot Act and any other Applicable Law.  Each Loan Party is hereby advised that any Loans hereunder are subject to satisfactory results of such verification.  Agent and Lender shall have the right to periodically conduct due diligence on each Loan Party, its senior management and key principals and legal and beneficial owners. Each Loan Party agrees to cooperate in respect of the conduct of such due diligence and further agrees that the reasonable costs and charges for any such due diligence by Agent or Lender shall constitute expenses for which Agent and Lender is entitled to reimbursement as provided herein and be for the account of Borrowers.

13.7   <u>Counterparts, Electronic Signature, Etc.</u>  This Agreement or any of the other Loan Documents may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement.  This Agreement may be executed by means of (a) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, or any other relevant and applicable electronic signatures law; (b) an original manual signature; or (c) a faxed, scanned, or photocopied manual signature delivered by electronic method of transmission (including a "pdf" by email).  Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature.  Agent reserves the right, in its sole discretion, to accept, deny, or condition acceptance of any electronic signature on this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Agent, Lender and Loan Parties have caused these presents to be duly executed as of the day and year first above written.

LENDER:

1903 PARTNERS, LLC

By: _____
Name: _____
Title: _____

AGENT:

1903P LOAN AGENT, LLC

By: _____
Name:   _____
Title: _____

<u>BORROWERS</u>:

TRIAD CATALOG CO., L.L.C.,
as Debtor and Debtor-In-Possession

By: _____
Name: _____
Title: _____


TRIAD RETAIL, L.L.C.,
as Debtor and Debtor-In-Possession

By: _____
Name: _____
Title: _____

<u>GUARANTORS</u>:

SOFT SURROUNDINGS INTERMEDIATE HOLDINGS, LLC,
as Debtor and Debtor-In-Possession

By: _____
Name: _____
Title: _____


SOFT SURROUNDINGS HOLDINGS, LLC,
as Debtor and Debtor-In-Possession

By: _____
Name: _____
Title: _____

[Signature Page to Credit Agreement]

EXHIBIT A
TO
SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

<u>Initial DIP Budget</u>

See attached.

EXHIBIT B
TO
SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

<u>Form of Borrowing Base Certificate</u>

See attached.

EXHIBIT C-1
TO
SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Form of Compliance Certificate

_____, 20___

To:    1903P Loan Agent, LLC, as Agent
       101 Huntington Avenue, Suite 1100
       Boston, Massachusetts 02199
       Attention: Kyle C. Shonak, Senior Managing Director
       Email: kshonak@gordonbrothers.com

This Compliance Certificate is furnished pursuant to the Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of [_____], 2023 (as amended, modified, renewed or extended from time to time, the "Credit Agreement") by and among Triad Catalog Co., L.L.C., a Missouri limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Triad Catalog"), Triad Retail, L.L.C., a Missouri limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Triad Retail", and together with Triad Catalog and any other entity that may from time to time become a Borrower, each a "Borrower" and collectively, the "Borrowers"), Soft Surroundings Holdings, LLC, a Delaware limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Holdings"), Soft Surroundings Intermediate Holdings, LLC, a Delaware limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Intermediate Holdings", and together with Holdings and any entity that may from time to time become a Guarantor, each a "Guarantor" and collectively, the "Guarantors"), 1903 Partners, LLC, a Delaware limited liability company ("Lender") and 1903P Loan Agent, LLC, in its capacity as agent for Lender (in such capacity, "Agent").  Capitalized terms used herein but not specifically defined herein shall have the meanings assigned to them in the Credit Agreement.

The undersigned hereby, in such undersigned's capacity as [chief executive officer][president][chief financial officer][chief administrative officer][treasurer][assistant treasurer][authorized signatory] of the Lead Borrower, and not in an individual capacity certifies to Agent and Lender that:

1.   Authorization. I am a Responsible Officer of the Lead Borrower.

2.   No Default.

(a)    I have reviewed the terms of the Credit Agreement, and the contents of this Compliance Certificate, and have made or have caused to be made under my supervision, an examination, sufficient to make an informed statement, of the financial condition of the Loan Parties during the immediately preceding fiscal [month][quarter][year].

(b)    All representations and warranties contained in the Loan Documents that are qualified as to materiality or Material Adverse Effect are true and correct and the representations and warranties that are not so qualified are true and correct in all material respects on and as of the date hereof, except to the

extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties are true and correct on and as of such earlier date).

(c)      The review and examination described in Section 2(a) above did not disclose the existence during or at the end of such fiscal [month][quarter][year], and I have no knowledge of the occurrence or existence and continuation on the date hereof or during such period, of any condition or event that constitutes a Default or an Event of Default, except as set forth on Schedule I attached hereto.

(d)      Schedule I attached hereto describes the condition or event, if any, that constitutes a Default or Event of Default in detail, the nature of the condition or event, the period during which it has existed and the action which the Loan Parties have taken, are taking, or propose to take with respect to such condition or event.

3.    Financial Statements; Accounting Changes.

(a)      Attached hereto as Schedule II are the financial statements required by the Credit Agreement for the fiscal [month][quarter][year] ending [_____].  The financial statements have been prepared in accordance with GAAP consistently applied, and present fairly in all material respects the financial condition of Intermediate Holdings and each of the Borrowers on a consolidated basis at the close of, and the results of operations and cash flows of Intermediate Holdings and each of the Borrowers for, the period(s) covered, [subject to normal year-end audit adjustments and the absence of footnotes[1]].

(b)      There has been no change in GAAP or the application thereof since the date of the financial statements furnished to Agent for the year ending [_____], other than the material accounting changes disclosed on Schedule II hereto and Schedule II includes any reconciliation required to the extent permitted under the Credit Agreement.

4.Additional Matters. I further certify that, based on the review and examination described in Section 2(a) above, the Loan Parties have not at any time during or at the end of the immediately preceding fiscal [month][quarter][year], except as specifically described on Schedule III attached hereto or as permitted by the Credit Agreement, done any of the following:

(a)      materially changed the terms of any Material Contract in such a way that would reasonably be expected to have a Material Adverse Effect;

(b)      permitted or suffered to exist any security interest in or liens on any of its properties, whether real or personal, other than as specifically permitted in the Loan Documents; or

(c)      become aware of, obtained knowledge of, or received notification of, any breach or violation of any material covenant contained in any instrument or agreement in respect of Indebtedness for money borrowed by a Loan Party.

The foregoing certifications are made as of the date of the most recent financial statements delivered to Agent pursuant to the Credit Agreement.

---

[1] Include for delivery of quarterly and monthly financial statements delivered pursuant to Section 7.1(a)(ii) or (iii), respectively.

[Signature Page Follows]

IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned as of the date first written above.

TRIAD CATALOG CO., L.L.C.,
as Debtor and Debtor-In-Possession,
as Lead Borrower

By:_____
Name: _____
Title:_____

EXHIBIT C-2
TO
SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

<u>Form of DIP Budget Compliance Certificate</u>

_____, 20\_\_\_

To:     1903P Loan Agent, LLC, as Agent
        101 Huntington Avenue, Suite 1100
        Boston, Massachusetts 02199
        Attention: Kyle C. Shonak, Senior Managing Director
        Email: kshonak@gordonbrothers.com

This DIP Budget Compliance Certificate is furnished pursuant to the Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of [_____], 2023 (as amended, modified, renewed or extended from time to time, the "Credit Agreement") by and among Triad Catalog Co., L.L.C., a Missouri limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Triad Catalog"), Triad Retail, L.L.C., a Missouri limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Triad Retail", and together with Triad Catalog and any other entity that may from time to time become a Borrower, each a "Borrower" and collectively, the "Borrowers"), Soft Surroundings Holdings, LLC, a Delaware limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Holdings"), Soft Surroundings Intermediate Holdings, LLC, a Delaware limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Intermediate Holdings", and together with Holdings and any entity that may from time to time become a Guarantor, each a "Guarantor" and collectively, the "Guarantors"), 1903 Partners, LLC, a Delaware limited liability company ("Lender") and 1903P Loan Agent, LLC, in its capacity as agent for Lender (in such capacity, "Agent").  Capitalized terms used herein but not specifically defined herein shall have the meanings assigned to them in the Credit Agreement.

The undersigned hereby, in such undersigned's capacity as [chief executive officer][president][chief financial officer][chief administrative officer][treasurer][assistant treasurer][authorized signatory] of the Lead Borrower, and not in an individual capacity certifies to Agent and Lender that:

1.  <u>Authorization</u>. I am a Responsible Officer of the Lead Borrower.

2.  <u>No Default</u>.

    (a)     I have reviewed the terms of the Credit Agreement, and the contents of this DIP Budget Compliance Certificate, and have made or have caused to be made under my supervision, an examination, sufficient to make an informed statement, of the financial condition of the Loan Parties during the immediately preceding calendar week.

    (b)     All representations and warranties contained in the Loan Documents that are qualified as to materiality or Material Adverse Effect are true and correct and the representations and warranties that

C-2-1

are not so qualified are true and correct in all material respects on and as of the date hereof, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties are true and correct on and as of such earlier date).

(c)     The review and examination described in Section 2(a) above did not disclose the existence during or at the end of such calendar week, and I have no knowledge of the occurrence or existence and continuation on the date hereof or during such period, of any condition or event that constitutes a Default or an Event of Default, except as set forth on Schedule I attached hereto.

(d)     Schedule I attached hereto describes the condition or event, if any, that constitutes a Default or Event of Default in detail, the nature of the condition or event, the period during which it has existed and the action which the Loan Parties have taken, are taking, or propose to take with respect to such condition or event.

3.   <u>DIP Budget</u>.

(a)     Borrowers are in compliance with the covenant contained in clause (d) of Section 7.19 of the Credit Agreement, as applicable, as demonstrated on the detailed calculations set forth on Schedule II attached hereto.

(b)     Attached hereto as Schedule III is the DIP Budget Variance Report for the week immediately preceding the date hereof and for the period from the commencement of the initial DIP Budget to the end of the week immediately preceding the date hereof.

The foregoing certifications are made as of the date hereof.

[Signature Page Follows]

IN WITNESS WHEREOF, this DIP Budget Compliance Certificate is executed by the undersigned as of the date first written above.

TRIAD CATALOG CO., L.L.C.,
as Debtor and Debtor-In-Possession,
as Lead Borrower

By:_____
Name: _____
Title:_____

EXHIBIT D
TO
SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

<u>Form of Borrowing Request</u>

1903P Loan Agent, LLC, as Agent
101 Huntington Avenue, Suite 1100
Boston, Massachusetts 02199
Attention: Kyle C. Shonak, Senior Managing Director
Email: kshonak@gordonbrothers.com

[_____], 20[___][2]

Ladies and Gentlemen:

 Reference is hereby made to the Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of [_____], 2023 (as amended, modified, renewed or extended from time to time, the "Credit Agreement") by and among Triad Catalog Co., L.L.C., a Missouri limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Triad Catalog"), Triad Retail, L.L.C., a Missouri limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Triad Retail", and together with Triad Catalog and any other entity that may from time to time become a Borrower, each a "Borrower" and collectively, the "Borrowers"), Soft Surroundings Holdings, LLC, a Delaware limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Holdings"), Soft Surroundings Intermediate Holdings, LLC, a Delaware limited liability company, as debtor and debtor-in-possession under the Bankruptcy Code ("Intermediate Holdings", and together with Holdings and any entity that may from time to time become a Guarantor, each a "Guarantor" and collectively, the "Guarantors"), 1903 Partners, LLC, a Delaware limited liability company ("Lender") and 1903P Loan Agent, LLC, in its capacity as agent for Lender (in such capacity, "Agent").  Capitalized terms used herein but not specifically defined herein shall have the meanings assigned to them in the Credit Agreement.

 The undersigned hereby gives you notice pursuant to <u>Section 2.2</u> of the Credit Agreement that it requests the Borrowings under the Credit Agreement to be made on the terms set forth below:

(A) Borrower: [Triad Catalog Co., L.L.C.] [Triad Retail, L.L.C.]

(B) Aggregate principal amount of Borrowing:  $[_____][3]

---

[2] To request a Borrowing, Borrowers (or Lead Borrower on behalf of Borrowers) shall notify Agent of such request in a writing (delivered by hand, telecopy or e-mail) substantially in the form of this Exhibit D or such other writings approved by Agent and, in each case, signed by a Borrower, not later than 11:00 a.m. (or such later time as Agent may consent to in its discretion), (x) on the DIP Facility Closing Date in the case of any Borrowing on the DIP Facility Closing Date and (y) two (2) Business Days before the proposed Borrowing of any Loan thereafter.

[3] Each Borrowing of a Loan shall be in a principal amount of $100,000 or a whole multiple of $100,000 in excess

D-1

(C)     Date of Borrowing (which shall be a Business Day):     [_____], 20[___]

(D)     Wire Transfer Instructions:

| *Wire Transfer Instructions:* | |
|---|---|
| Bank: | [●] |
| ABA No.: | [●] |
| Account No.: | [●] |
| Account Name: | [●] |

      The undersigned hereby certifies that the conditions precedent set forth in Sections 4.1 or 4.2 of the Credit Agreement, as applicable, will be satisfied on the date of the requested Borrowing.

[Signature Page Follows]

---

thereof.

C-2-5

TRIAD CATALOG CO., L.L.C.,
as Debtor and Debtor-In-Possession,
as Lead Borrower

By:_____
Name: _____
Title:_____

EXHIBIT E
TO
SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

[RESERVED]

EXHIBIT F
TO
SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

[RESERVED]

EXHIBIT G
TO
SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

[RESERVED]

EXHIBIT H
TO
SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

<u>Form of Credit Card Notification</u>

[Prepare on applicable Loan Party's letterhead –
One for each Credit Card Processor and Credit Card Issuer]

<u>CREDIT CARD NOTIFICATION</u>

[_____, 20____]

To:     [Name and Address of Credit Card Processor or Credit Card Issuer] (The "Credit Card Company")

Re:    [Triad Catalog Co., L.L.C.], as debtor and debtor-in-possession under the Bankruptcy Code (the "Company")
      [_____] among the Credit Card Company and the Company, dated as of [_____ ___, 20__] (the "Credit Card Agreement")
      Merchant Account Number: [_____]

Dear Sir/Madam:

Pursuant to the Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of [_____], 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified and in effect from time to time, the "Credit Agreement"), by and among the Company, certain affiliates of the company party thereto, 1903 Partners, LLC, a Delaware limited liability company ("Lender") and 1903P Loan Agent, LLC, in its capacity as agent for Lender (in such capacity, "Agent"), and the other Loan Documents (as defined in the Credit Agreement), the Company has granted to Agent a security interest in and to, among other things, all payments with respect to credit card charges (the "Charges") submitted by the Company to the Credit Card Company for processing and the amounts which the Credit Card Company owes to the Company on account thereof (the "Credit Card Proceeds") and all other amounts due or to become due to the Company under the Credit Card Agreement.

1.     Until the Credit Card Company receives written notification from an officer of Agent that the interest of Agent in the Charges and Credit Card Proceeds has been terminated, all amounts as may become due from time to time from the Credit Card Company to the Company shall continue to be transferred only as follows:

(a)     By ACH, Depository Transfer Check, or Electronic Depository Transfer to:

      [Name of Bank]
      ABA #:_____
      Account No.: _____
      Re: _____

or

(b)     As the Credit Card Company may be instructed from time to time in writing by an officer of Agent.

2.     Upon request of Agent, a copy of each periodic statement provided by the Credit Card Company to the Company should be provided to Agent at the following address (which address may be changed upon seven (7) days' written notice given to the Credit Card Company by Agent):

> 1903P Loan Agent, LLC, as Agent
> 101 Huntington Avenue, Suite 1100
> Boston, Massachusetts 02199
> Attention: Kyle C. Shonak, Senior Managing Director
> Email: kshonak@gordonbrothers.com

3.     The Credit Card Company shall be fully protected in acting on any order or direction by Agent respecting the Charges and the Credit Card Proceeds without making any inquiry whatsoever as to Agent's right or authority to give such order or direction or as to the application of any payment made pursuant thereto. Nothing contained herein is intended to, nor shall it be deemed to, modify the rights and obligations of the Company and Agent under the terms of the Credit Agreement and the Loan Documents executed in connection therewith between, among others, the Company and Agent.

4.     Agent and Lender are relying upon this Credit Card Notification and its terms may not be changed or terminated orally or by course of conduct. This Credit Card Notification is enforceable by, and is for the benefit of, Agent and Lender and their respective successors and assigns (including any lender or group of lenders or agent for such group of lenders that at any time refinances, replaces or succeeds to the financing arrangements referred to above). This Credit Card Notification may be amended only by the written agreement of the Credit Card Company, the Company, and an officer of Agent and may be terminated solely by written notice signed by an officer of Agent.

5.     This Credit Card Notification is an authenticated notification delivered to an account debtor pursuant to Sections 9-607(a) and 9-406(a) of the Uniform Commercial Code in the state of New York. The Company appreciates the Credit Card Company's cooperation and assistance in effectuating the instructions contained herein.

6.     This Credit Card Notification hereby terminates any notice received by the Credit Card Company from the Company prior to the date hereof with respect to the Credit Card Agreement.

[Signature Pages Follow]

H-2

Very truly yours,

[TRIAD CATALOG CO., L.L.C.],
as Debtor and Debtor-In-Possession,
as the Company

By:    _____
Name:  _____
Title:   _____

cc:  1903P Loan Agent, LLC

H-3

**Schedule 7.16**
**to Credit Agreement**

**Milestones**

Each of the actions set forth below (the "Milestones") shall occur on or before the dates set forth below (or such later date as may be agreed to by Agent) and each document referenced in any Milestone shall be in all respects in form and substance acceptable to Agent in its discretion:

| | |
|---|---|
| (a) | On or before September 12, 2023, the Bankruptcy Court shall have entered an order in form and substance satisfactory to Agent approving (i) the assumption of the Consulting Agreement by and between certain Debtors and Gordon Brothers Retail Partners, LLC; and (ii) the conduct of closings or similarly themed sales and the procedures; (iii) and the procedures and actions necessary or desirable to conduct such sales at the closing stores (the "<u>Store Closing Motion</u>". |
| (b) | On or before September 12, 2023, Loan Parties shall have filed with the Bankruptcy Court a motion in form and substance satisfactory to Agent seeking conditional approval of (i) a Disclosure Statement with respect to an Acceptable Plan of Reorganization in form and substance acceptable to Agent; and (ii) the solicitation materials in form and substance acceptable to Agent related to an Acceptable Plan of Reorganization (such materials, collectively, the "<u>Solicitation Materials</u>") |
| (c) | On or before September 25, 2023, the Bankruptcy Court shall have entered an order in form and substance satisfactory to Agent conditionally approving (i) the Disclosure Statement with respect to an Acceptable Plan of Reorganization; and (ii) the Solicitation Materials. |
| (d) | On or before October 2, 2023, the Bankruptcy Court shall have entered (i) the Final Financing Order and (ii) the Final Store Closing Order, in form and substance satisfactory to Agent. |
| (e) | On or before November 3, 2023, the Bankruptcy Court shall have entered a final order in form and substance satisfactory to Agent (i) confirming an Acceptable Plan of Reorganization, and (ii) approving the Sale Transaction and Agency Agreement (as defined in the RSA). |
| (f) | On or before November 3, 2023, the Debtors shall have entered into the Agency Agreement (as defined in the RSA). |
| (g) | On or before November 6, the Sale Transaction shall have closed, Lender shall have received repayment in full of the Obligations (including any Pre-Petition Obligations then outstanding, except as Agent may otherwise agree with respect to the Specified Pre-Petition Obligations) and the DIP Credit Facility shall terminate. |

## <u>EXHIBIT 2</u>

**Budget**

# Soft Surroundings

**DIP BUDGET**

| | 1 forecast | 2 forecast | 3 forecast | 4 forecast | 5 forecast | 6 forecast | 7 forecast | 8 forecast | 9 forecast | |
|---|---|---|---|---|---|---|---|---|---|---|
| *Fiscal Week No.* | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | |
| *Fiscal Month* | September | | | October | | | | November | | |
| *Week Ending* | 9/16/23 | 9/23/23 | 9/30/23 | 10/7/23 | 10/14/23 | 10/21/23 | 10/28/23 | 11/4/23 | 11/11/23 | Total |
| **Total Receipts** | $3,255,550 | $3,066,362 | $3,359,987 | $2,754,081 | $3,831,713 | $3,250,520 | $2,990,264 | $3,761,022 | $3,907,855 | $30,177,353 |
| **Operating Disbursements** | | | | | | | | | | |
| Merchant Related | – | | – | | – | | – | | – | – |
| Freight & Customs | 294,085 | 648,774 | 264,986 | 195,488 | 374,027 | 571,114 | 208,938 | 262,261 | 275,632 | 3,095,305 |
| Sales Tax | 703,870 | | | | | 757,994 | | | 676,703 | 2,138,567 |
| Marketing | 1,341,433 | 1,578,700 | 1,001,502 | 351,115 | 417,638 | 52,296 | 128,833 | 525,646 | 307,100 | 5,704,262 |
| Payroll and Benefits | 58,143 | 1,195,023 | 46,143 | 1,097,398 | 60,518 | 1,072,227 | 48,518 | 1,072,227 | 48,518 | 4,698,716 |
| Rent & Other Leases | – | | | 1,170,202 | | | – | 1,119,020 | | 2,289,222 |
| Other Operating | 326,331 | 936,726 | 419,549 | 663,474 | 575,159 | 671,571 | 790,442 | 774,989 | 689,250 | 5,847,490 |
| Consulting Fee | 97,667 | 91,991 | 100,800 | 82,622 | 114,951 | 97,516 | 89,708 | 112,831 | 117,236 | 905,321 |
| Consulting Expenses | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 900,000 |
| **Total Operating Disbursements** | 2,921,529 | 4,551,214 | 1,932,979 | 3,660,299 | 1,642,293 | 3,322,718 | 1,366,438 | 3,966,974 | 2,214,439 | 25,578,883 |
| **Restructuring and Financing Disbursements** | | | | | | | | | | |
| 503(b)(9) Claims [1] | – | | – | | – | | – | | – | – |
| Professional Fees (Escrow Account Funding) | 427,778 | 327,778 | 425,278 | 390,278 | 390,278 | 890,278 | 237,778 | 202,778 | 202,778 | 3,495,000 |
| Shippers & Warehousemen | 100,000 | 100,000 | | | | | | | | 200,000 |
| Utility Deposits | 50,000 | | | | | | | | | 50,000 |
| Interest / Fees | 360,000 | – | – | 219,476 | – | – | – | 235,873 | – | 815,350 |
| **Total Restructuring Disbursements** | 937,778 | 427,778 | 425,278 | 609,754 | 390,278 | 890,278 | 237,778 | 438,651 | 202,778 | 4,560,350 |
| **Total Disbursements** | 3,859,307 | 4,978,992 | 2,358,257 | 4,270,053 | 2,032,571 | 4,212,996 | 1,604,216 | 4,405,625 | 2,417,217 | 30,139,233 |
| **Net Cash Flow** | (603,756) | (1,912,630) | 1,001,730 | (1,515,972) | 1,799,142 | (962,476) | 1,386,048 | (644,603) | 1,490,638 | 38,120 |
| | *est* | | | | | | | | | |
| **Beginning Book Cash Balance** | 200,195 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,195 |
| Net Cash Flow | (603,756) | (1,912,630) | 1,001,730 | (1,515,972) | 1,799,142 | (962,476) | 1,386,048 | (644,603) | 1,490,638 | 38,120 |
| Net Draw / (Paydown) | 603,561 | 1,912,630 | (1,001,730) | 1,515,972 | (1,799,142) | 962,476 | (1,386,048) | 644,603 | (1,490,638) | (38,315) |
| **Ending Book Cash Balance** | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 |
| **Beginning Loan Balance** | 14,700,000 | 15,303,561 | 17,216,192 | 16,214,461 | 17,730,434 | 15,931,292 | 16,893,768 | 15,507,720 | 16,152,323 | 14,700,000 |
| Draw | 3,859,112 | 4,978,992 | 2,358,257 | 4,270,053 | 2,032,571 | 4,212,996 | 1,604,216 | 4,405,625 | 2,417,217 | 30,139,038 |
| Paydown | (3,255,550) | (3,066,362) | (3,359,987) | (2,754,081) | (3,831,713) | (3,250,520) | (2,990,264) | (3,761,022) | (3,907,855) | (30,177,353) |
| **Ending Loan Balance** | $15,303,561 | $17,216,192 | $16,214,461 | $17,730,434 | $15,931,292 | $16,893,768 | $15,507,720 | $16,152,323 | $14,661,685 | $14,661,685 |
| AR and Inventory Collateral Availability | 18,627,162 | 18,206,193 | 17,114,644 | 16,536,514 | 15,852,222 | 14,934,899 | 14,199,608 | 13,771,321 | 12,947,997 | |
| less: Reserves | (272,000) | (272,000) | (272,000) | (272,000) | (272,000) | (272,000) | (272,000) | (272,000) | (272,000) | |
| **Adjusted Borrowing Base** | 18,355,162 | 17,934,193 | 16,842,644 | 16,264,514 | 15,580,222 | 14,662,899 | 13,927,608 | 13,499,321 | 12,675,997 | |
| Supplemental Collateral | – | – | – | 1,715,919 | 601,070 | 2,480,869 | 1,830,112 | 2,903,003 | 2,235,689 | |
| **Total Net Availability - ABL** | 18,355,162 | 17,934,193 | 16,842,644 | 17,980,434 | 16,181,292 | 17,143,768 | 15,757,720 | 16,402,323 | 14,911,685 | |
| Excess Availability - ABL | 3,051,600 | 718,002 | 628,183 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | |
| **Total Available Liquidity** | $3,251,600 | $918,002 | $828,183 | $450,000 | $450,000 | $450,000 | $450,000 | $450,000 | $450,000 | |

*Note:*
1  Pending Investigation post filing

9/10/2023